1    Geoff D. Biegler, SB #290040
     Biegler@fr.com
2    Robert M. Yeh, SB #286018
     RYeh@fr.com
3    Nancy L. Ly, SB #284991
     Ly@fr.com
4    Ryan L. Frei, SB #310722
     RFrei@fr.com
5    FISH & RICHARDSON P.C.
     12390 El Camino Real
6    San Diego, CA 92130
     Telephone: (858) 678-5070
7    Fax: (858) 678-5099

8    *[Additional counsel listed on following page]*

9    Attorneys for Plaintiffs

10

11            **UNITED STATES DISTRICT COURT**

12         **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 13   MICHAEL BLOOM, STEPHEN CHATZKY, TONY DIAZ, VALERIE GRISCHY, PENNY HELMS, BENJAMIN HERNANDEZ, DOUG HIGGINS, SUZONNE KEITH, DAVID WILSON, individually and on behalf of themselves and all others similarly situated, | Case No. __'17 CV2324 AJB NLS__ |
| | CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, RESTITUTION AND DAMAGES UNDER THE UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983), AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132), SECTION 504 OF THE REHABILITATION ACT (29 U.S.C.§ 794), THE UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983), THE U.S. AND CALIFORNIA CONSTITUTIONS, AND CALIFORNIA CIVIL CODE §52.1 |
|       Plaintiffs | |
|       vs. | |
| CITY OF SAN DIEGO; MAYOR KEVIN FAULCONER; CITY COUNCIL MEMBERS DAVID ALVAREZ, BARBARA BRY, CHRIS CATE, MYRTLE COLE, GEORGETTE GOMEZ, MARK KERSEY, SCOTT SHERMAN, CHRIS WARD & LORI ZAPF; SAN DIEGO POLICE DEPARTMENT; POLICE CHIEF SHELLEY ZIMMERMAN, in their official capacities only; | **JURY TRIAL DEMANDED** |
|       Defendants. | |

13–26 (as above)

27

28

                             Case No.

Maria Foscarinis (*Pro Hac Vice* to be filed)
mfoscarinis@nlchp.org
National Law Center on Homelessness and Poverty
2000 M Street, NW, Suite 210
Washington, DC 20036
Telephone: (202) 638-2835 x. 102
Fax: (202) 628-2737

Ann E. Menasche, SB # 74774
Ann.menasche@disabilityrightsca.org
Stuart Seaborn, SB# 198590
Stuart.seaborn@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1111 Sixth Avenue, Suite 200
San Diego, CA  92101
Telephone:  (619) 239-7861
Fax: (619) 239-7906

Robert Scott Dreher, SB #120527
scott@dreherlawfirm.com
Dreher Law Firm
350 Ash Street, Ste. 101
San Diego, CA 92101
Telephone: (619) 230-8828
Fax: (619) 687-0142

Manfred P. Muecke, SB # 222893
mmuecke@bffb.com
Patricia Syverson, SB # 203111
psyverson@bffb.com
Bonnett Fairbourn Friedman & Balint PC
600 West Broadway, #900
San Diego, CA 92101
Telephone: (619) 798-4292
Fax:  (602) 274-1199

Case No.

# INTRODUCTION

1.     In the midst of a severe housing crisis characterized by dramatically rising rents, a shrinking affordable housing supply, long waits for housing subsidies, scarcity of shelter beds, and a homeless population that has grown 23% in five years, the City of San Diego ("the City") is targeting its most vulnerable residents.  There are at least 817 unsheltered homeless residents in San Diego, many with disabilities, who seek shelter in their recreational vehicles ("RVs"), campers, or other vehicles.  For these people, their vehicles are their only reliable, safe shelter from the elements and only place to store their belongings.  Yet, even though there are no adequate alternatives, the City has repeatedly ticketed and harassed these individuals for seeking shelter in their vehicles or simply for owning vehicles and having nowhere else to park.  Specifically, the City has used its ordinance prohibiting RV parking from 2:00 AM to 6:00 AM, San Diego Muni. Code § 86.0139(a) ("the nighttime RV parking ordinance"), and its ordinance prohibiting vehicle habitation, San Diego Muni. Code § 86.0137(f) ("the vehicle habitation ordinance"), to target homeless vehicle owners, ticketing them and impounding their vehicles for unpaid tickets.  In addition, the City has threatened homeless vehicle owners with arrest and misdemeanor charges for illegal lodging.

2.     Even after being alerted to these issues, the City has refused to modify its policies to provide an opportunity for homeless individuals to park their vehicles legally on City streets or other public property, at least until affordable, accessible, and medically appropriate housing is made available to them.  While failing to provide any accommodation for homeless individuals, including those with disabilities, the City has created an exemption to the nighttime RV parking ordinance, via a permit system, for persons who have a physical address.  In other words, under certain circumstances, the City allows people who are not homeless to park their RVs overnight, but imposes penalties against those who are homeless for the same behavior.

3.     The City has carried out this discriminatory, cruel, punitive, and unconstitutional policy against homeless vehicle owners, many of whom have

disabilities, despite the fact that these individuals have nowhere else to go.  Sky-high rents and extremely low incomes, among other factors, have excluded these City residents from the housing market.  RV parks are often as costly as renting an apartment, and so are not viable options.  "Safe lots" that allow overnight parking for homeless individuals do not accept RVs and have far fewer spaces than the number of homeless persons with vehicles in San Diego.  The number of unsheltered homeless people far outnumbers available emergency shelter beds, which are generally filled and cannot accommodate the hundreds of people who are forced to seek shelter in their vehicles.  Moreover, emergency and temporary shelter beds are functionally unavailable to many homeless people with disabilities because the conditions in the shelter environment are not medically acceptable given those disabilities.  Homeless vehicle owners therefore do not have either a place to seek shelter in their vehicles legally in the City or the availability of adequate, accessible, and medically appropriate housing that they can afford.  In addition, homeless vehicle owners have no funds with which to pay the excessive fines associated with the nighttime RV parking and vehicle habitation citations without jeopardizing their ability to buy food, medicine, or other necessities.  As a result, homeless vehicle owners have had and are at risk of having their only shelter taken away by the City for unpaid tickets.

4.    The nighttime RV parking ordinance and vehicle habitation ordinance both violate numerous U.S. and State Constitutional rights, including the Eighth Amendment prohibition on Cruel and Unusual Punishment and the Fourteenth Amendment Substantive Due Process protections, including the prohibition on reckless endangerment; the Right to Equal Protection; and the Right to Travel.  The vehicle habitation ordinance is also so vague and ambiguously worded that neither homeless individuals nor anyone else can ascertain what is or is not prohibited or how to comply with the ordinance to avoid receiving a ticket or having their vehicle impounded.  In addition, enforcement of the ordinances discriminates against homeless vehicle owners based on disability in violation of the antidiscrimination protections of Title II of the

Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

5. Rather than adequately accommodating this homeless, largely disabled group of individuals and complying with statutory and constitutional requirements, the City has instead chosen to place the health, safety, and lives of homeless vehicle owners in further jeopardy, in the hope that the continuing and escalating harassment will force these residents simply to leave town.

6. Plaintiffs seek a Court order requiring that the City put an end to these harmful, discriminatory, and unconstitutional practices against this defenseless group of individuals.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant 28 U.S.C. § 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

8. Venue is proper in the Southern District of California because Defendants reside in the District and all events given rise to Plaintiffs' claims occurred in the District. The relief Plaintiffs seek is within this Court's power to grant.

## PARTIES

**A.    Plaintiffs**

9. Plaintiff MICHAEL BLOOM is 68 years-old and a life-long resident of the City of San Diego. Mr. Bloom previously worked as an electrician and carpenter but suffered several accidents that left him with a severely damaged arm and foot, and led to his suffering from hypoglycemia and severe depression. Because of these debilitating physical and mental health issues, Mr. Bloom has not been able to engage in gainful employment since his last accident in 1982. His sole source of income is

Social Security benefits, and he cannot afford market rents in San Diego. Even if Mr. Bloom were able to locate an open bed at an emergency or temporary shelter, which are generally full and cannot accommodate the hundreds of homeless people who currently seek shelter in their vehicles, it would be functionally unavailable to him because his physical disabilities require him to lie down frequently during the day and the overcrowding and lack of privacy would worsen his mental health condition. As a result, for the last ten years, his only available shelter has been his RV. Mr. Bloom is not able to park his RV in the existing City "safe lots" because the "safe lots" do not allow RVs. Despite this, and even though he has a disability placard on his vehicle, Mr. Bloom has received at least a dozen tickets for parking his RV at night on city streets, about five tickets for vehicle habitation, and has been threatened with arrest for vehicle habitation. When he has paid these tickets, Mr. Bloom has not had enough money to pay for food or gasoline. If Mr. Bloom does not pay the tickets, however, the City may impound his RV, which would be devastating for his mental and physical health and put him at far greater physical risk. It would also leave Mr. Bloom without the only form of shelter available to him. Mr. Bloom meets the definition of "chronically homeless" as defined by the regulations issued by the U.S. Department of Housing and Urban Development (HUD). 24 C.F.R. § 91.5(1). Mr. Bloom is also a qualified individual with disabilities within the meaning of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12102, and the Rehabilitation Act of 1973, 29 U.S.C. § 706(8).

10.    Plaintiff STEPHEN CHATZKY is 70 years old and resides in the City of San Diego with his domestic partner, Suzonne Keith, and her disabled adult daughter. Mr. Chatzky is a lawyer, but his Attention Deficit Disorder and memory problems have made it difficult for him practice law. As a result, since 2002, his sole source of income has been Social Security benefits, and he cannot afford market rents in San Diego. Even if Mr. Chatzky were able to locate an open bed at a temporary or emergency shelter, which are generally filled and cannot accommodate the hundreds of homeless

people forced to seek shelter in their vehicles, it would be functionally unavailable to him because shelter conditions would force the family to separate. A psychologist who evaluated Mr. Chatzky opined that if Mr. Chatzky were separated from his family, it would worsen his mental health condition. Additionally, Mr. Chatzky has asthma and sleep apnea and is prone to lung infections. Shelters typically reek of tobacco smoke, which make it difficult for him to breathe and put him at risk for lung infections. Because of these circumstances, the family has lived in an RV since 2008. The City of San Diego impounded the family's first RV for failure to pay tickets, including tickets for nighttime RV parking and vehicle habitation, even though the family had a disability placard on the vehicle at that time. After the impoundment, the family had no regular shelter, and they were forced to sleep cramped in a car for five months until they were able to obtain another RV through a family member's assistance. Because Mr. Chatzky and Ms. Keith live in an RV, they are unable to utilize existing City "safe lots" because "safe lots" do not accept RVs. As a result, Mr. Chatzky and Ms. Keith continue to receive tickets for parking their RV at night. Mr. Chatzky meets the definition of "chronically homeless" as defined by HUD regulations and is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.

11. Plaintiff SUZONNE KEITH is 68 years old and a resident of the City of San Diego. Ms. Keith has held a range of government jobs, including as an equal rights investigator, but her disabilities have made her unable to engage in gainful employment for the last 19 years. She has severe arthritis and edema that interfere with her ability to stand or walk, depression, and Post Traumatic Stress Disorder ("PTSD") from having survived domestic violence prior to meeting Mr. Chatzky, and debilitating migraines. Ms. Keith's sole source of income is a pension of $400 per month, and she cannot afford market rents in San Diego. As a result, Ms. Keith's only option for shelter has been to live in an RV with Mr. Chatzky and her daughter. After the couple's first RV was impounded for not paying parking tickets, the couple slept cramped in a car for five months. Because the police continue to ticket the couple, Ms. Keith is terrified

Case No.

that the City will also impound their second RV, which is the only form of shelter available to her.  Even if Ms. Keith were able to locate an open bed at a temporary or emergency shelter, which are generally filled and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because it would require that Ms. Keith be separated from Mr. Chatzky and her adult daughter, triggering her trauma symptoms and worsening her depression.  Additionally, the conditions of shelters, including the high noise level, triggers migraines for Ms. Keith.  When Ms. Keith is suffering from a debilitating migraine, she needs to rest in a private and dark space, which is usually not available at shelters.  Ms. Keith is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act and meets the definition of "chronically homeless" as defined by the HUD regulations.

12.    Plaintiff TONY DIAZ is 58 years old and a resident of the City of San Diego.  Mr. Diaz worked as a welder until 2011, when worsening pain and other symptoms of his anxiety disorder, diabetes, hypertension, severe respiratory problems, and bad knee and shoulder prevented him from working.  He also recently had major heart surgery.  Mr. Diaz has been homeless for approximately five years and owns a pick-up truck with a shell that serves as his only shelter and place to keep his belongings.  He has no regular income, and he cannot afford market rents in San Diego.  Mr. Diaz has received four vehicle habitation tickets, even though he spends nights parked at a local 7-Eleven store with the permission of the manager and does not sleep in his vehicle when it is parked on City property.  On August 25, 2016 at approximately 6:30 a.m., Mr. Diaz came out of a bathroom in a public park when a member of the San Diego Police Department issued him a vehicle habitation ticket.  Mr. Diaz explained to the officer that he had just arrived to go fishing and told the officer that he was disabled and had just had heart surgery.  The officer nonetheless issued the ticket and threatened to ticket him anytime he saw Mr. Diaz's vehicle.  The officer also threatened to have Mr. Diaz arrested for vehicle habitation.  Since that incident, police officers have

continued to harass and ticket Mr. Diaz under the vehicle habitation ordinance. Mr. Diaz has done his best to comply with the vehicle habitation ordinance by parking overnight on private property with the owner's permission but does not understand what he needs to do in order to stop the ticketing. Even if Mr. Diaz were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because the tobacco smoke, cleaning fluid odors, and lack of fresh air would aggravate his respiratory condition. Moreover, the crowded, noisy, and regimented environment of shelters would worsen his symptoms of anxiety. Mr. Diaz is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. He also meets the definition of "chronically homeless" as defined by HUD regulations.

13. Plaintiff VALERIE GRISCHY is 58 years old and a resident of the City of San Diego. Ms. Grischy was a licensed chiropractor and had a successful career, until she became disabled by a serious car accident in 2009. Since shortly after the accident, she has been unable to work due to severe back pain, depression, anxiety, and panic attacks stemming from a traumatic brain injury and PTSD. Ms. Grischy's sole source of income is Supplementary Security Income (SSI), and she cannot afford market rents in San Diego. Because she has not been able to afford housing, Ms. Grischy has been living in her RV since 2012. She has received tickets from the City of San Diego for vehicle habitation and nighttime RV parking even though she has a disability placard on the vehicle. Ms. Grischy has tried to find places to park, driving up to 30 miles a day, in an attempt to avoid being ticketed. Despite her efforts, Ms. Grischy continued to receive written warnings and tickets from police. Paying these parking tickets would be a severe financial hardship for her. The threat of ticketing also forced her to leave San Diego temporarily, which she considers her home, to avoid further ticketing. Even if Ms. Grischy were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds

Case No.

of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because her medical history and medical needs require that she live alone. Communal shelter life is simply untenable. The current City "safe lots" are not an option for Ms. Grischy because RVs are not allowed in those lots. Ms. Grischy is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. She also meets the definition of "chronically homeless" as defined by HUD regulations.

14.    Plaintiff PENNY "GRACE" HELMS is 58 years old and a resident of the City of San Diego. Ms. Helms supported herself throughout her 20s working as a waiter and dancer. At the age of 29, the long-term effects of chronic illnesses, and the physical and emotional trauma that she experienced as a child, became so debilitating that she had to stop working. Ms. Helms suffers from fibromyalgia; chronic fatigue syndrome; arthritis; six bulging disks; hypersensitivity and allergy to environmental pollutants such as cigarette smoke and perfume; and various neurological disorders including PTSD, hypervigilance, emotional hypersensitivity, and dissociative identity disorder. Over the past two decades, she has tried to earn a living by working as a house cleaner, dog groomer, among other jobs, whenever her disabilities permit. But none of that income has been steady or sufficient for her to support herself, and that income has only fallen over the years. Ms. Helms' main, and often the only, source of income for the past few years has been Social Security disability benefits. She cannot afford market rents in San Diego. Because of this, Ms. Helms had been forced to seek shelter in her RV. She has been threatened multiple times by police with ticketing for vehicle habitation and impoundment for living in her RV. She has also been threatened with arrest for encroachment near her RV. The threat of receiving citations she cannot afford to pay, impoundment, and arrest terrifies her and exacerbates her disabilities, including her hypervigilance. She has recently left San Diego for periods of weeks due to her fear of being ticketed, arrested, and having her RV impounded. Ms. Helms currently does not have a place in San Diego where she can safely park or seek shelter

in her RV.  Even if Ms. Helms were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because she cannot tolerate communal living given her myriad disabilities.  The current City "safe lots" are not an option for Ms. Helms because RVs are not allowed.  Ms. Helms is a qualified individual with disabilities within the meaning of the ADA, and the Rehabilitation Act.  She also meets the definition of "chronically homeless" as defined by HUD regulations.

15.    Plaintiff BENJAMIN HERNANDEZ is a 54-year-old man and a resident of the City of San Diego.  Mr. Hernandez was a stonemason and primary breadwinner for his family until he was involved in a pedestrian accident in 2015.  After the accident, the orthopedic impairments from his injuries, along with depression, left him unable to work.  Mr. Hernandez was only given a small, one-time disability award and does not receive ongoing disability benefits.  Though his wife works, her wages are extremely modest and insufficient to afford the high cost of housing in San Diego.  Their lack of funds has caused Mr. Hernandez and his wife to utilize their RV as their primary shelter for the past year.  On July 26, 2017, however, the City impounded their RV for unpaid nighttime RV parking citations.  Since they cannot afford to pay the citations in order to retrieve their RV from impoundment, the couple is now forced to use his truck as shelter from the elements.  Now in his truck, Mr. Hernandez remains at risk for vehicle habitation tickets.  Even if Mr. Hernandez were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because it would force him to separate from his wife, significantly worsening his depression.  Mr. Hernandez is a qualified individual with disabilities within the meaning of the Rehabilitation Act, the ADA, and California law. He also meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

Case No.

16.    Plaintiff DOUG HIGGINS is 68 years old, a resident of the City of San Diego, and a veteran who was honorably discharged from the U.S. Army.  He had a successful career as a car dealer until his symptoms of anxiety and depression, along with a painful back condition, worsened in 2009.  His bad back, which is aggravated by stress, keeps him from standing, sitting, or walking for any length of time.  His sole source of income is Social Security benefits, and he cannot afford to pay market rent in San Diego.  Even if Mr. Higgins were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because it would exacerbate his mental health symptoms.  For the past three years, his RV has been the only shelter available to him.  Mr. Higgins has received tickets both for vehicle habitation and for nighttime RV parking, but paying the tickets jeopardizes his ability to pay for food and other necessities.  The threat of ticketing and fear of losing his RV to impoundment increases his stress and exacerbates the symptoms of his disabilities.  Police have told him to leave the City if he does not like the ticketing, but he considers San Diego to be his home.  Mr. Higgins is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.  Mr. Higgins also meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

17.    Plaintiff DAVID WILSON is 47 years old and a resident of the City of San Diego.  Mr. Wilson previously worked as an actor, taxi driver, and security guard.  Mr. Wilson has a range of conditions arising from a car accident, including compression of the spine, peripheral neuropathy, edema in both feet and ankles (requiring him to elevate his feet), depression, PTSD, Social Anxiety Disorder, an eating disorder, and porphyria (a skin condition that makes him highly susceptible to infection).  Mr. Wilson also suffers from asthma, hypersomnia (a condition in which a person has trouble staying awake during the day), and social anxiety.  Because of these conditions, Mr. Wilson had to stop working in 1999.  His sole source of income is SSI,

Case No.

and he cannot afford to pay market rent in San Diego. In 2013, Mr. Wilson purchased an RV, giving him a place to lie down and take shelter from the elements. Mr. Wilson has received numerous tickets from the City of San Diego, including for vehicle habitation and nighttime RV parking, and has been threatened with arrest for vehicle habitation. This happened despite his having a disabled placard on the vehicle. In an attempt to save the little money he has to pay the tickets, Mr. Wilson has resorted to eating out of the trash. Ultimately unable to pay all the tickets, Mr. Wilson sold his RV in December 2015 to avoid imminent impoundment and purchased a truck with the proceeds. Deprived of his RV, he began sleeping outside or cramped in the cab of the truck. Without a proper place to lie down and elevate his feet, and forced to sleep outside or in his truck, Mr. Wilson ended up hospitalized soon after losing his RV to impoundment. Even if Mr. Wilson were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because the crowded and noisy shelter environment would aggravate Mr. Wilson's mental health conditions and, due to his vulnerability to infection and asthma, put his physical condition at further risk. Police have also continued to issue Mr. Wilson warnings and threatened him with further ticketing for vehicle habitation in his truck, which is the only reasonable form of shelter available to him. Mr. Wilson is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. Mr. Wilson also meets the definition of "chronically homeless" as defined by HUD regulations.

18.    The term "Named Plaintiffs" or "Plaintiffs" refers to all the individual Plaintiffs named in this section.

**B.    Defendants**

19.    Defendant CITY OF SAN DIEGO is now, and at all times mentioned in this Complaint, was a local government agency and subdivision of the State of California. Defendant CITY OF SAN DIEGO, through its agents the Mayor, City

Council, City Attorney, Parking Enforcement, Police Department, and the Police Chief undertakes to cite Plaintiffs and Class members for nighttime RV parking and for vehicle habitation.  Defendant CITY OF SAN DIEGO also demands exorbitant penalties that Plaintiffs and Class members cannot afford to pay, impounds and/or threatens to impound their RVs or other vehicles, and threatens them with arrest, all the while refusing to provide reasonable modifications of these policies based on Plaintiffs' and Class members' disabilities.  Defendant CITY OF SAN DIEGO implements the ticketing and impoundment of Plaintiffs' and Class members' vehicles under the nighttime RV parking ordinance and the vehicle habitation ordinance even though Plaintiffs' and Class Members' vehicles are the only shelter from the elements available to them and the only secure place they have to keep their belongings.  In addition, the Defendant CITY OF SAN DIEGO has threatened Plaintiffs and Class members with arrest and misdemeanor charges for illegal lodging.

20.    Defendant KEVIN FAULCONER is the Mayor of the City of San Diego and sued in his official capacity only as an elected official responsible in whole or in part for designing and/or carrying out the above-described anti-homeless enforcement policies against Plaintiffs and Class members.

21.    Defendants DAVID ALVAREZ, BARBARA BRY, CHRIS CATE, MYRTLE COLE, GEORGETTE GOMEZ, MARK KERSE, SCOTT SHERMAN, CHRIS WARD AND LORI ZAPF, are members of the San Diego City Council and sued in their official capacities only as elected officials who are responsible in whole or in part for designing and/or implementing the anti-homeless enforcement policies challenged herein.

22.    Defendant CITY OF SAN DIEGO POLICE DEPARTMENT is the City's law enforcement department, which is involved in enforcement of the City's parking and habitation regulations, including the nighttime RV parking ordinance and the vehicle habitation ordinance at issue in this Complaint.

23.    Defendant SHELLEY ZIMMERMAN is the duly appointed Chief of

Police for the City of San Diego that is authorized to appoint, direct, and supervise the personnel of the Police Department and exercises all powers and duties provided by general laws or by ordinances of the City Council, including through the San Diego Police Department's Parking Enforcement Unit.  Ms. Zimmerman is sued only in her official capacity.

## CLASS ALLEGATIONS

24.     Plaintiffs bring this action against Defendants on their own behalf and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

25.     The main class, referred to as the "Homeless Ticketing Class" or "Main Class" is defined as:

> All homeless persons who have been cited and/or subject to citation by the City of San Diego pursuant to San Diego Muni. Code §§ 86.0137(f); San Diego Muni. Code § 86.0139(a); and/or are at risk of arrest for illegal lodging.

26.     Plaintiffs also bring this action on behalf of a subclass, referred to as the "Disability Subclass" or "Subclass," which is defined as:

> All Class members who have a "disability" as defined under the ADA, 42 U.S.C. § 12102.

27.     All members of the Subclass are also members of the Main Class.  The terms "Class" and "Classes" refers to both the Main Class and the Subclass collectively.

28.     Plaintiffs reserve the right to amend or modify the Class definitions in connection with a motion for class certification and/or with the result of discovery.

### Numerosity

#### Main Class

29.     Plaintiffs do not know the exact size or identities of the Class.  However, Plaintiffs believe that the Class encompasses a minimum of several hundred homeless individuals who are dispersed geographically throughout the City of San Diego as well

Case No.

as California and neighboring states. (*2017 We All Count Results*, REGIONAL TASK FORCE ON THE HOMELESS (2017), http://www.rtfhsd.org/wp-content/uploads/2017/07/2017-PITC-Results-Powerpoint.pdf.) Therefore, the members of the Class are so numerous that individual joinder of all members is impracticable.

30.    All members of the Class are subject to Defendants' policies and practice in enforcing the nighttime RV parking ordinance /or the vehicle habitation ordinance. The Class is united in its interests with respect to proof of Defendants' conduct, and the effects caused by Defendants' actions.

Subclass

31.    Plaintiffs do not know the exact size or identities of the Disability Subclass. Plaintiffs believe that the Subclass consists of hundreds of homeless individuals based on the high number of persons with disabilities found in surveys of the homeless population in San Diego. See ¶ 43, *infra*.

32.    All members of the Sub-Class are subject to Defendants' discriminatory policies and practice in enforcing the nighttime RV parking ordinance and/or the vehicle habitation ordinance. The Class is united in its interests with respect to proof of Defendants' discriminatory conduct, and the effects caused by Defendants' actions.

**Predominance of Common Issues**

Main Class

33.    The questions of law and fact common to members of the Class predominate over questions that may affect individual Class members. Such common questions of law and fact include but are not limited to the following:

(i)    whether Defendants' enforcement of San Diego Muni. Code §§ 86.0137(f) and 86.0139(a) has and continues to violate 42 U.S.C. § 1983 by infringing upon Named Plaintiffs' and Class members' constitutional rights, including by recklessly endangering Plaintiffs and Class members, and by violating their right to travel, right to equal protection, and right to be free from cruel and unusual punishment.

(ii)    whether Named Plaintiffs and other Class members are at risk of arrest for illegal lodging under Defendants' existing policies because they are homeless and need to live in their vehicles;

(iii)    whether Named Plaintiffs and other Class members are at risk that their RV, camper or other vehicle will be impounded by the City for unpaid tickets along with their personal belongings seized because they are homeless and need to use their vehicles as shelter;

(iv)    whether Named Plaintiffs and the other Class members are entitled to equitable relief, including system-wide policy changes to address the constitutional and statutory violations detailed in this Complaint.

Subclass

(i)    whether Defendants' policies, including their policies regarding enforcement of San Diego Muni. Code §§ 86.0137(f) and 86.0139(a) discriminate on the basis of disability; and

(ii)    whether Defendants have failed or refused to provide reasonable modifications of their policies as required under the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 749.

**Typicality**

Main Class

34.    Named Plaintiffs are asserting claims typical of the claims of the entire class of affected persons described above and do not conflict with the interests of any other members of the Classes.  Named Plaintiffs and Class members have been injured by the same wrongful policies, practices, and conduct of Defendants.  Named Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class members and are based on the same legal theories.

Subclass

35.    Named Plaintiffs are all qualified individuals with disabilities and assert claims typical of the claims of the entire Disability Subclass.  The interests of the

Named Plaintiffs do not conflict with those of the Disability Subclass. All have been injured by the same wrongful policies, practices, and conduct of Defendants, which discriminate on the basis of disability. Named Plaintiffs' claims arise from the same practices and conduct that give rise of all Subclass members and are based on the same legal theories.

### Adequate Representation

36.    Named Plaintiffs will fairly and adequately represent the interests of the Main Class and the Subclass, and they have no interests antagonistic to those of the Classes. Indeed, Named Plaintiffs' interests are aligned with those of the Class members. Named Plaintiffs have retained lawyers who are competent and experienced in class action litigation.

### Superiority

37.    A class action is preferable and superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of claims by many Class members who could not afford to individually litigate their claims or vindicate their rights against the government. There are no difficulties likely to be encountered in the management of this case that might preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this matter.

### COMMON FACTUAL ALLEGATIONS

Plaintiffs allege the following common facts on information and belief.

### San Diego's Lack of Affordable Housing Has Created a Homelessness Crisis

38.    San Diego now has the fourth largest homeless population in the country. (*The 2016 Annual Homeless Assessment Report to Congress,* DEPT. OF HOUSING AND URBAN DEV. 29 (Nov. 2016), https://www.hudexchange.info/resources/documents/2016-AHAR-Part-1.pdf.) Based on a January 2017 survey, the Regional Task Force on the Homeless found that there are 5,619 homeless people in the City of San Diego, an increase of 10% since 2016. (*2017 We All Count Results, supra at 16.*) The

Regional Task Force further found that 3,231 of these 5,619 homeless individuals are unsheltered and living in places not meant for human habitation, an 18% increase from the previous year.  According to the same survey, San Diego County now has a homeless population of 9,116, more than double the approximately 4,000 shelter beds available in the County.  The results of this crisis have been seen in the rapidly expanding tent encampments in downtown San Diego that have more than doubled in size in the past year.

39.    The homelessness crisis in San Diego is directly linked to the lack of affordable housing.  As of 2014, the median cost of an efficiency studio apartment in San Diego was 110% of the amount of an SSI check, which is less than $900/month. (Emily Cooper et al., *Priced Out in 2014: The Housing Crisis for People with Disabilities*, TECHNICAL ASSISTANCE COLLABORATIVE (June 2015), http://www.tacinc. org/media/52012/Priced%20Out%20in%202014.pdf.)    Since then, rents have continued to rise.  The San Diego Housing Federation found that there is a shortfall of 135,749 homes affordable to low income San Diegans, with rents up 32% in the last decade.  Average rent and utilities for a two-bedroom apartment has climbed to $1618 a month.  (Stephen Russell, *The Affordable Housing Crisis in San Diego: How Do We Meet the Need?,* SAN DIEGO HOUSING FEDERATION (January 25, 2017), http://docs. sandiego.gov/councilcomm_agendas_attach/2017/sglu_170125_4c.pdf.)  In addition, the demand for housing subsidies far exceeds the supply.  There is a 10 to 12 year waiting list for a Section 8 housing voucher, with over 60,000 persons on the waiting list.  The small amount of existing affordable or subsidized housing also has long waiting lists.

40.    The Regional Task Force on Homelessness found that the homeless population in the City of San Diego included 817 people living in vehicles.  (*2017 We All Count Results, supra at 16.*)  These individuals have no shelter available to them other than in their vehicles.  RV owners without physical addresses have no legal place to park their RVs at night.  The few "safe lots" established in San Diego only serve a

1  small portion of people with vehicles who are homeless, prioritize families with small

2  children, and exclude RVs.

3      41.   RV parks in San Diego charge high rents.  Monthly rentals in RV parks in

4  the City of San Diego range from a low of $699 per month to a high of $1950 per

5  month depending on the park and the time of year, which is unaffordable to Plaintiffs

6  and Class members.  Moreover, many RV parks have maximum stay limits and limit

7  or exclude older RVs.

8      **People with Disabilities Have Been Severely and Disproportionately**

9                                **Harmed by the Crisis**

10      42.   There is also a strong link between homelessness and disability.  The U.S.

11  Department of Housing and Urban Development (HUD) defines "chronically

12  homeless" as an individual with a disability who has been homeless continuously for

13  at least 12 months or on at least four separate occasions in the last three years.  24

14  C.F.R. § 91.5(1).  A person is deemed homeless if he or she lacks a fixed, regular, and

15  adequate nighttime residence.  This includes persons who use RVs or other vehicles

16  for other than temporary living quarters for recreational use. 42 U.S.C. § 11302(a)(1);

17  24 C.F.R. § 3282.8(g).  The Regional Task Force found that 31% of the City's homeless

18  population was "chronically homeless."  (*2017 We All Count Results, supra at 16*.)

19      43.   In San Diego, a high number of homeless individuals have disabilities.

20  The Regional Task Force found that 39% of homeless people in San Diego reported

21  mental health disabilities and 40% reported a physical disability.  Some surveys have

22  found even higher rates of disability.  For example, of the 1,145 persons attending a

23  one-day resource fair for the homeless in the City, 60.2% reported a long lasting

24  medical condition and 49.5% reported having a mental illness.  San Diego Housing

25  Commission, Project Homeless Connection Report, April 15, 2015.(*Project Homeless*

26  *Connect Report*, SAN DIEGO HOUSING COMMISSION (April 15, 2015), http://

27  www.sdhc.org/uploadedFiles/Housing_Innovations/Project_Homeless_Connect/

28  2015Project%20Homeless%20Connect%20Report_04.15.15.pdf.)

44.     The primary reason for the strong link between disability and homelessness is an economic one.   Homeless individuals with disabilities are not normally homeless as a matter of choice.   Rather, many people with disabilities including Named Plaintiffs and Class members are unable to work due to their disabilities and therefore must rely on a rapidly shrinking social safety net that has not kept up with rising San Diego rents.

45.     Living on the streets is dangerous, especially for women, seniors, and people with disabilities.   In the fiscal year ending September 30, 2017, 117 homeless people died on the streets of San Diego, double the figure from two years ago.   Daniel Wheaton, *Homeless Deaths Have Doubled Over Two Years,* SAN DIEGO UNION TRIB. (Nov. 28, 2016 2:00 PM), http://www.sandiegouniontribune.com/news/data-watch/sd-me-homeless-deaths-20161128-story.html.)   Homeless adults age 50 and older also have rates of chronic illness and geriatric conditions similar to or higher than those of adults living in housing that are 15 to 20 years older.   Jennifer Goldberg, et al., "How to Prevent and End Homelessness Among Older Adults."   (Jennifer Goldberg et al., *How to Prevent and End Homelessness Among Older Adults*, JUSTICE IN AGING (April 2016),       http://www.justiceinaging.org/wp-content/uploads/2016/04/Homelessness-Older-Adults.pdf.)

46.     The City's current Hepatitis A epidemic highlights the health dangers, both to homeless individuals and to others, associated with living on the streets without access to shelter and sanitation.   The Hepatitis A outbreak has already resulted in at least twenty deaths.

## Plaintiffs and Class Members Have No Reasonable Option for Shelter Other Than Their RVs or Other Vehicles

47.     Sheltering oneself is not voluntary conduct.   It is a basic human need.   It is harmless.   And it is an act integral to the status of homelessness.   For Named Plaintiffs and Class members fortunate enough to have RVs or other vehicles, their only reasonable option is to utilize the rudimentary shelter provided by their vehicles

19          Case No.

until permanent, accessible, and medically appropriate housing that they can afford, becomes available.

48.    Named Plaintiffs and Class members do not have any reasonably accessible places in the City to seek shelter in their vehicles or to park their RVs legally at night.  As explained above, RV parks in San Diego are generally unaffordable to Plaintiffs and Class members.  Dreams of Change operates a "Safe Parking Program," which provides a few places to park vehicles at night.  As of mid-October 2017, Dreams of Changes operates three such lots in the City.  However, there are currently only 150 parking spaces available, a fraction of the number of unsheltered homeless people with vehicles.  The Program has frequently had long waiting lists for admission. RVs are not accepted.  In the absence of permanent housing options, all participants are required to sign up for so-called transitional housing programs that provide only temporary or short-term shelter, and are often inaccessible and/or medically unacceptable to Plaintiffs and to Disability Subclass members.

49.    There is also an insufficient number of temporary shelter beds available in the City as compared to the unsheltered homeless population forced to seek shelter in their vehicles.  There are hundreds more unsheltered homeless people forced to seek shelter in their vehicles than available emergency shelter beds, even when accounting for seasonal and overflow spaces.

50.    Even if a homeless person is able to identify an available bed in a temporary or emergency shelter, the shelter bed may be functionally unavailable to that person.  Emergency and temporary shelter beds and transitional housing programs are functionally unavailable to people with disabilities because those types of living arrangements are likely to aggravate their mental health and/or physical conditions. Many shelters and transitional housing programs in San Diego have an overcrowded congregate living environment, are noisy, have a complete lack of privacy, often lack opportunity to lie down during the day, present an increased risk of infection, may have strong odors from smoke and chemical cleaning products that can aggravate respiratory

Case No.

1     disabilities, and present the risk of criminal activity. In addition, many shelters only

2     take single people, thereby separating family members and causing additional trauma.

3         51.     Temporary and emergency shelters and most transitional housing

4     programs also do not provide a real solution for Named Plaintiffs or Class members.

5     Even if they were to enter a temporary or emergency shelter or be admitted into a

6     transitional housing program, Named Plaintiffs and Class members with RVs would

7     still not have anywhere to park their RVs legally at night and would continue to be at

8     risk of ticketing under the nighttime RV parking ordinance. Moreover, because the

9     shelter provided is only temporary with strict time limits, and in the absence of

10     permanent affordable housing alternatives, even individuals who are able to use the

11     shelter system are often condemned to spending at least some time on the streets, with

12     all the associated health and safety risks.

13         52.     Thus, under current conditions, there are no reasonable alternatives for

14     Named Plaintiffs and Class members other than utilizing their RVs or other vehicles.

15                 **City Ordinances Punish Homeless Individuals with Vehicles**

16         53.     The City's "Prohibition of Use of Streets for Storage, Service or Sale of

17     Vehicles or For Habitation" ordinance, San Diego Muni. Code § 86.0137(f), provides:

18     "It is unlawful for any person to use a vehicle while it is parked or standing on any

19     streets as either temporary or permanent living quarters, abode, or place of habitation."

20     The terms "temporary or permanent living quarters, abode, or place of habitation" are

21     not defined. A ticket for vehicle habitation is punishable as an infraction by a fine of

22     $40 plus a $12.50 surcharge and doubles if not paid in 21 days.

23         54.     The City's "Prohibition of Parking of Oversized, Non-Motorized and

24     Recreational Vehicles" ordinance, San Diego Muni. Code § 86.0139(a), provides in

25     relevant part: "Except as provided in section 86.0140 or otherwise expressly provided

26     to the contrary herein, or unless such parking or standing is authorized by the City

27     Manager and appropriate sign permitting such parking or standing are posted: (a) it is

28     unlawful for any person to park or leave standing upon any public street, park road or

1    park parking lot, any oversized, non-motorized or recreational vehicle between the
2    hours of 2:00 a.m. and 6:00 a.m." A ticket for nighttime RV parking is punishable as
3    an infraction by a fine of $100 plus a $12.50 surcharge and doubles if not paid in 21
4    days.

5        55.    In addition to fines, there is the potential for other serious consequences
6    for violating either of these ordinances. A vehicle can be removed or impounded by
7    the City when it has five or more unpaid parking violations. Cal. Veh. Code § 22651.
8    In addition, the City may notify the Department of Motor Vehicles (DMV) and the
9    DMV will not renew the registration until the penalties are paid. Cal. Veh. Code
10    §§ 4760 and 40229(a).

11        56.    Though it has made no exceptions to either of these ordinances on the
12    basis of homelessness or disability, the City has created an exception to its nighttime
13    RV parking ordinance via a permit process that allows for temporary overnight parking
14    of RVs on public streets for a cumulative total of up to 72 days in a given year. San
15    Diego Muni. Code § 86.0143. Such permits are only available for people with physical
16    addresses, thereby excluding the persons who live in their vehicles, including Named
17    Plaintiffs and Class members. *Id.* Named Plaintiffs and Class members are therefore
18    left with no options anywhere in the City to park their RVs at night whether or not they
19    are able to access a shelter bed.

20        57.    On information and belief, the City enacted the nighttime RV parking
21    ordinance in 2013 for the primary purpose of removing homeless RV owners from the
22    community. The City enacted the ordinance in large part due to the difficulty the City
23    was having proving that such homeless persons are in violation of the existing vehicle
24    habitation ordinance, and due to problems the City had experienced enforcing the
25    ordinance prohibiting parking a vehicle in excess of 72 consecutive hours. San Diego
26    Muni. Code § 86.0118.

27        58.    The Report from the City Council's Land Use & Housing Committee in
28    support of the nighttime RV parking ordinance declared that "in many cases an

occupant is living illegally in vehicle" and "current enforcement tools are time consuming and unproductive (e.g. marking tires, knocking on vehicle doors)." (*Neighborhood Parking Protection and Public Safety Ordinance*, LAND USE & HOUSING COMMITTEE (March 27, 2013), http://docs.sandiego.gov/ councilcomm_agendas_attach/2013/LUH_130327_4ppt.pdf.)   At a subsequent Mission Beach Town Council meeting, Julio DeGuzman from the San Diego City Attorney's office responded to complaints regarding an increasing number of "transients" with RVs, by reassuring the attendees that his office "works on removing the homeless from our community." (*Minutes of General Membership Meeting*, MISSION BEACH TOWN COUNCIL (Nov. 13, 2013), http://www.missionbeachtc.com/ uploads/5/0/0/3/50033147/mbtc_minutes_general_mtg_nov.13.2013.pdf.)

59.   Defendants have had and continue to have a policy and practice of utilizing these ordinances to issue and/or threaten to issue parking tickets to homeless vehicle owners, including to individuals with disability placards or special disabled license plates issued by the State of California prominently displayed on their vehicles, to impose exorbitant penalties, and to impound their vehicles for failure to pay the penalties.   Defendants have carried out this policy even though they knew or reasonably should have known that the majority of the "transients" being targeted for ticketing have a disability and/or have no other reasonable option for shelter besides their vehicles.   San Diego police officers and other agents and employees of Defendants knew or reasonably should have known that many of the individuals receiving these tickets have disabilities due to the fact that disability placards are commonly displayed on the vehicles; and even in the absence of a disability placard, the officers may have had an opportunity to observe or interact with the persons being ticketed, who either had an obvious disability or voluntarily disclosed the disability to the officer.

60.   State law considers a person guilty of Disorderly Conduct, a misdemeanor, if the person "lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the

possession or in control of it."  Cal. Penal Code § 647(e).  Violation of the statute carries a maximum penalty of six months in jail and a $500 fine.  The language of the statute makes clear that the City has the authority to grant permission to persons lodging in vehicles to stay on public property and therefore such arrests or threats of arrest are purely discretionary.

### **The City Has Refused to Modify Its Discriminatory Policies**

61.    On March 30, 2017, seven of the Plaintiffs—Michael Bloom, Stephen Chatzky, Valerie Grischy, Penny Helms, Doug Higgins, Suzonne Keith, and David Wilson—acting through their attorneys, delivered to the office of the City Attorney a written request for a reasonable modification of the City's ticketing policies pursuant to the provisions of Title II of the ADA.  The reasonable modification would allow them and other homeless RV owners with disabilities to continue to live in San Diego and fully utilize their RVs, including at night without ticketing and harassment.  The request included supporting evidence documenting each of the individual's disability-related need to utilize their RVs.

62.    Plaintiffs are aware of multiple parking lots under City control that are empty at night, and that could be used by Named Plaintiffs and Class members for nighttime parking of their RVs.  The use of these lots would not infringe on residential parking or otherwise inconvenience other City residents.

63.    In response to Plaintiffs' reasonable modification request, the City Attorney's office held one meeting with Plaintiffs' counsel on May 9, 2017.  Over the next two months, and despite the urgency of this matter to Plaintiffs' health and safety, the City did not take or propose any actions to address Plaintiffs' concerns.  The City, while claiming an interest in seeking a resolution, continued to ticket homeless RV owners and to impound their vehicles including those with disabilities.  The City's actions showed an unwillingness to make reasonable modifications to its nighttime RV parking and vehicle habitation ordinances.

64.    On July 8, 2017, Plaintiffs requested that the City temporarily halt

enforcement of San Diego Muni. Code §§ 86.0139(a) and 86.0137(f) to stop ticketing homeless RV owners and impounding their RV's pending a final resolution of the matter. The City again stalled, waiting until August 23, 2017, before telling Plaintiffs that it would not agree to halt enforcement of these ordinances temporarily. Because of the continued harm being caused to Named Plaintiffs and Class members, Plaintiffs have no choice now but to file this Complaint.

## CLAIMS

## FIRST CAUSE OF ACTION

### Violation of Substantive Due Process—Reckless Endangerment
### (Fourteenth Amendment; 42 U.S.C. § 1983)

65.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.    Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir. 1989).

67.    Defendants have acted and continue to act affirmatively as described herein to place Plaintiffs and Class members in a highly dangerous situation that they would not otherwise face, threatening Plaintiffs' and Class members' health and safety, risking serious exacerbations of their disabilities, and putting their lives at risk.

68.    Defendants have acted affirmatively by citing Plaintiffs and Class members for parking and vehicle habitation violations that they cannot reasonably avoid, thereby forcing Plaintiffs and Class members to attempt to pay more than they can afford on exorbitant fines. Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication, or other necessities. And when they can no longer afford the fines, they lose the only form of shelter available to them—their RV or vehicle—through impoundment. Without shelter, Plaintiffs and Class members face the dangers described herein of living on the streets

without shelter.

69.    In the absence of Defendants' affirmative actions, Plaintiffs and Class members would not face these highly dangerous situations.   Plaintiffs knew or reasonably should have known that their actions—up to and including taking away Defendants' and Class members' only form of shelter—would create these threats to Defendants' and Class members' health and safety.

70.    Defendants acted with reckless disregard or deliberate indifference to the dangers—malnourishment, illness, and/or lack of shelter—they were creating for Plaintiffs and Class members by issuing and/or threatening to issue nighttime RV parking and vehicle habitation citations and impounding RVs and other vehicles. Defendants also knew or reasonably should have known that the Named Plaintiffs and many Class members have disabilities, are chronically homeless, and have no other viable options for shelter.  Defendants' actions show a reckless disregard or deliberate indifference to the health, safety and well-being of Plaintiffs and Class members, in violation of Plaintiffs' and Class members' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.  *Wood*, 875 F. 2d at 583.

71.    As a result of Defendants' actions, Named Plaintiffs' health and safety were placed in grave danger in violation of the Fourteenth Amendment.  Named Plaintiffs were injured and damaged in that they were forced to bear the risks and medical costs created by these acts.  In addition to that cost, the Named Plaintiffs suffered emotional and mental distress as well as humiliation because of the danger created by Defendants' unlawful actions.  Defendants' unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress.

72.    An actual controversy exists between Plaintiffs and Class members on the one hand, and Defendants on the other, as to whether Defendants have violated and/or are imminently threatening to violate 42 U.S.C. § 1983.

73.    Plaintiffs and Class members have no adequate remedy at law for the

Case No.

violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief, including restitution for fines and assessments collected and vehicles impounded by Defendants.  Plaintiffs are also entitled to attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Violation of Cruel and Unusual Punishment

### (Eighth and Fourteenth Amendments; 42 U.S.C. § 1983)

74.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.    The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

76.    Defendants' practice and policy of issuing tickets and threats of tickets for nighttime RV parking and vehicle habitation to Plaintiffs and Class members, impounding their RVs and vehicles as a result of those offenses, and threats of arrest for vehicle habitation violates the Eighth Amendment's prohibition on cruel and unusual punishment because it constitutes a punishment that is disproportionate to the severity of the "crime" of violating the nighttime RV parking and vehicle habitation ordinances or of lodging in one's vehicle on City streets.  *See Solem v. Helm*, 463 U.S. 277 (1983).

77.    The punishments inflicted by Defendants for violation of the ordinances in question force Named Plaintiffs and Class members to attempt to pay more than they can afford on exorbitant fines.  Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication or other necessities. And when they can no longer afford the fines, they lose the only form of shelter available to them—their RV or vehicle—through impoundment.  Without shelter, Plaintiffs and Class members face the dangers described herein of living on the streets without shelter.

78.    These punishments grossly outweigh any interest on the part of

Defendants in preventing Plaintiffs and Class members from parking on city streets at certain times of the day and/or seeking shelter in their vehicles.

79.   For Named Plaintiffs and Disability Subclass members, Defendants' practice and policy also violates the Eighth Amendment's prohibition on cruel and unusual punishment because it punishes Named Plaintiffs and Disability Subclass members for being homeless.  By punishing the act of sheltering oneself in a vehicle when there are no other reasonable alternatives, the City effectively punishes the status of homelessness.  Defendants infringe Plaintiffs' and Subclass members' rights by issuing tickets and threats of tickets for nighttime RV parking and vehicle habitation, as well as by impounding RVs and vehicles, and threatening arrest for vehicle habitation.  *See Robinson v. California*, 370 U.S. 660 (1962); *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated after settlement*, 505 F.3d 1006 (9th Cir. 2007).

80.   Named Plaintiffs and Disability Subclass members are involuntarily homeless.  They are homeless because their disabilities led to their unemployment and poverty, and because the City lacks affordable housing and accessible, adequate, and available shelters.  They cannot reasonably forego sheltering themselves, as sheltering oneself is a basic human need.  It is harmless.  And it is an act integral to the status of homelessness.  Until permanent, affordable, and accessible housing is available to them, their RVs or other vehicles are their only option for meeting their basic human need for shelter.

81.   As a result of Defendants inflicting cruel and unusual punishment under color of law in violation of the Eighth and Fourteenth Amendments, the Named Plaintiffs were injured and damaged in that they were forced to pay exorbitant fines they could not afford to pay, and/or were deprived of the use of their only available shelter—their RVs or other vehicles—and were forced to bear the cost of finding and securing whatever other accommodations they could obtain.  In addition to that cost, the Named Plaintiffs suffered emotional and mental distress as well as humiliation

because of this violation of their rights. Defendants' unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress. Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION

**Violation of Substantive Due Process—Void for Vagueness**

**(Fourteenth Amendment; 42 U.S.C. § 1983)**

82. Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83. The Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

84. In order to satisfy the Due Process Clause, an ordinance must be sufficiently definite to provide adequate notice of the conduct proscribed and provide sufficient guidelines for the police so that arbitrary and discriminatory enforcement does not occur. *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1106-1107 (1995).

85. San Diego's vehicle habitation ordinance does not satisfy the requirements of the Due Process Clause. As written, the vehicle habitation ordinance makes unlawful the use of a vehicle parked or standing on the street as "either temporary or permanent living quarters, abode, or place of habitation." None of the terms used—"temporary living quarters," "permanent living quarters," "abode" or "place of habitation"—are defined anywhere in the ordinance.

86. The City's vehicle habitation ordinance fails to provide adequate notice and sufficient guidance, which would allow an individual to ascertain beyond mere speculation as to how one uses a parked or standing vehicle as "either temporary or permanent living quarters, abode, or place of habitation." The ordinance therefore fails "to draw a clear line between innocent and criminal conduct," *Desertrain v. City of Los Angeles,* 754 F. 3d 1147, 1156 (9th Cir. 2014), and invites selective enforcement against

people who are homeless, many of whom have disabilities. As detailed above, Named Plaintiffs and Class members have attempted to comply with the vehicle habitation ordinance but have nonetheless been ticketed under its vague and overbroad reach.

87. The vehicle habitation ordinance should therefore be declared unconstitutionally vague both on its face and as applied against Named Plaintiffs and Class members in violation of substantive due process protections under the Fourteenth Amendment to the U.S. Constitution.

88. As a result of the Defendants' actions under color of law in violation of the Due Process Clause of the Fourteenth Amendment, Named Plaintiffs and Class members have been and continue to be forced to pay fines and assessments they cannot afford to pay and have been and continue to be deprived of or threatened with the deprivation of their only available shelter—their RVs or other vehicles. In addition to that cost, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights. Defendants' unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress. Named Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## **FOURTH CAUSE OF ACTION**

### **Violation of Substantive Due Process—Right to Travel**

### **(Fourteenth Amendment; Cal. Const. Art. 1, §§ 7 and 24; 42 U.S.C. § 1983)**

89. Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90. The Fourteenth Amendment to the U.S. Constitution protects as a hallmark of personal liberty the right to travel to whatever place one's own inclination may direct and stay as long as one wishes. Enforcement practices that deprive individuals of a basic necessity of life may be found to burden the right to travel unconstitutionally. *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974); *Pottinger v. Miami,* 810 F. Supp. 1551 (S.D. Fla. 1992). "The right to travel has found

Case No.

1    its strongest expression in the context of attempts by states to discourage the in-

2    migration of indigents." *Joyce v. City & Cty. of S.F.*, 846 F. Supp. 843, 860 (N.D. Cal.

3    1994).  The California Constitution also specifically protects the right to intrastate

4    travel.  Cal. Const. Art. 1, §§ 7 and 24; *Tobe v. City of Santa Ana,* 9 Cal. 4th 1069 (Cal.

5    1995).

6        91.    Defendants' pattern and practice of ticketing Named Plaintiffs and Class

7    members under its nighttime RV parking and vehicle habitation ordinances directly

8    infringes Named Plaintiffs' and Class members' Right to Travel.  Defendants have

9    created an RV parking permit process available to most city residents to allow

10    nighttime RV parking, but have denied access to that permitting process to Named

11    Plaintiffs and Class members.  Defendants have conducted these activities by

12    collecting exorbitant fines that Named Plaintiffs cannot afford to pay, impounding their

13    vehicles, and threatening criminal prosecution for a misdemeanor, even though Named

14    Plaintiffs and Class members have no reasonable alternative but to utilize the

15    rudimentary shelter provided by their vehicles.  This conduct has the purpose and effect

16    of depriving or threatening to deprive Named Plaintiffs and Class members of the

17    necessities of life, including food, shelter, and medicine, thereby preventing Named

18    Plaintiffs and Class members from travelling to and residing in San Diego.

19        92.    Defendants' enforcement of the nighttime RV parking ordinance

20    specifically leaves Named Plaintiffs and Class members with no options for parking

21    their RVs between 2:00 AM and 6:00 AM.  Since Named Plaintiffs and Class members

22    lack the means to pay for housing or private parking and temporary shelters are not

23    available to them, Named Plaintiffs and Class members cannot reasonably be in the

24    City within those times, effectively depriving them of all shelter while traveling within

25    the City.

26        93.    Defendants' enforcement of the vehicle habitation ordinance also

27    infringes Named Plaintiffs' and Class members' Right to Travel by preventing them

28    from obtaining shelter in the City of San Diego in the only way available to them (in

their vehicles), thereby depriving them of that basic necessity in the City. As described herein, Named Plaintiffs and Class members lack the means to obtain other shelter or to pay for private parking for their vehicles in the City, and in the case of Disability Sub-Class members, temporary and emergency shelters and transitional housing programs are not available to them, because of a lack of capacity and/or their disabilities and medical conditions.

94.   Defendants' actions have violated Named Plaintiffs' and Class members' Right to Travel under both the Fourteenth Amendment and the California Constitution by refusing to provide an exemption to the nighttime RV parking ordinance based on homelessness or disability. The City has provided an exemption to its nighttime RV parking ordinance via a permit process that allows people with physical addresses to park RVs and oversized vehicles from 2:00 AM to 6:00 AM, but has denied the same rights to those without physical addresses, including Named Plaintiffs and Class members. Defendants' enforcement of the nighttime RV parking ordinance against Named Plaintiffs and Class members denies them the basic necessity of shelter and violates their Constitutional Right to Travel.

95.   Defendants' actions therefore unconstitutionally infringe on the Right to Travel protected under the Fourteenth Amendment to the U.S. Constitution and the California Constitution.

96.   As a result of Defendants' actions under color of law in violation of the Right to Travel under the Due Process Clause of the Fourteenth Amendment, Plaintiffs and Class members were forced to pay citations that they could not afford, and/or lost their vehicles through impoundment, thereby depriving them of the use of their only available shelter—their RVs or other vehicles. In addition to that cost, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights. Defendants' unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages including damages for emotional distress. Named Plaintiffs and Class members are also entitled to injunctive and declaratory

relief, restitution, and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Violation of Substantive Due Process—Equal Protection

### (Fourteenth Amendment; 42 U.S.C. § 1983)

97.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

98.    The Equal Protection Clause of the Fourteenth Amendment dictates that no State shall deny to any person within its jurisdiction the equal protection of the laws. Conduct violates the Equal Protection Clause when it disproportionately affects a suspect class or impinges on the exercise of a fundamental right. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

99.    Defendants discriminate against homeless individuals through the enforcement of the nighttime RV parking ordinance by providing an exemption to the prohibition contained in its nighttime RV parking ordinance via a permit process that allows people with physical addresses to park RVs and oversized vehicles from 2:00 AM to 6:00 AM, but denies the same rights to those without physical addresses, including Named Plaintiffs and Class members.

100.    Defendants' policies and practices further prevent Named Plaintiffs and Class members from obtaining benefits provided by the City by blocking them from obtaining a permit exempting them from the nighttime RV parking ordinance. These actions by Defendants have no rational connection to a legitimate government interest. In adopting and implementing these policies and practices as above stated, Defendants have thus violated and continue to violate the Equal Protection Clause of the United States Constitution.

101.    Defendants' above-described policies and practices of ticketing homeless vehicle owners under its nighttime RV parking and vehicle habitation ordinances and impounding their RVs or other vehicles serve to single out and discriminate against homeless people and/or people with disabilities, including Named Plaintiffs and Class

members.  Named Plaintiffs and Class members are being singled out for enforcement of these ordinances that are not enforced against people with RVs or other vehicles who do not appear to be homeless or disabled.  Defendants' selective enforcement of these ordinances violates Named Plaintiffs' and Class members' right to Equal Protection under the Fourteenth Amendment.

102.   Defendants' conduct prevents Named Plaintiffs and Class members from traveling to the City of San Diego without fear of ticketing and arrest, as detailed in the Fourth Cause of Action.   This restriction of the right to travel infringes a fundamental right, is not substantially related to any important government interest, and therefore violates the Equal Protection Clause of the U.S. Constitution.

103.   As a result of Defendants' actions under color of law in violation of the Equal Protection Clause of the Fourteenth Amendment, Named Plaintiffs and Class members were forced to pay citations that they could not afford, and/or lost their vehicles through impoundment, thereby depriving them of the use of their only available shelter—their RVs or other vehicles.   In addition to that cost, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights.  Defendants' unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress. Named Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

### Violation of California Constitution - Due Process and Equal Protection
### (Cal. Const. art I, § 7)

104.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.   Defendants' policies and practices as herein stated violate the due process liberty interests and equal protection provisions of Article I, § 7 of the California Constitution.

Case No.

## SEVENTH CAUSE OF ACTION

### Violation of Bane Act

### (California Civil Code § 52.1 "Bane Act")

106.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

107.    California Civil Code § 52.1, also known as the "Bane Act," provides a cause of action to individuals whose exercise or enjoyment of rights secured by the United States and/or California Constitutions and other laws has been interfered with, or attempted to be interfered with, by another's threat, intimidation, or coercion.

108.    By their conduct and actions as set forth herein, Defendants have interfered with, have attempted to interfere with, and continue to attempt to interfere with, by threat, intimidation, and/or coercion, Plaintiffs' and Class members' exercise of their rights to be present on the public streets and parking locations in the areas of San Diego, as those rights are secured by the Eighth and Fourteenth Amendments to the United States Constitution and by the Constitution and laws of the State of California, including California Constitution Art. I, § 7, and the federal and state statutory protections guaranteed to individuals with disabilities.  Defendants' actions, including citations, arrests, and punishments and the threat thereof, have criminalized conduct that is the involuntary result of Named Plaintiffs' and Class members' status, in violation of Plaintiffs' Constitutional rights.

109.    There was and is no lawful justification for Defendants to threaten, intimidate, or coerce any of the Named Plaintiffs and Class members, or to attempt to use threats, intimidation, or coercion as described herein to interfere with Plaintiffs' exercise of their rights.  Defendants' actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Named Plaintiffs and Class members from exercising their protected constitutional and statutory rights.

110.    As a direct and legal result of Defendants' actions, Named Plaintiffs suffered and continue to suffer pain and suffering, humiliation and embarrassment and

are entitled to compensatory damages for injury to their persons, loss of property and health, and a loss of their constitutional rights including all damages authorized by Cal. Civ. Code § 52, and all other applicable laws including treble damages and punitive damages against the Defendants, as permitted by law. Named Plaintiffs and Class members are further entitled to injunctive relief.

## EIGHTH CAUSE OF ACTION

### Violation of Americans with Disabilities Act

### (42 U.S.C. § 12132)

### (On Behalf of Disability Subclass Members)

111.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    Title II of the ADA, 42 U.S.C. § 12132, provides that:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

113.    The Named Plaintiffs and Disability Subclass members are "qualified persons with disabilities" as defined under the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

114.    Under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does." *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F. 3d 168, 171 & n. 5 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations).

115.    The City's parking program including the enforcement by the Police Department of its parking ordinances is a service, program, or activity of the City.

116.    In addition, the various amenities of City life offered to its residents, including San Diego's parks, beaches and public events are "services, programs, or activities" of the City.

117.    Title II protects people with disabilities against facially neutral policies that burden people with disabilities more than others, by requiring that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental alteration of the program.  28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagaw*, 81 F. 3d 1480 (9th Cir. 1996).

118.    Reasonable modifications can adjust for the financial limitations that arise from a disability, not just the immediate manifestations of the impairment giving rise to the disability.  *Giebeler v. M & B Associates,* 343 F. 3d 1143, 1152 (9th Cir. 2003).

119.    By refusing to reasonably modify their policies and practices as described herein to allow Named Plaintiffs and Disability Subclass members to legally park their vehicles on City streets or other public property and to utilize their vehicles for shelter, at least until affordable, accessible and medically appropriate housing is available for them, Defendants have violated and continue to violate the antidiscrimination requirements of Title II of the ADA.

120.    Title II regulations interpreting the ADA prohibit a public entity from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability.  29 C.F.R. § 35.130(b)(3).

121.    A public entity is also prohibited from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity.  28 C.F.R. § 35.130(b)(8).

122.    Defendants' policies and practices in administrating their parking program through ticketing Disability Subclass members, impounding their RVs and other vehicles and excluding homeless RV owners from the ability to obtain parking permits available to people with physical addresses, has the effect of discriminating against and imposing disproportionate burdens on people with disabilities based on disability, screening out such persons from the benefits of the City's parking program, and denying them meaningful access to such benefits and to the City's amenities enjoyed

1    by and available to people without disabilities.

2    123.    In carrying out Defendants' policies and practices as described herein,

3    Defendants have utilized criteria or methods of administration that have the effect of

4    subjecting qualified individuals with disabilities to discrimination based on disability.

5    29 C.F.R. § 35.130(b)(3).

6    124.    In carrying out Defendants' policies and practices as herein described and

7    denying Plaintiffs' request for reasonable modification in violation of Plaintiffs' rights

8    under the ADA, Defendants have acted knowingly and with deliberate indifference to

9    the harm substantially likely to occur.

10    125.    As a result of Defendants' unlawful acts, Named Plaintiffs have suffered

11    and continue to suffer injuries, including emotional injuries, and are entitled to

12    compensatory damages, including damages for emotional distress.  In addition, Named

13    Plaintiffs and Disability Subclass members are entitled to injunctive and declaratory

14    relief, restitution, and attorneys' fees and costs.

15    ## NINTH CAUSE OF ACTION

16    **Violation of § 504 of the Rehabilitation Act of 1973**

17    **(29 U.S.C. § 794)**

18    **(On Behalf of Disability Subclass Members)**

19    126.    Plaintiffs hereby incorporate each and every allegation contained in the

20    foregoing paragraphs as if fully set forth herein.

21    127.    Defendants City of San Diego and the San Diego Police Department are

22    recipients of financial assistance from the federal government.

23    128.    Section 504 of the Rehabilitation Act of 1973 requires that qualified

24    persons with disabilities be provided with meaningful access to federally funded

25    programs.  In order to assure meaningful access, reasonable modifications may be

26    required unless the recipient of federal funding can demonstrate that such

27    modifications would result in a fundamental alteration in the nature of the program.  29

28    U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

129.    Defendants' actions and omissions as herein stated have denied Plaintiffs' and Disability Subclass members' right to reasonable modifications thereby denying them meaningful access to Defendants' parking program and to the amenities that the City offers its residents without disabilities, and subjecting them to discrimination on the basis of disability, in violation of section 504 of the Rehabilitation Act.

130.    As a result of Defendants' unlawful acts in violation of the Rehabilitation Act, Named Plaintiffs have suffered and continue to suffer injuries, including emotional injuries, and are entitled to compensatory damages, including damages for emotional distress.  In addition, Named Plaintiffs and Disability Subclass members are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare that Defendants' past, present, and threatened future enforcement of the vehicle habitation and nighttime RV parking ordinances, San Diego Muni. Code §§ 86.0137(f) and 86.0139(a), against Named Plaintiffs and Class members or any citing, arrest or prosecution or threatened citation or arrest for lodging in vehicles on public property violates the right to be free from cruel and unusual punishment, the right to travel, the right to due process and equal protection of the laws;

B.    Declare that Defendants' past, present and threatened future enforcement of the above San Diego ordinances and threats of arrest for lodging in vehicles on public property against Named Plaintiffs and Disability Subclass members discriminates on the basis of disability in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794;

C.    Declare that San Diego's vehicle habitation ordinance, San Diego Muni. Code § 86.0137(a), is void for vagueness and unenforceable facially and/or as applied to Named Plaintiffs and Class members pursuant to the due process protections of the U.S. and California Constitutions;

D.    Issue a preliminary and permanent injunction, enjoining Defendants, their

1  officers, employees, assignees, successors, and agents from enforcing the vehicle

2  habitation and nighttime RV parking ordinances against Named Plaintiffs and Class

3  members through issuing of additional tickets, collecting unpaid fines associated with

4  previous tickets issued under these ordinances, arresting Class members, or through

5  impoundment of RVs or other vehicles for such unpaid tickets and further enjoining

6  Defendants against ticketing, arrests, prosecutions or any threats of arrest or

7  prosecution against Named Plaintiffs and Class members for lodging in vehicles on

8  public property, until such time that permanent accessible housing that is affordable is

9  made available to these individuals;

10      E.      Award restitution for fines and penalties that Defendants collected from

11  Named Plaintiffs and Class members and for vehicles that were impounded pursuant

12  to Defendants' enforcement of the nighttime RV parking and vehicle habitation

13  ordinances;

14      F.      Order Defendants to pay compensatory damages to Named Plaintiffs only

15  pursuant to 42 U.S.C. § 1983 for the deprivation of Plaintiffs' constitutionally

16  guaranteed rights, and for violation of the ADA, 42 U.S.C. § 12132, and Section 504

17  of the Rehabilitation Act, 19 U.S.C. § 794, and for violation of the Bane Act, Cal. Civ.

18  Code § 52.1, including damages for emotional distress, and pain and suffering in an

19  amount to be proven at trial;

20      G.      Award to Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C.

21  § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a(a)(2)(b), Cal. Civ. Code § 52, and Cal.

22  Civ. Proc. Code § 1021.5;

23      H.      Award to Plaintiffs costs of suit; and

24      I.      Order such other and further relief that the Court deems just and proper.

25

26

27

28

40            Case No.

1    Dated:  November 15, 2017              FISH & RICHARDSON P.C.

2

3                                  By:  */s/ Geoff D. Biegler*
                                        Geoff D. Biegler, SB #290040
4                                       Biegler@fr.com
                                        Robert M. Yeh, SB #286018
5                                       RYeh@fr.com
                                        Nancy L. Ly, SB #284991
6                                       Ly@fr.com
                                        Ryan L. Frei, SB #310722
7                                       RFrei@fr.com
                                        FISH & RICHARDSON P.C.
8                                       12390 El Camino Real
                                        San Diego, CA 92130
9                                       Telephone: (858) 678-5070
                                        Fax: (858) 678-5099
10
                                        Maria Foscarinis (*Pro Hac Vice* to be
11                                      filed)
                                        mfoscarinis@nlchp.org
12                                      National Law Center on Homelessness
                                        and Poverty
13                                      2000 M Street, NW, Suite 210
                                        Washington, DC 20036
14                                      Telephone: (202) 638-2835 x. 102
                                        Fax: (202) 628-2737
15
                                        Ann E. Menasche, SB # 74774
16                                      Ann.menasche@disabilityrightsca.org
                                        Stuart Seaborn, SB# 198590
17                                      Stuart.seaborn@disabilityrightsca.org
                                        DISABILITY RIGHTS CALIFORNIA
18                                      1111 Sixth Avenue, Suite 200
                                        San Diego, CA  92101
19                                      Telephone:  (619) 239-7861
                                        Fax: (619) 239-7906
20

21

22

23

24

25

26

27

28

                                    41              Case No.

Robert Scott Dreher, SB #120527
scott@dreherlawfirm.com
Dreher Law Firm
350 Ash Street, Ste. 101
San Diego, CA 92101
Telephone: (619) 230-8828
Fax: (619) 687-0142

Manfred P. Muecke, SB # 222893
mmuecke@bffb.com
Patricia Syverson, SB # 203111
psyverson@bffb.com
Bonnett Fairbourn Friedman & Balint PC
600 West Broadway, #900
San Diego, CA 92101
Telephone: (619) 798-4292
Fax:  (602) 274-1199

**ATTORNEYS FOR PLAINTIFFS**

Case No.