1  Geoff D. Biegler, SB #290040
   Biegler@fr.com
2  Robert M. Yeh, SB #286018
   RYeh@fr.com
3  Nancy L. Ly, SB #284991
   Ly@fr.com
4  Ryan L. Frei, SB #310722
   RFrei@fr.com
5  FISH & RICHARDSON P.C.
   12390 El Camino Real
6  San Diego, CA 92130
   Telephone: (858) 678-5070
7  Fax: (858) 678-5099

8  *[Additional counsel listed on following page]*

9  Attorneys for Plaintiffs

10

11              **UNITED STATES DISTRICT COURT**

12            **SOUTHERN DISTRICT OF CALIFORNIA**

13  MICHAEL BLOOM, STEPHEN              )  Case No.: 3:17-cv-02324-AJB-NLS
    CHATZKY, TONY DIAZ, VALERIE        )
14  GRISCHY, PENNY HELMS,              )  FIRST AMENDED CLASS ACTION
    BENJAMIN HERNANDEZ, DOUG           )  COMPLAINT FOR DECLARATORY
15  HIGGINS, SUZONNE KEITH,            )  RELIEF, INJUNCTIVE RELIEF,
    GERALD STARK, ANNA STARK, and      )  RESTITUTION AND DAMAGES
16  DAVID WILSON, individually and on  )  UNDER THE UNITED STATES CIVIL
    behalf of themselves and all others )  RIGHTS ACT (42 U.S.C. § 1983),
17  similarly situated,                )  AMERICANS WITH DISABILITIES
                                       )  ACT (42 U.S.C. § 12132), SECTION
18          Plaintiffs                 )  504 OF THE REHABILITATION ACT
                                       )  (29 U.S.C.§ 794), THE UNITED
19       vs.                           )  STATES CIVIL RIGHTS ACT (42
                                       )  U.S.C. § 1983), THE U.S. AND
20  CITY OF SAN DIEGO,                 )  CALIFORNIA CONSTITUTIONS,
                                       )  AND CALIFORNIA CIVIL CODE
21          Defendant.                 )  §52.1
    -------------------------------------- )
22                                         **JURY TRIAL DEMANDED**

23

24

25

26

27

28

                                    Case No. 3:17-cv-02324-AJB-NLS

Maria Foscarinis (*Pro Hac Vice* to be filed)
mfoscarinis@nlchp.org
National Law Center on Homelessness and Poverty
2000 M Street, NW, Suite 210
Washington, DC 20036
Telephone: (202) 638-2835 x. 102
Fax: (202) 628-2737

Ann E. Menasche, SB # 74774
Ann.menasche@disabilityrightsca.org
Stuart Seaborn, SB# 198590
Stuart.seaborn@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1111 Sixth Avenue, Suite 200
San Diego, CA  92101
Telephone:  (619) 239-7861
Fax: (619) 239-7906

Robert Scott Dreher, SB #120527
scott@dreherlawfirm.com
Dreher Law Firm
350 Ash Street, Ste. 101
San Diego, CA 92101
Telephone: (619) 230-8828
Fax: (619) 687-0142

Manfred P. Muecke, SB # 222893
mmuecke@bffb.com
Patricia Syverson, SB # 203111
psyverson@bffb.com
Bonnett Fairbourn Friedman & Balint PC
600 West Broadway, #900
San Diego, CA 92101
Telephone: (619) 798-4292
Fax:  (602) 274-1199

Case No. 3:17-cv-02324-AJB-NLS

# **INTRODUCTION**

1.    In the midst of a severe housing crisis characterized by dramatically rising rents, a shrinking affordable housing supply, long waits for housing subsidies, scarcity of shelter beds, and a homeless population that has grown 23% in five years, the City of San Diego ("the City") is targeting its most vulnerable residents.  There are at least 817 unsheltered homeless residents in San Diego, many with disabilities, who seek shelter in their recreational vehicles ("RVs"), campers, or other vehicles.  For these people, their vehicles are their only reliable, safe shelter from the elements and only place to store their belongings.  Yet, even though there are no adequate alternatives, the City has repeatedly ticketed and harassed these individuals for seeking shelter in their vehicles or simply for owning vehicles and having nowhere else to park.  Specifically, the City has used its ordinance prohibiting RV parking from 2:00 AM to 6:00 AM, San Diego Muni. Code § 86.0139(a) ("the nighttime RV parking ordinance"), and its ordinance prohibiting vehicle habitation, San Diego Muni. Code § 86.0137(f) ("the vehicle habitation ordinance"), to target homeless vehicle owners, ticketing them and impounding their vehicles for unpaid tickets.  In addition, the City has threatened homeless vehicle owners with arrest and misdemeanor charges for illegal lodging.

2.    Even after being alerted to these issues, the City has refused to modify its policies to provide an opportunity for homeless individuals to park their vehicles legally on City streets or other public property, at least until affordable, accessible, and medically appropriate housing is made available to them.  While failing to provide any accommodation for homeless individuals, including those with disabilities, the City has created an exemption to the nighttime RV parking ordinance, via a permit system, for persons who have a physical address.  In other words, under certain circumstances, the City allows people who are not homeless to park their RVs overnight but imposes penalties against those who are homeless for the same behavior.

3.    The City has carried out this discriminatory, cruel, punitive, and unconstitutional policy against homeless vehicle owners, many of whom have

disabilities, despite the fact that these individuals have nowhere else to go.  Sky-high rents and extremely low incomes, among other factors, have excluded these City residents from the housing market.  RV parks are often as costly as renting an apartment, and so are not viable options.  "Safe lots" that allow overnight parking for homeless individuals do not accept RVs and have far fewer spaces than the number of homeless persons with vehicles in San Diego.  The number of unsheltered homeless people far outnumbers available emergency shelter beds, which are generally filled and cannot accommodate the hundreds of people who are forced to seek shelter in their vehicles.  At best, emergency and temporary shelters provide only transitory accommodations, with a large majority who are exited from shelters still lacking the permanent housing that they need.  Moreover, emergency and temporary shelter beds are functionally unavailable to many homeless people with disabilities because the conditions in the shelter environment are not medically acceptable given those disabilities.  Homeless vehicle owners therefore do not have either a place to seek shelter in their vehicles legally in the City or the availability of adequate, accessible, stable and medically appropriate housing that they can afford.  In addition, homeless vehicle owners have no funds with which to pay the excessive fines associated with the nighttime RV parking and vehicle habitation citations without jeopardizing their ability to buy food, medicine, or other necessities.  As a result, homeless vehicle owners have had and are at risk of having their only shelter taken away by the City for unpaid tickets.

4.    The nighttime RV parking ordinance and vehicle habitation ordinance both violate numerous U.S. and State Constitutional rights, including the Eighth Amendment prohibition on Cruel and Unusual Punishment and Fourteenth Amendment Due Process protections, including the prohibition on state-created danger; the Right to Equal Protection; and the Right to Travel.  The vehicle habitation ordinance is also so vague and ambiguously worded that neither homeless individuals nor anyone else can ascertain what is or is not prohibited or how to comply with the

ordinance to avoid receiving a ticket or having their vehicle impounded.  In addition, enforcement of the ordinances discriminates against homeless vehicle owners based on disability in violation of the antidiscrimination protections of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

5.     Rather than adequately accommodating this homeless, largely disabled group of individuals and complying with statutory and constitutional requirements, the City has instead chosen to place the health, safety, and lives of homeless vehicle owners in further jeopardy, in the hope that the continuing and escalating harassment will force these residents simply to leave town.

6.     Plaintiffs seek a Court order requiring that the City put an end to these harmful, discriminatory, and unconstitutional practices against this defenseless group of individuals.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action pursuant 28 U.S.C. § 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

8.     Venue is proper in the Southern District of California because Defendant resides in the District and all events given rise to Plaintiffs' claims occurred in the District.  The relief Plaintiffs seek is within this Court's power to grant.

## PARTIES

A.     **Plaintiffs**

9.     Plaintiff MICHAEL BLOOM is 68 years-old and a life-long resident of the City of San Diego.  Mr. Bloom previously worked as an electrician and carpenter but suffered several accidents that left him with a severely damaged arm and foot, and

led to his suffering from hypoglycemia and severe depression. Because of these debilitating physical and mental health issues, Mr. Bloom has not been able to engage in gainful employment since his last accident in 1982. His sole source of income is Social Security benefits, and he cannot afford market rents in San Diego. Even if Mr. Bloom were able to locate an open bed at an emergency or temporary shelter, which are generally full and cannot accommodate the hundreds of homeless people who currently seek shelter in their vehicles, it would be functionally unavailable to him because his physical disabilities require him to lie down frequently during the day and the overcrowding and lack of privacy would worsen his mental health condition. As a result, for the last ten years, his only available shelter has been his RV. Mr. Bloom is not able to park his RV in the existing City "safe lots" because the "safe lots" do not allow RVs. Despite this, and even though he has a disability placard on his vehicle, Mr. Bloom has received at least a dozen tickets for parking his RV at night on city streets, about five tickets for vehicle habitation, and has been threatened with arrest for vehicle habitation. As one example, he received a ticket on or about December 12, 2017 for violation of the nighttime RV parking ordinance. When he has paid these tickets, Mr. Bloom has not had enough money to pay for food or gasoline. If Mr. Bloom does not pay the tickets, however, the City may impound his RV, which would be devastating for his mental and physical health and put him at far greater physical risk. It would also leave Mr. Bloom without the only form of shelter available to him. Mr. Bloom meets the definition of "chronically homeless" as defined by the regulations issued by the U.S. Department of Housing and Urban Development (HUD). 24 C.F.R. § 91.5(1). Mr. Bloom is also a qualified individual with disabilities within the meaning of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12102, and the Rehabilitation Act of 1973, 29 U.S.C. § 706(8).

10. Plaintiff STEPHEN CHATZKY is 70 years old and resides in the City of San Diego with his domestic partner, Suzonne Keith, and her disabled adult daughter. Mr. Chatzky is a lawyer, but his Attention Deficit Disorder and memory problems have

made it difficult for him practice law.  As a result, since 2002, his sole source of income has been Social Security benefits, and he cannot afford market rents in San Diego. Even if Mr. Chatzky were able to locate an open bed at a temporary or emergency shelter, which are generally filled and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because shelter conditions would force the family to separate.  A psychologist who evaluated Mr. Chatzky opined that if Mr. Chatzky were separated from his family, it would worsen his mental health condition.  Additionally, Mr. Chatzky has asthma and sleep apnea and is prone to lung infections.  Shelters typically reek of tobacco smoke, which make it difficult for him to breathe and put him at risk for lung infections. Because of these circumstances, the family has lived in an RV since 2008.   In approximately June of 2015, the City of San Diego impounded the family's first RV for failure to pay tickets, including tickets for nighttime RV parking and vehicle habitation, even though the family had a disability placard on the vehicle at that time. After the impoundment, the family had no regular shelter, and they were forced to sleep cramped in a car for five months until they were able to obtain another RV through a family member's assistance.  Because Mr. Chatzky and Ms. Keith live in an RV, they are unable to utilize existing City "safe lots" because "safe lots" do not accept RVs.  As a result, despite making every effort to avoid the ticketing, Mr. Chatzky and Ms. Keith continue to receive tickets for parking their RV at night, as recently as February 13, 2018.  Mr. Chatzky meets the definition of "chronically homeless" as defined by HUD regulations and is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.

11.    Plaintiff SUZONNE KEITH is 68 years old and a resident of the City of San Diego.  Ms. Keith has held a range of government jobs, including as an equal rights investigator, but her disabilities have made her unable to engage in gainful employment for the last 19 years.  She has severe arthritis and edema that interfere with her ability to stand or walk, depression, and Post Traumatic Stress Disorder ("PTSD") from

having survived domestic violence prior to meeting Mr. Chatzky, and debilitating migraines. Ms. Keith's sole source of income is a pension of $400 per month, and she cannot afford market rents in San Diego. As a result, Ms. Keith's only option for shelter has been to live in an RV with Mr. Chatzky and her daughter. After the couple's first RV was impounded for not paying parking tickets, the couple slept cramped in a car for five months. Because the police continue to ticket the couple, Ms. Keith is terrified that the City will also impound their second RV, which is the only form of shelter available to her. Even if Ms. Keith were able to locate an open bed at a temporary or emergency shelter, which are generally filled and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because it would require that Ms. Keith be separated from Mr. Chatzky and her adult daughter, triggering her trauma symptoms and worsening her depression. Additionally, the conditions of shelters, including the high noise level, triggers migraines for Ms. Keith. When Ms. Keith is suffering from a debilitating migraine, she needs to rest in a private and dark space, which is usually not available at shelters. Ms. Keith is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act and meets the definition of "chronically homeless" as defined by the HUD regulations.

12.    Plaintiff TONY DIAZ is 58 years old and a resident of the City of San Diego. Mr. Diaz worked as a welder until 2011, when worsening pain and other symptoms of his anxiety disorder, diabetes, hypertension, severe respiratory problems, and bad knee and shoulder prevented him from working. He also recently had major heart surgery. Mr. Diaz has been homeless for approximately five years and owns a pick-up truck with a shell that serves as his only shelter and place to keep his belongings. He has no regular income, and he cannot afford market rents in San Diego. Mr. Diaz has received four vehicle habitation tickets, even though he spends nights parked at a local 7-Eleven store with the permission of the manager and does not sleep in his vehicle when it is parked on City property. On August 25, 2016 at approximately

6:30 a.m., Mr. Diaz came out of a bathroom in a public park when a member of the San Diego Police Department issued him a vehicle habitation ticket.  Mr. Diaz explained to the officer that he had just arrived to go fishing and told the officer that he was disabled and had just had heart surgery.  The officer nonetheless issued the ticket and threatened to ticket him anytime he saw Mr. Diaz's vehicle.  The officer also threatened to have Mr. Diaz arrested for vehicle habitation.  Since that incident, police officers have continued to harass and ticket Mr. Diaz under the vehicle habitation ordinance.  As one example, Mr. Diaz received a ticket for violation of the vehicle habitation ordinance on or about December 23, 2017.  Mr. Diaz has done his best to comply with the vehicle habitation ordinance by parking overnight on private property with the owner's permission but does not understand what he needs to do in order to stop the ticketing. Even if Mr. Diaz were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because the tobacco smoke, cleaning fluid odors, and lack of fresh air would aggravate his respiratory condition.  Moreover, the crowded, noisy, and regimented environment of shelters would worsen his symptoms of anxiety.  Mr. Diaz is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.  He also meets the definition of "chronically homeless" as defined by HUD regulations.

13.    Plaintiff VALERIE GRISCHY is 59 years old and a resident of the City of San Diego.  Ms. Grischy was a licensed chiropractor and had a successful career, until she became disabled by a serious car accident in 2009.  Since shortly after the accident, she has been unable to work due to severe back pain, depression, anxiety, and panic attacks stemming from a traumatic brain injury and PTSD.  Ms. Grischy's sole source of income is Supplementary Security Income (SSI), and she cannot afford market rents in San Diego.  Because she has not been able to afford housing, Ms. Grischy has been living in her RV since 2012.  She has received tickets from the City of San Diego for vehicle habitation and nighttime RV parking even though she has a

disability placard on the vehicle.  Ms. Grischy has tried to find places to park, driving up to 30 miles a day, in an attempt to avoid being ticketed.  Despite her efforts, Ms. Grischy has continued to receive written warnings and tickets from police.  As one example, she received two tickets on or about December 30, 2017, one for violation of the vehicle habitation ordinance and one for violation of the nighttime RV parking ordinance.  Paying these parking tickets would be a severe financial hardship for her.  The threat of ticketing also forced her to leave San Diego temporarily, which she considers her home, to avoid further ticketing.  Even if Ms. Grischy were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because her medical history and medical needs require that she live alone.  Communal shelter life is simply untenable.  The current City "safe lots" are not an option for Ms. Grischy because RVs are not allowed in those lots.  Ms. Grischy is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.  She also meets the definition of "chronically homeless" as defined by HUD regulations.

14.    Plaintiff PENNY "GRACE" HELMS is 58 years old and a resident of the City of San Diego.  Ms. Helms supported herself throughout her 20s working as a waiter and dancer.  At the age of 29, the long-term effects of chronic illnesses, and the physical and emotional trauma that she experienced as a child, became so debilitating that she had to stop working.  Ms. Helms suffers from fibromyalgia; chronic fatigue syndrome; arthritis; six bulging disks; hypersensitivity and allergy to environmental pollutants such as cigarette smoke and perfume; and various neurological disorders including PTSD, hypervigilance, emotional hypersensitivity, and dissociative identity disorder.  Over the past two decades, she has tried to earn a living by working as a house cleaner, dog groomer, among other jobs, whenever her disabilities permit.  But none of that income has been steady or sufficient for her to support herself, and that income has only fallen over the years.  Ms. Helms' main, and often the only, source of

income for the past few years has been Social Security disability benefits. She cannot afford market rents in San Diego. Because of this, Ms. Helms had been forced to seek shelter in her RV. She has been threatened multiple times by police with ticketing for vehicle habitation and impoundment for living in her RV, as least as recently as April 2017. She has also been threatened with arrest for encroachment near her RV. The threat of receiving citations she cannot afford to pay, impoundment, and arrest terrifies her and exacerbates her disabilities, including her hypervigilance. She has left San Diego for periods of weeks or months at a time due to her fear of being ticketed, arrested, and having her RV impounded, even though she considers San Diego her home. Ms. Helms currently does not have a place in San Diego where she can safely park or seek shelter in her RV. Even if Ms. Helms were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because she cannot tolerate communal living given her myriad disabilities. The current City "safe lots" are not an option for Ms. Helms because RVs are not allowed. Ms. Helms is a qualified individual with disabilities within the meaning of the ADA, and the Rehabilitation Act. She also meets the definition of "chronically homeless" as defined by HUD regulations.

15.    Plaintiff BENJAMIN HERNANDEZ is a 54-year-old man and a resident of the City of San Diego. Mr. Hernandez was a stonemason and primary breadwinner for his family until he was involved in a pedestrian accident in 2015. After the accident, the orthopedic impairments from his injuries, along with depression, left him unable to work. Mr. Hernandez was only given a small, one-time disability award and does not receive ongoing disability benefits. Though his wife works, her wages are extremely modest and insufficient to afford the high cost of housing in San Diego. Their lack of funds has caused Mr. Hernandez and his wife to utilize their RV as their shelter for the past year. In addition to offering shelter from the elements, their RV provided them with a shower, toilet, refrigerator, stove and microwave and a queen-sized bed. On or

about July 26, 2017, however, the City impounded their RV for unpaid nighttime RV parking citations.  Since they could not afford to pay the citations and towing fees in order to retrieve their RV from impoundment, the couple spent several weeks cramped in their Toyota Camry which aggravated Mr. Hernandez's back injury.  The loss of his RV was also extremely traumatic, causing Mr. Hernandez's depression to worsen. Currently, Mr. Hernandez uses an SUV as his only available shelter, and he remains at risk for vehicle habitation tickets.  Even if Mr. Hernandez were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because it would force him to separate from his wife, aggravating the symptoms of his depression.  Mr. Hernandez is a qualified individual with disabilities within the meaning of the Rehabilitation Act, the ADA, and California law.  He also meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

16.    Plaintiff DOUG HIGGINS is 68 years old, a resident of the City of San Diego, and a veteran who was honorably discharged from the U.S. Army.  He had a successful career as a car dealer until his symptoms of anxiety and depression, along with a painful back condition, worsened in 2009.  His bad back, which is aggravated by stress, keeps him from standing, sitting, or walking for any length of time.  His sole source of income is Social Security benefits, and he cannot afford to pay market rent in San Diego.  Even if Mr. Higgins were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because it would exacerbate his mental health symptoms.  For the past three years, his RV has been the only shelter available to him.  Mr. Higgins has received tickets both for vehicle habitation and for nighttime RV parking.  He received a nighttime RV parking ticket on or about November 11, 2017 and a habitation ticket on or about November 10, 2016.  He cannot afford to pay the tickets; paying them

jeopardizes his ability to pay for food and other necessities. The threat of ticketing and fear of losing his RV to impoundment increases his stress and exacerbates the symptoms of his disabilities. Police have told him to leave the City if he does not like the ticketing, but he considers San Diego to be his home. Mr. Higgins is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. Mr. Higgins also meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

17. Plaintiff DAVID WILSON is 47 years old and a resident of the City of San Diego. Mr. Wilson previously worked as an actor, taxi driver, and security guard. Mr. Wilson has a range of conditions arising from a car accident, including compression of the spine, peripheral neuropathy, edema in both feet and ankles (requiring him to elevate his feet), depression, PTSD, Social Anxiety Disorder, an eating disorder, and porphyria (a skin condition that makes him highly susceptible to infection). Mr. Wilson also suffers from asthma, hypersomnia (a condition in which a person has trouble staying awake during the day), and social anxiety. Because of these conditions, Mr. Wilson had to stop working in 1999. His sole source of income is SSI, and he cannot afford to pay market rent in San Diego. In 2013, Mr. Wilson purchased an RV, giving him a place to lie down and take shelter from the elements. In addition, the RV provided him with running water, a stove, a refrigerator and the ability to control the temperature in his environment. Mr. Wilson has received numerous tickets from the City of San Diego, including for vehicle habitation and nighttime RV parking, and has been threatened with arrest for vehicle habitation. This happened despite his having a disabled placard on the vehicle. In an attempt to save the little money he had to pay the tickets, Mr. Wilson has resorted to eating out of the trash. Ultimately unable to pay all the tickets, Mr. Wilson sold his RV around October of 2015 to avoid imminent impoundment and purchased a truck with the proceeds. Deprived of his RV, he began sleeping outside or cramped in the cab of the truck. Without a proper place to lie down and elevate his feet, and forced to sleep outside or in his truck, Mr. Wilson ended up

hospitalized soon after he was forced to sell his RV due to imminent threat of impoundment.  The loss of his RV has continued to have negative effects on Mr. Wilson's health; however, he has been and continues to be deterred from exchanging his truck for another RV because of the ongoing enforcement of the nighttime RV parking ordinance. Even if Mr. Wilson were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to him because the crowded and noisy shelter environment would aggravate Mr. Wilson's mental health conditions and, due to his vulnerability to infection and asthma, put his physical condition at further risk.  Police have also continued to issue Mr. Wilson warnings and threatened him with further ticketing for vehicle habitation in his truck, which is the only reasonable form of shelter available to him.  He received such threats at least as recently as June 2017.  Mr. Wilson is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.  Mr. Wilson also meets the definition of "chronically homeless" as defined by HUD regulations.

18.    Plaintiff GERALD STARK is 76 years-old, and has lived his entire life in the City of San Diego.  Mr. Stark worked installing pipes as a member of the Steamfitters Union until he retired in 2007.  Since retirement, his income consists only of Social Security and a small pension totaling $2,000 per month to support himself and his wife of twelve years, Anna Stark.  This income is not enough to afford market rents in San Diego for himself and his wife.  As a result, Mr. Stark and his wife, Anna, moved into an RV in 2008 – one year after his retirement.  Emergency shelter is not an option for Mr. Stark. Even if he were able to locate an open bed at an emergency or temporary shelter, which are generally full and cannot accommodate the hundreds of homeless people who currently seek shelter in their vehicles, it would be functionally unavailable to him because it would require him to separate from his wife.  Since 2008, Mr. Stark's home and only available shelter has been inside an RV shared with Ms.

Stark. Mr. Stark is not able to park an RV in the existing City "safe lots" because the "safe lots" do not allow RVs. Despite this, Mr. Stark has received tickets for parking his RV at night on city streets and for vehicle habitation during the last two years. Because he was unable to afford to pay those tickets, his RV was impounded by the City on or about March 28, 2017. Because the City impounded his home and only form of shelter, Mr. Stark now lives unsheltered on the streets of the City where he has suffered and will continue to suffer serious physical, mental, and emotional harm. Mr. Stark meets the definition of "chronically homeless" as defined by the regulations issued by the U.S. Department of Housing and Urban Development (HUD). 24 C.F.R. § 91.5(1).

19.    Plaintiff ANNA STARK is 48 years-old, and she has lived in the City of San Diego for her entire life. She has been married to Gerald Stark for twelve years. Ms. Stark has severe anxiety stemming from multiple past traumas. She previously worked as a home health care worker, but has been unemployed for many years due to her mental health condition. She has no income, and she is entirely dependent on her husband's small pension and Social Security, which is too low to afford market rents in San Diego. Even if Ms. Stark were able to locate an open bed at an emergency or temporary shelter, which are generally full and cannot accommodate the hundreds of homeless people who currently seek shelter in their vehicles, it would be functionally unavailable to her because it would require her to separate from her husband and her support animal and the crowded congregate living environment would aggravate her anxiety. Since 2008, her only available home and shelter has been inside an RV shared with Mr. Stark. Ms. Stark is not able to park an RV in the existing City "safe lots" because the "safe lots" do not allow RVs. Despite this, the RV Ms. Stark uses as a home has been ticketed multiple times, including for parking at night on city streets. On or about March 28, 2017, the Starks' RV was impounded for unpaid tickets. Because the City impounded their home and only form of shelter, Ms. Stark now lives unsheltered on the streets of the City where she has suffered and will continue to suffer

13        Case No. 3:17-cv-02324-AJB-NLS

serious physical, mental, and emotional harm.  Ms. Stark is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.  Ms. Stark also meets the definition of "chronically homeless" as defined by the regulations issued by the U.S. Department of Housing and Urban Development (HUD).  24 C.F.R. § 91.5(1).

20.     The term "Named Plaintiffs" or "Plaintiffs" refers to all the individual Plaintiffs named in this section.

**B.    Defendant**

21.     Defendant CITY OF SAN DIEGO is now and, at all times mentioned in this Complaint, was a local government agency and subdivision of the State of California.  Defendant CITY OF SAN DIEGO, through its agents the Mayor, City Council, City Attorney, Parking Enforcement, Police Department, and the Police Chief undertakes to cite Plaintiffs and Class members for nighttime RV parking and for vehicle habitation.  Defendant CITY OF SAN DIEGO also demands exorbitant penalties that Plaintiffs and Class members cannot afford to pay, impounds and/or threatens to impound their RVs or other vehicles, and threatens them with arrest, all the while refusing to provide reasonable modifications of these policies based on Plaintiffs' and Class members' disabilities.  Defendant CITY OF SAN DIEGO implements the ticketing and impoundment of Plaintiffs' and Class members' vehicles under the nighttime RV parking ordinance and the vehicle habitation ordinance even though Plaintiffs' and Class members' vehicles are the only shelter from the elements available to them and the only secure place they have to keep their belongings.  In addition, the Defendant CITY OF SAN DIEGO has threatened Plaintiffs and Class members with arrest and misdemeanor charges for illegal lodging.

## CLASS ALLEGATIONS

22.     Plaintiffs bring this action against Defendant on their own behalf and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

23.     The main class, referred to as the "Homeless Ticketing Class" or "Main

Class" is defined as:

> All homeless persons who have been cited and/or subject to citation by the City of San Diego pursuant to San Diego Muni. Code §§ 86.0137(f); San Diego Muni. Code § 86.0139(a); and/or are at risk of arrest for illegal lodging.

24.    Plaintiffs also bring this action on behalf of a subclass, referred to as the "Disability Subclass" or "Subclass," which is defined as:

> All Class members who have a "disability" as defined under the ADA, 42 U.S.C. § 12102.

25.    All members of the Subclass are also members of the Main Class. The terms "Class" and "Classes" refers to both the Main Class and the Subclass collectively.

26.    Plaintiffs reserve the right to amend or modify the Class definitions in connection with a motion for class certification and/or with the result of discovery.

### **Numerosity**

### Main Class

27.    Plaintiffs do not know the exact size or identities of the Class. However, Plaintiffs believe that the Class encompasses a minimum of several hundred homeless individuals who are dispersed geographically throughout the City of San Diego as well as California and neighboring states. (*2017 We All Count Results*, REGIONAL TASK FORCE ON THE HOMELESS (2017), http://www.rtfhsd.org/wp-content/uploads/2017/07/2017-PITC-Results-Powerpoint.pdf.) Therefore, the members of the Class are so numerous that individual joinder of all members is impracticable.

28.    All members of the Class are subject to Defendant's policies and practice in enforcing the nighttime RV parking ordinance and/or the vehicle habitation ordinance. The Class is united in its interests with respect to proof of Defendant's conduct, and the effects caused by Defendant's actions.

### Subclass

29.    Plaintiffs do not know the exact size or identities of the Disability

Subclass.    Plaintiffs believe that the Subclass consists of hundreds of homeless individuals based on the high number of persons with disabilities found in surveys of the homeless population in San Diego.  See ¶ 43, *infra*.

30.    All members of the Sub-Class are subject to Defendant's discriminatory policies and practice in enforcing the nighttime RV parking ordinance and/or the vehicle habitation ordinance.  The Class is united in its interests with respect to proof of Defendant's discriminatory conduct, and the effects caused by Defendant's actions.

### **Predominance of Common Issues**

### Main Class

31.    The questions of law and fact common to members of the Class predominate over questions that may affect individual Class members.  Such common questions of law and fact include but are not limited to the following:

(i)    whether Defendant's enforcement of San Diego Muni. Code §§ 86.0137(f) and 86.0139(a) including ticketing for "violation of signs" prohibiting vehicle habitation under § 86.0112(E) has and continues to violate 42 U.S.C. § 1983 by infringing upon Named Plaintiffs' and Class members' constitutional rights, including by endangering Plaintiffs and Class members, and by violating their right to travel, right to equal protection, and right to be free from cruel and unusual punishment.

(ii)    whether Named Plaintiffs and other Class members are at risk of arrest for illegal lodging under Defendant's existing policies because they are homeless and need to live in their vehicles;

(iii)    whether Named Plaintiffs and other Class members are at risk that their RV, camper or other vehicle will be impounded by the City for unpaid tickets along with their personal belongings seized because they are homeless and need to use their vehicles as shelter;

(iv)    whether Named Plaintiffs and the other Class members are entitled to equitable relief, including system-wide policy changes to address the

1  constitutional and statutory violations detailed in this Complaint.

2  <u>Subclass</u>

3  (i)    whether Defendant's policies, including its policies regarding

4  enforcement of San Diego Muni. Code §§ 86.0137(f) and 86.0139(a) including

5  ticketing for "violation of signs" prohibiting habitation under § 86.0112(E)

6  discriminate on the basis of disability; and

7  (ii)    whether Defendant has failed or refused to provide reasonable

8  modifications of their policies as required under the ADA, 42 U.S.C. § 12132,

9  and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 749.

10  **<u>Typicality</u>**

11  <u>Main Class</u>

12  32.    Named Plaintiffs are asserting claims typical of the claims of the entire

13  class of affected persons described above and do not conflict with the interests of any

14  other members of the Classes.  Named Plaintiffs and Class members have been injured

15  by the same wrongful policies, practices, and conduct of Defendant.  Named Plaintiffs'

16  claims arise from the same practices and conduct that give rise to the claims of all Class

17  members and are based on the same legal theories.

18  <u>Subclass</u>

19  33.    Named Plaintiffs are all qualified individuals with disabilities and assert

20  claims typical of the claims of the entire Disability Subclass.  The interests of the

21  Named Plaintiffs do not conflict with those of the Disability Subclass.  All have been

22  injured by the same wrongful policies, practices, and conduct of Defendant, which

23  discriminate on the basis of disability.  Named Plaintiffs' claims arise from the same

24  practices and conduct that give rise of all Subclass members and are based on the same

25  legal theories.

26  **<u>Adequate Representation</u>**

27  34.    Named Plaintiffs will fairly and adequately represent the interests of the

28  Main Class and the Subclass, and they have no interests antagonistic to those of the

Classes.   Indeed, Named Plaintiffs' interests are aligned with those of the Class members.  Named Plaintiffs have retained lawyers who are competent and experienced in class action litigation.

### Superiority

35.    A class action is preferable and superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit the adjudication of claims by many Class members who could not afford to individually litigate their claims or vindicate their rights against the government.  There are no difficulties likely to be encountered in the management of this case that might preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this matter.

### COMMON FACTUAL ALLEGATIONS

Plaintiffs allege the following common facts on information and belief.

### San Diego's Lack of Affordable Housing Has Created a Homelessness Crisis

36.    San Diego now has the fourth largest homeless population in the country. (*The 2016 Annual Homeless Assessment Report to Congress,* DEPT. OF HOUSING AND URBAN DEV. 29 (Nov. 2016), https://www.hudexchange.info/resources/documents/2016-AHAR-Part-1.pdf.)  Based on a January 2017 survey, the Regional Task Force on the Homeless found that there are 5,619 homeless people in the City of San Diego, an increase of 10% since 2016.  (*2017 We All Count Results, supra at 16.*)  The Regional Task Force further found that 3,231 of these 5,619 homeless individuals are unsheltered and living in places not meant for human habitation, an 18% increase from the previous year.  According to the same survey, San Diego County now has a homeless population of 9,116, more than double the approximately 4,000 shelter beds available in the County.  The results of this crisis have been seen in the rapidly expanding tent encampments in downtown San Diego that have more than doubled in size in the past year.

37.    The homelessness crisis in San Diego is directly linked to the lack of

affordable housing.  As of 2014, the median cost of an efficiency studio apartment in San Diego was 110% of the amount of an SSI check, which is less than $900/month. (Emily Cooper et al., *Priced Out in 2014: The Housing Crisis for People with Disabilities*, TECHNICAL ASSISTANCE COLLABORATIVE (June 2015), http://www.tacinc. org/media/52012/Priced%20Out%20in%202014.pdf.)    Since then, rents have continued to rise.  The San Diego Housing Federation found that there is a shortfall of 135,749 homes affordable to low income San Diegans, with rents up 32% in the last decade.  Average rent and utilities for a two-bedroom apartment has climbed to $1618 a month.  (Stephen Russell, *The Affordable Housing Crisis in San Diego: How Do We Meet the Need?,* SAN DIEGO HOUSING FEDERATION (January 25, 2017), http://docs. sandiego.gov/councilcomm_agendas_attach/2017/sglu_170125_4c.pdf.)   In addition, the demand for housing subsidies far exceeds the supply.  There is a 10 to 12 year waiting list for a Section 8 housing voucher, with over 60,000 persons on the waiting list.  The small amount of existing affordable or subsidized housing also has long waiting lists.

38.    The Regional Task Force on Homelessness found that the homeless population in the City of San Diego included 817 people living in vehicles.  (*2017 We All Count Results, supra at 16*.)  These individuals have no shelter available to them other than in their vehicles.  RV owners without physical addresses have no legal place to park their RVs at night.  The few "safe lots" established in San Diego only serve a small portion of people with vehicles who are homeless, prioritize families with small children, and exclude RVs.

39.    RV parks in San Diego charge high rents.  Monthly rentals in RV parks in the City of San Diego range from a low of $699 per month to a high of $1950 per month depending on the park and the time of year, which is unaffordable to Plaintiffs and Class members.  Moreover, many RV parks have maximum stay limits and limit or exclude older RVs.

## People with Disabilities Have Been Severely and Disproportionately Harmed by the Crisis

40.   There is also a strong link between homelessness and disability.  The U.S. Department of Housing and Urban Development (HUD) defines "chronically homeless" as an individual with a disability who has been homeless continuously for at least 12 months or on at least four separate occasions in the last three years.  24 C.F.R. § 91.5(1).  A person is deemed homeless if he or she lacks a fixed, regular, and adequate nighttime residence.  This includes persons who use RVs or other vehicles for other than temporary living quarters for recreational use.  42 U.S.C. § 11302(a)(1); 24 C.F.R. § 3282.8(g).  The Regional Task Force found that 31% of the City's homeless population was "chronically homeless."  (*2017 We All Count Results, supra at 16*.)

41.   In San Diego, a high number of homeless individuals have disabilities.  The Regional Task Force found that 39% of homeless people in San Diego reported mental health disabilities and 40% reported a physical disability.  Some surveys have found even higher rates of disability.  For example, of the 1,145 persons attending a one-day resource fair for the homeless in the City, 60.2% reported a long lasting medical condition and 49.5% reported having a mental illness.  San Diego Housing Commission, Project Homeless Connection Report, April 15, 2015.(*Project Homeless Connect Report*, SAN DIEGO HOUSING COMMISSION (April 15, 2015), http://www.sdhc.org/uploadedFiles/Housing_Innovations/Project_Homeless_Connect/2015Project%20Homeless%20Connect%20Report_04.15.15.pdf.)

42.   The primary reason for the strong link between disability and homelessness is an economic one.  Homeless individuals with disabilities are not normally homeless as a matter of choice.  Rather, many people with disabilities including Named Plaintiffs and Class members are unable to work due to their disabilities and therefore must rely on a rapidly shrinking social safety net that has not kept up with rising San Diego rents.

43.   Living on the streets is dangerous, especially for women, seniors, and

people with disabilities.  In the fiscal year ending September 30, 2017, 117 homeless people died on the streets of San Diego, double the figure from two years ago.  Daniel Wheaton, *Homeless Deaths Have Doubled Over Two Years,* SAN DIEGO UNION TRIB. (Nov. 28, 2016 2:00 PM), http://www.sandiegouniontribune.com/news/data-watch/sd-me-homeless-deaths-20161128-story.html.)  Homeless adults age 50 and older also have rates of chronic illness and geriatric conditions similar to or higher than those of adults living in housing that are 15 to 20 years older.  Jennifer Goldberg, et al., "How to Prevent and End Homelessness Among Older Adults."  (Jennifer Goldberg et al., *How to Prevent and End Homelessness Among Older Adults*, JUSTICE IN AGING (April 2016), http://www.justiceinaging.org/wp-content/uploads/2016/04/Homelessness-Older-Adults.pdf.)

44.    The City's recent Hepatitis A epidemic highlights the health dangers, both to homeless individuals and to others, associated with living on the streets without access to shelter and sanitation.  The Hepatitis A outbreak has resulted in at least twenty deaths.

### Plaintiffs and Class Members Have No Reasonable Option for Shelter Other Than Their RVs or Other Vehicles

45.    Sheltering oneself is not voluntary conduct.  It is a basic human need.  It is harmless. And it is an act integral to the status of homelessness.  For Named Plaintiffs and Class members fortunate enough to have RVs or other vehicles, their only reasonable option is to utilize the rudimentary shelter provided by their vehicles until permanent, accessible, and medically appropriate housing that they can afford, becomes available.

46.    Named Plaintiffs and Class members do not have any reasonably accessible places in the City to seek shelter in their vehicles or to park their RVs legally at night.  As explained above, RV parks in San Diego are generally unaffordable to Plaintiffs and Class members.  Dreams of Change operates a "Safe Parking Program," which provides a few places to park vehicles at night.  As of mid-October 2017,

Dreams of Changes operates three such lots in the City.  However, there are currently only 150 parking spaces available, a fraction of the number of unsheltered homeless people with vehicles.  The Program has frequently had long waiting lists for admission. RVs are not accepted.  In the absence of permanent housing options, all participants are required to sign up for so-called transitional housing programs that provide only temporary or short-term shelter, and are often inaccessible and/or medically unacceptable to Plaintiffs and to Disability Subclass members.

47.    There is also an insufficient number of temporary shelter beds available in the City as compared to the unsheltered homeless population forced to seek shelter in their vehicles.  There are hundreds more unsheltered homeless people forced to seek shelter in their vehicles than available emergency shelter beds, even when accounting for seasonal and overflow spaces.

48.    Even if a homeless person is able to identify an available bed in a temporary or emergency shelter, the shelter bed may be functionally unavailable to that person.  Emergency and temporary shelter beds and transitional housing programs are functionally unavailable to many people with disabilities including the Named Plaintiffs, because those types of living arrangements are likely to aggravate their mental health and/or physical conditions.  Many shelters and transitional housing programs in San Diego have an overcrowded congregate living environment, are noisy, have a complete lack of privacy, often lack opportunity to lie down during the day, present an increased risk of infection, may have strong odors from smoke and chemical cleaning products that can aggravate respiratory disabilities,  and present the risk of criminal activity.  In addition, many shelters only take single people, thereby separating family members and causing additional trauma.

49.    Emergency and temporary shelters including most transitional housing programs do not provide a real solution for Named Plaintiffs or Class members.  Even if they were to enter a temporary or emergency shelter or be admitted into a transitional housing program, Named Plaintiffs and Class members with RVs would still not have

anywhere to park their RVs legally at night and would continue to be at risk of ticketing under the nighttime RV parking ordinance.  Moreover, these programs provide only temporary accommodations with strict time limits. The Regional Taskforce on Homelessness has found that a majority of persons exited from shelter programs have not been placed in permanent housing.  Therefore, in the continued absence of sufficient permanent affordable housing alternatives, even individuals who are able to use the shelter system are often condemned to spending at least some time on the streets, with all the associated health and safety risks.  Thus, under current conditions, there are no reasonable alternatives for Named Plaintiffs and Class members other than utilizing their RVs or other vehicles.

### City Ordinances Punish Homeless Individuals with Vehicles

50.    The City's "Prohibition of Use of Streets for Storage, Service or Sale of Vehicles or For Habitation" ordinance, San Diego Muni. Code § 86.0137(f), provides: "It is unlawful for any person to use a vehicle while it is parked or standing on any streets as either temporary or permanent living quarters, abode, or place of habitation." The terms "temporary or permanent living quarters, abode, or place of habitation" are not defined.  A ticket for vehicle habitation is punishable as an infraction by a fine of $40 plus a $12.50 surcharge and doubles if not paid in 21 days.

51.    The City has posted signs in various locations within the City stating "No Habitation."  Named Plaintiffs and Class members have been ticketed and/or are at risk of being ticketed for "Violation of Signs" under San Diego Muni. Cod § 86.0112(E) for allegedly "habitating" in their vehicles. A ticket for "Violation of Signs" is punishable as an infraction by a fine of $40 plus a $12.50 surcharge and doubles if not paid in 21 days.

52.    The City's "Prohibition of Parking of Oversized, Non-Motorized and Recreational Vehicles" ordinance, San Diego Muni. Code § 86.0139(a), provides in relevant part: "Except as provided in section 86.0140 or otherwise expressly provided to the contrary herein, or unless such parking or standing is authorized by the City

Manager and appropriate sign permitting such parking or standing are posted: (a) it is unlawful for any person to park or leave standing upon any public street, park road or park parking lot, any oversized, non-motorized or recreational vehicle between the hours of 2:00 a.m. and 6:00 a.m."  A ticket for nighttime RV parking is punishable as an infraction by a fine of $100 plus a $12.50 surcharge and doubles if not paid in 21 days.

53.    In addition to fines, there is the potential for other serious consequences for violating these ordinances.  A vehicle can be removed or impounded by the City when it has five or more unpaid parking violations.  Cal. Veh. Code § 22651.  In addition, the City may notify the Department of Motor Vehicles (DMV) and the DMV will not renew the registration until the penalties are paid.  Cal. Veh. Code §§ 4760 and 40229(a).

54.    Though it has made no exceptions to any of these ordinances on the basis of homelessness or disability, the City has created an exception to its nighttime RV parking ordinance via a permit process that allows for temporary overnight parking of RVs on public streets for a cumulative total of up to 72 days in a given year.  San Diego Muni. Code § 86.0143.  Such permits are only available for people with physical addresses, thereby excluding persons whose only stable form of shelter is their RVs, including Named Plaintiffs and Class members.  *Id.*  Named Plaintiffs and Class members are therefore left with no options anywhere in the City to park their RVs at night whether or not they are able to access a temporary shelter bed.

55.    On information and belief, the City enacted the nighttime RV parking ordinance in 2013 for the primary purpose of removing homeless RV owners from the community.  The City enacted the ordinance in large part due to the difficulty the City was having proving that such homeless persons are in violation of the existing vehicle habitation ordinance, and due to problems the City had experienced enforcing the ordinance prohibiting parking a vehicle in excess of 72 consecutive hours.  San Diego Muni. Code § 86.0118.

56.    The Report from the City Council's Land Use & Housing Committee in support of the nighttime RV parking ordinance declared that "in many cases an occupant is living illegally in vehicle" and "current enforcement tools are time consuming and unproductive (e.g. marking tires, knocking on vehicle doors)." (*Neighborhood Parking Protection and Public Safety Ordinance*, LAND USE & HOUSING COMMITTEE (March 27, 2013), http://docs.sandiego.gov/councilcomm_agendas_attach/2013/LUH_130327_4ppt.pdf.)    At a subsequent Mission Beach Town Council meeting, Julio DeGuzman from the San Diego City Attorney's office responded to complaints regarding an increasing number of "transients" with RVs, by reassuring the attendees that his office "works on removing the homeless from our community." (*Minutes of General Membership Meeting*, MISSION BEACH TOWN COUNCIL (Nov. 13, 2013), http://www.missionbeachtc.com/uploads/5/0/0/3/50033147/mbtc_minutes_general_mtg_nov.13.2013.pdf.)

57.    Defendant has had and continues to have a policy and practice of utilizing these ordinances to issue and/or threaten to issue parking tickets to homeless vehicle owners, including to individuals with disability placards or special disabled license plates issued by the State of California prominently displayed on their vehicles, to impose exorbitant penalties, and to impound their vehicles for failure to pay the penalties.  Defendant has carried out this policy even though it knew or reasonably should have known that the majority of the "transients" being targeted for ticketing have a disability and/or have no other reasonable option for shelter besides their vehicles.  San Diego police officers and other agents and employees of the City knew or reasonably should have known that many of the individuals receiving these tickets have disabilities due to the fact that disability placards are commonly displayed on the vehicles; and even in the absence of a disability placard, the officers may have had an opportunity to observe or interact with the persons being ticketed, who either had an obvious disability or voluntarily disclosed the disability to the officer.

58.    State law considers a person guilty of Disorderly Conduct, a

misdemeanor, if the person "lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it."  Cal. Penal Code § 647(e).  Violation of the statute carries a maximum penalty of six months in jail and a $500 fine.  The language of the statute makes clear that the City has the authority to grant permission to persons lodging in vehicles to stay on public property and therefore such arrests or threats of arrest are purely discretionary.

### The City Has Refused to Modify Its Discriminatory Policies

59.    On March 30, 2017, seven of the Plaintiffs—Michael Bloom, Stephen Chatzky, Valerie Grischy, Penny Helms, Doug Higgins, Suzonne Keith, and David Wilson—acting through their attorneys, delivered to the office of the City Attorney a written request for a reasonable modification of the City's ticketing policies pursuant to the provisions of Title II of the ADA.  The reasonable modification would allow them and other homeless RV owners with disabilities to continue to live in San Diego and fully utilize their RVs as shelter, including at night without ticketing and harassment.  The request included supporting evidence documenting each of the individual's disability-related need to utilize their RVs.

60.    Plaintiffs are aware of multiple parking lots under City control that are empty at night, and that could be used by Named Plaintiffs and Class members for nighttime parking of their RVs.  Plaintiffs are also aware of streets in industrial areas that are empty at night and have ample places to park RVs. The use of these lots and industrial areas for nighttime parking of Class members' RVs would not infringe on residential parking or otherwise inconvenience other City residents.

61.    In response to Plaintiffs' reasonable modification request, the City Attorney's office held one meeting with Plaintiffs' counsel on May 9, 2017.  Over the next two months, and despite the urgency of this matter to Plaintiffs' health and safety, the City did not take or propose any actions to address Plaintiffs' concerns.  The City, while claiming an interest in seeking a resolution, continued to ticket homeless RV

1  owners and to impound their vehicles including those with disabilities. The City's
2  actions showed an unwillingness to make reasonable modifications to its nighttime RV
3  parking and vehicle habitation ordinances.

4  62.    On July 8, 2017, Plaintiffs requested that the City temporarily halt
5  enforcement of San Diego Muni. Code §§ 86.0139(a) and 86.0137(f) to stop ticketing
6  homeless RV owners and impounding their RV's pending a final resolution of the
7  matter. The City again stalled, waiting until August 23, 2017, before telling Plaintiffs
8  that it would not agree to halt enforcement of these ordinances temporarily. Because
9  of the continued harm being caused to Named Plaintiffs and Class members, Plaintiffs
10  have no choice now but to file this Complaint.

11  ## CLAIMS

12  ## FIRST CAUSE OF ACTION

13  ### Violation of Substantive Due Process—State Created Danger

14  ### (Fourteenth Amendment; 42 U.S.C. § 1983)

15  63.    Plaintiffs hereby incorporate each and every allegation contained in the
16  foregoing paragraphs as if fully set forth herein.

17  64.    Under the Substantive Due Process Clause of the Fourteenth Amendment,
18  the state deprives a person of a substantive due process right if it affirmatively places
19  the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir.
20  1989).

21  65.    Defendant City of San Diego has a policy, pattern, custom, and practice
22  of issuing citations to Named Plaintiffs and Class members under the above-described
23  ordinances, and when said Class members are unable to pay the citation, impounding
24  RVs or other vehicles that Plaintiffs and Class members rely on for shelter from the
25  elements and for other necessities.

26  66.    As a direct result of that policy and practice, Defendant, through its
27  agents, employees, officials and departments, has acted and continues to act
28  affirmatively as described herein to place Plaintiffs and Class members in a highly

dangerous situation that they would not otherwise face, thereby threatening Plaintiffs' and Class members' health and safety, risking serious exacerbations of their disabilities, and putting their lives at risk.

67.    As a direct result of its policy and practice, Defendant has acted affirmatively by citing Plaintiffs and Class members for parking and vehicle habitation violations that they cannot reasonably avoid, thereby forcing Plaintiffs and Class members to attempt to pay more than they can afford on exorbitant fines. Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication, or other necessities. And when they can no longer afford the fines, they lose the only form of shelter available to them—their RV or vehicle—through impoundment. Without their vehicle, Plaintiffs and Class members are highly likely to be forced into the ranks of the unsheltered homeless and face the dangers described herein of living on the streets. In addition, Class members who have their RVs taken are deprived of other necessities of life previously provided by their RV including ready access to running water, toilet, shower, cooking and food storage facilities; temperature control; and secure sleeping accommodations, causing a significant negative impact on their physical and/or mental health.

68.    In the absence of Defendant's affirmative actions, Plaintiffs and Class members would not face these highly dangerous situations. Defendant knew or reasonably should have known that its actions—up to and including taking away Plaintiffs' and Class members' only form of shelter—would create these threats to Plaintiffs' and Class members' health and safety.

69.    Defendant acted with reckless disregard or deliberate indifference to the dangers—malnourishment, illness, and/or aggravation of disabilities due to loss of shelter—they were creating for Plaintiffs and Class members by issuing and/or threatening to issue nighttime RV parking and vehicle habitation citations and impounding RVs and other vehicles. Defendant and their agents and employees also knew or reasonably should have known that the Named Plaintiffs and many Class

members have disabilities, are chronically homeless, and have no other viable options for shelter.  Defendant's actions show a reckless disregard or deliberate indifference to the health, safety and well-being of Plaintiffs and Class members, in violation of Plaintiffs' and Class members' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.  *Wood*, 875 F. 2d at 583.

70.    As a result of Defendant's policies and practices described herein, Named Plaintiffs' health and safety were placed in grave danger in violation of the Fourteenth Amendment.  Named Plaintiffs were injured and damaged in that they were forced to bear the risks and medical costs created by these acts.  In addition to that cost, the Named Plaintiffs suffered emotional and mental distress as well as humiliation because of the danger created by Defendant's unlawful actions.  Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress.

71.    An actual controversy exists between Plaintiffs and Class members on the one hand, and Defendant on the other, as to whether Defendant has violated and/or are imminently threatening to violate 42 U.S.C. § 1983.

72.    Plaintiffs and Class members have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief, including restitution for fines and assessments collected and vehicles impounded by Defendant.  Plaintiffs are also entitled to attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Violation of Cruel and Unusual Punishment

### (Eighth and Fourteenth Amendments; 42 U.S.C. § 1983)

73.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.    The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

75. Defendant's practice and policy of issuing tickets and threats of tickets for nighttime RV parking and vehicle habitation to Plaintiffs and Class members, impounding their RVs and vehicles as a result of those offenses, and threats of arrest for vehicle habitation violates the Eighth Amendment's prohibition on cruel and unusual punishment because it constitutes a punishment that is disproportionate to the severity of the "crime" of violating the nighttime RV parking and vehicle habitation ordinances or of lodging in one's vehicle on City streets. *See Solem v. Helm*, 463 U.S. 277 (1983).

76. The punishments inflicted by Defendant for violation of the ordinances in question force Named Plaintiffs and Class members to attempt to pay more than they can afford on exorbitant fines. Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication or other necessities. And when they can no longer afford the fines, they lose the only form of shelter available to them—their RV or vehicle—through impoundment. With their RVs or vehicles taken from them, Plaintiffs and Class members face the dangers described herein of living on the streets without shelter and/or without the other necessities of life provided by their RVs.

77. These punishments grossly outweigh any interest on the part of Defendant in preventing Plaintiffs and Class members from parking on city streets at certain times of the day and/or seeking shelter in their vehicles.

78. For Named Plaintiffs and Disability Subclass members, Defendant's practice and policy also violates the Eighth Amendment's prohibition on cruel and unusual punishment because it punishes Named Plaintiffs and Disability Subclass members for being homeless. By punishing the act of sheltering oneself in a vehicle when there are no other reasonable alternatives, the City effectively punishes the status of homelessness. Defendant infringes Plaintiffs' and Subclass members' rights by issuing tickets and threats of tickets for nighttime RV parking and vehicle habitation, as well as by impounding RVs and vehicles, and threatening arrest for vehicle

habitation.  *See Robinson v. California*, 370 U.S. 660 (1962); *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated after settlement*, 505 F.3d 1006 (9th Cir. 2007).

79.    Named Plaintiffs and Disability Subclass members are involuntarily homeless.  They are homeless because their disabilities led to their unemployment and poverty, and because the City lacks affordable permanent housing and accessible, adequate, and available shelters.  They cannot reasonably forego sheltering themselves, as sheltering oneself is a basic human need.  It is harmless.  And it is an act integral to the status of homelessness.  Until permanent, affordable, and accessible housing is available to them, their RVs or other vehicles are their only option for meeting their basic human need for shelter and for other necessities of life that housing normally provides.

80.    As a result of Defendant inflicting cruel and unusual punishment under color of law in violation of the Eighth and Fourteenth Amendments, the Named Plaintiffs were injured and damaged in that they were forced to pay exorbitant fines they could not afford to pay, and/or were deprived of the use of their only available shelter—their RVs or other vehicles—and were forced to bear the cost of finding and securing whatever other accommodations they could obtain.  In addition to that cost, the Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights.  Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress.  Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### Violation of Substantive Due Process—Void for Vagueness

### (Fourteenth Amendment; 42 U.S.C. § 1983)

81.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.   The Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

83.   In order to satisfy the Due Process Clause, an ordinance must be sufficiently definite to provide adequate notice of the conduct proscribed and provide sufficient guidelines for the police so that arbitrary and discriminatory enforcement does not occur. *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1106-1107 (1995).

84.   San Diego's vehicle habitation ordinance does not satisfy the requirements of the Due Process Clause.  As written, the vehicle habitation ordinance makes unlawful the use of a vehicle parked or standing on the street as "either temporary or permanent living quarters, abode, or place of habitation."  None of the terms used—"temporary living quarters," "permanent living quarters," "abode" or "place of habitation"—are defined anywhere in the ordinance.

85.   The City's vehicle habitation ordinance (whether enforced directly or indirectly through citations issued under "Violation of Signs" prohibiting habitation) fails to provide adequate notice and sufficient guidance, which would allow an individual to ascertain beyond mere speculation as to how one uses a parked or standing vehicle as "either temporary or permanent living quarters, abode, or place of habitation."  The ordinance therefore fails "to draw a clear line between innocent and criminal conduct," *Desertrain v. City of Los Angeles,* 754 F. 3d 1147, 1156 (9th Cir. 2014), and invites selective enforcement against people who are homeless, many of whom have disabilities.  As detailed above, Named Plaintiffs and Class members have attempted to comply with the vehicle habitation ordinance but have nonetheless been ticketed under its vague and overbroad reach.

86.   The vehicle habitation ordinance should therefore be declared unconstitutionally vague both on its face and as applied against Named Plaintiffs and Class members in violation of substantive due process protections under the Fourteenth Amendment to the U.S. Constitution.

87.    As a result of the Defendant's actions under color of law in violation of the Due Process Clause of the Fourteenth Amendment, Named Plaintiffs and Class members have been and continue to be forced to pay fines and assessments they cannot afford to pay and have been and continue to be deprived of or threatened with the deprivation of their only available shelter—their RVs or other vehicles.  In addition to that cost, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights.  Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress.  Named Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Violation of Substantive Due Process—Right to Travel

### (Fourteenth Amendment; Cal. Const. Art. 1, §§ 7 and 24; 42 U.S.C. § 1983)

88.    Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.    The Fourteenth Amendment to the U.S. Constitution protects as a hallmark of personal liberty the right to travel to whatever place one's own inclination may direct and stay as long as one wishes.  Enforcement practices that deprive individuals of a basic necessity of life may be found to burden the right to travel unconstitutionally.  *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974); *Pottinger v. Miami,* 810 F. Supp. 1551 (S.D. Fla. 1992).  "The right to travel has found its strongest expression in the context of attempts by states to discourage the in-migration of indigents." *Joyce v. City & Cty. of S.F.*, 846 F. Supp. 843, 860 (N.D. Cal. 1994).  The California Constitution also specifically protects the right to intrastate travel.  Cal. Const. Art. 1, §§ 7 and 24; *Tobe v. City of Santa Ana,* 9 Cal. 4th 1069 (Cal. 1995).

90.    Defendant's pattern and practice of ticketing Named Plaintiffs and Class members under its nighttime RV parking and vehicle habitation ordinances directly

infringes Named Plaintiffs' and Class members' Right to Travel. Defendant has created an RV parking permit process available to most city residents to allow nighttime RV parking, but have denied access to that permitting process to Named Plaintiffs and Class members. Defendant has conducted these activities by collecting exorbitant fines that Named Plaintiffs cannot afford to pay, impounding their vehicles, and threatening criminal prosecution for a misdemeanor, even though Named Plaintiffs and Class members have no reasonable alternative but to utilize the rudimentary shelter provided by their vehicles. This conduct has the purpose and effect of depriving or threatening to deprive Named Plaintiffs and Class members of the necessities of life, including food, shelter, and medicine, thereby preventing Named Plaintiffs and Class members from traveling to and residing in San Diego.

91. Defendant's enforcement of the nighttime RV parking ordinance specifically leaves Named Plaintiffs and Class members with no options for parking their RVs between 2:00 AM and 6:00 AM. Since Named Plaintiffs and Class members lack the means to pay for housing or private parking and temporary shelters are not available to them, Named Plaintiffs and Class members cannot reasonably be in the City within those times, effectively depriving them of all shelter while traveling within the City.

92. Defendant's enforcement of the vehicle habitation ordinance also infringes Named Plaintiffs' and Class members' Right to Travel by preventing them from obtaining shelter in the City of San Diego in the only way available to them (in their vehicles), thereby depriving them of that basic necessity in the City. As described herein, Named Plaintiffs and Class members lack the means to obtain housing or to pay for private parking for their vehicles in the City, and emergency and temporary shelters, including transitional housing programs lack capacity and in the large majority of cases, provide at best only transitory accommodations. In the case of Disability Sub-Class members, such shelter programs are usually inaccessible and therefore not available to them, due to their disabilities and medical conditions.

93.     Defendant's actions have violated Named Plaintiffs' and Class members' Right to Travel under both the Fourteenth Amendment and the California Constitution by refusing to provide an exemption to the nighttime RV parking ordinance based on homelessness or disability.  The City has provided an exemption to its nighttime RV parking ordinance via a permit process that allows people with physical addresses to park RVs and oversized vehicles from 2:00 AM to 6:00 AM, but has denied the same rights to those without physical addresses, including Named Plaintiffs and Class members.  Defendant's enforcement of the nighttime RV parking ordinance against Named Plaintiffs and Class members denies them the basic necessity of shelter and violates their Constitutional Right to Travel.

94.     Defendant's actions therefore unconstitutionally infringe on the Right to Travel protected under the Fourteenth Amendment to the U.S. Constitution and the California Constitution.

95.     As a result of Defendant's actions under color of law in violation of the Right to Travel under the Due Process Clause of the Fourteenth Amendment, Plaintiffs and Class members were forced to pay citations that they could not afford, and/or lost their vehicles through impoundment, thereby depriving them of the use of their only available shelter—their RVs or other vehicles.  In addition to that cost, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights.  Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages including damages for emotional distress.  Named Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Violation of Substantive Due Process—Equal Protection

### (Fourteenth Amendment; 42 U.S.C. § 1983)

96.     Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.    The Equal Protection Clause of the Fourteenth Amendment dictates that no State shall deny to any person within its jurisdiction the equal protection of the laws. Conduct violates the Equal Protection Clause when it disproportionately affects a suspect class or impinges on the exercise of a fundamental right. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

98.    Defendant discriminates against homeless individuals through the enforcement of the nighttime RV parking ordinance by providing an exemption to the prohibition contained in its nighttime RV parking ordinance via a permit process that allows people with physical addresses to park RVs and oversized vehicles from 2:00 AM to 6:00 AM, but denies the same rights to those without physical addresses, including Named Plaintiffs and Class members.

99.    Defendant's policies and practices further prevent Named Plaintiffs and Class members from obtaining benefits provided by the City by blocking them from obtaining a permit exempting them from the nighttime RV parking ordinance. These actions by Defendant have no rational connection to a legitimate government interest. In adopting and implementing these policies and practices as above stated, Defendant has thus violated and continue to violate the Equal Protection Clause of the United States Constitution.

100.    Defendant's above-described policies and practices of ticketing homeless vehicle owners under its nighttime RV parking and vehicle habitation ordinances and impounding their RVs or other vehicles serve to single out and discriminate against homeless people and/or people with disabilities, including Named Plaintiffs and Class members. Named Plaintiffs and Class members are being singled out for enforcement of these ordinances that are not enforced against people with RVs or other vehicles who do not appear to be homeless or disabled. Defendant's selective enforcement of these ordinances violates Named Plaintiffs' and Class members' right to Equal Protection under the Fourteenth Amendment.

101.    Defendant's conduct prevents Named Plaintiffs and Class members from

traveling to the City of San Diego without fear of ticketing and arrest, as detailed in the Fourth Cause of Action.   This restriction of the right to travel infringes a fundamental right, is not substantially related to any important government interest, and therefore violates the Equal Protection Clause of the U.S. Constitution.

102.   As a result of Defendant's actions under color of law in violation of the Equal Protection Clause of the Fourteenth Amendment, Named Plaintiffs and Class members were forced to pay citations that they could not afford, and/or lost their vehicles through impoundment, thereby depriving them of the use of their only available shelter—their RVs or other vehicles.   In addition to that cost, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights.  Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress. Named Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

### Violation of California Constitution - Due Process and Equal Protection
### (Cal. Const. art I, § 7)

103.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.   Defendant's policies and practices as herein stated violate the due process liberty interests and equal protection provisions of Article I, § 7 of the California Constitution.

## SEVENTH CAUSE OF ACTION

### Violation of Bane Act
### (California Civil Code § 52.1 "Bane Act")

105.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.   California Civil Code § 52.1, also known as the "Bane Act," provides a

cause of action to individuals whose exercise or enjoyment of rights secured by the United States and/or California Constitutions and other laws has been interfered with, or attempted to be interfered with, by another's threat, intimidation, or coercion.

107.    By their conduct and actions as set forth herein, Defendant through its agents and employees, has interfered with, has attempted to interfere with, and continues to attempt to interfere with, by threat, intimidation, and/or coercion, Plaintiffs' and Class members' exercise of their rights to be present on the public streets and parking locations in the areas of San Diego, as those rights are secured by the Eighth and Fourteenth Amendments to the United States Constitution and by the Constitution and laws of the State of California, including California Constitution Art. I, § 7, and the federal and state statutory protections guaranteed to individuals with disabilities.  Defendant's actions, including citations, arrests, and punishments and the threat thereof, have criminalized conduct that is the involuntary result of Named Plaintiffs' and Class members' status, in violation of Plaintiffs' Constitutional rights.

108.    There was and is no lawful justification for Defendant to threaten, intimidate, or coerce any of the Named Plaintiffs and Class members, or to attempt to use threats, intimidation, or coercion as described herein to interfere with Plaintiffs' exercise of their rights.  Defendant's actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Named Plaintiffs and Class members from exercising their protected constitutional and statutory rights.

109.    Plaintiffs and Class members are entitled to injunctive relief and other appropriate equitable relief to protect the peaceful exercise and enjoyment of Plaintiffs' and Class members' rights.

## EIGHTH CAUSE OF ACTION

### Violation of Americans with Disabilities Act

### (42 U.S.C. § 12132)

### (On Behalf of Disability Subclass Members)

110.    Plaintiffs hereby incorporate each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

111.    Title II of the ADA, 42 U.S.C. § 12132, provides that:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

112.    The Named Plaintiffs and Disability Subclass members are "qualified persons with disabilities" as defined under the ADA.  42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

113.    Under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does." *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F. 3d 168, 171 & n. 5 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations).

114.    The City's parking program including the enforcement by the Police Department of its parking ordinances is a service, program, or activity of the City.

115.    In addition, the various amenities of City life offered to its residents, including San Diego's parks, beaches and public events are "services, programs, or activities" of the City.

116.    Title II protects people with disabilities against facially neutral policies that burden people with disabilities more than others, by requiring that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental alteration of the program.  28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagaw*, 81 F. 3d 1480 (9th Cir. 1996).

117.    Reasonable modifications can adjust for the financial limitations that arise from a disability, not just the immediate manifestations of the impairment giving rise to the disability.  *Giebeler v. M & B Associates,* 343 F. 3d 1143, 1152 (9th Cir. 2003).

118.    By refusing to reasonably modify its policies and practices as described herein to allow Named Plaintiffs and Disability Subclass members to legally park their

vehicles on City streets or other public property and to utilize their vehicles for shelter, at least until affordable, accessible and medically appropriate housing is available for them, Defendant has violated and continues to violate the antidiscrimination requirements of Title II of the ADA.

119.    Title II regulations interpreting the ADA prohibit a public entity from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability.  29 C.F.R. § 35.130(b)(3).

120.    A public entity is also prohibited from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity.  28 C.F.R. § 35.130(b)(8).

121.    Defendant's policies and practices in administrating their parking program through ticketing Disability Subclass members, impounding their RVs and other vehicles and excluding homeless RV owners from the ability to obtain parking permits available to people with physical addresses, has the effect of discriminating against and imposing disproportionate burdens on people with disabilities based on disability, screening out such persons from the benefits of the City's parking program, and denying them meaningful access to such benefits and to the City's amenities enjoyed by and available to people without disabilities.

122.    In carrying out Defendant's policies and practices as described herein, Defendant has utilized criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

123.    In carrying out Defendant's policies and practices as herein described and denying Plaintiffs' request for reasonable modification in violation of Plaintiffs' rights under the ADA, Defendant has acted knowingly and with deliberate indifference to the harm substantially likely to occur.

124.    As a result of Defendant's unlawful acts, Named Plaintiffs have suffered

and continue to suffer injuries, including emotional injuries, and are entitled to compensatory damages, including damages for emotional distress. In addition, Named Plaintiffs and Disability Subclass members are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## NINTH CAUSE OF ACTION

### Violation of § 504 of the Rehabilitation Act of 1973

### (29 U.S.C. § 794)

### (On Behalf of Disability Subclass Members)

125.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.   Defendant City of San Diego and the City's Police Department, are recipients of financial assistance from the federal government.

127.   Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities be provided with meaningful access to federally funded programs. In order to assure meaningful access, reasonable modifications may be required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program. 29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

128.   Defendant's actions and omissions as herein stated have denied Plaintiffs' and Disability Subclass members' right to reasonable modifications thereby denying them meaningful access to Defendant's parking program and to the amenities that the City offers its residents without disabilities, and subjecting them to discrimination on the basis of disability, in violation of section 504 of the Rehabilitation Act.

129.   As a result of Defendant's unlawful acts in violation of the Rehabilitation Act, Named Plaintiffs have suffered and continue to suffer injuries, including emotional injuries, and are entitled to compensatory damages, including damages for emotional distress. In addition, Named Plaintiffs and Disability Subclass members are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare that Defendant's past, present, and threatened future enforcement of the vehicle habitation and nighttime RV parking ordinances, San Diego Muni. Code §§ 86.0137(f) and 86.0139(a), including its enforcement of San Diego Muni. Code § 86.0112(E)"Violation of Signs" for vehicle habitation against Named Plaintiffs and Class members or any citing, arrest or prosecution or threatened citation or arrest for lodging in vehicles on public property violates the right to be free from cruel and unusual punishment, the right to travel, the right to due process and equal protection of the laws;

B.    Declare that Defendant's past, present and threatened future enforcement of the above San Diego ordinances and threats of arrest for lodging in vehicles on public property against Named Plaintiffs and Disability Subclass members discriminates on the basis of disability in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794;

C.    Declare that San Diego's vehicle habitation ordinance, San Diego Muni. Code § 86.0137(a), is void for vagueness and unenforceable facially and/or as applied to Named Plaintiffs and Class members pursuant to the due process protections of the U.S. and California Constitutions and enforcement of § 86.0112(E) for vehicle habitation is similarly void;

D.    Issue a preliminary and permanent injunction, enjoining Defendant, their departments, officers, employees, assignees, successors, and agents from enforcing the vehicle habitation and nighttime RV parking ordinances and from enforcing violation of signs prohibiting vehicle habitation against Named Plaintiffs and Class members through issuing of additional tickets, collecting unpaid fines associated with previous tickets issued under these ordinances, arresting Class members, or through impound of RVs or other vehicles for such unpaid tickets and further enjoining Defendant against ticketing, arrests, prosecutions or any threats of arrest or prosecution

against Named Plaintiffs and Class members for lodging in vehicles on public property, until such time that permanent accessible housing that is affordable is made available to these individuals;

E.    Award restitution for fines and penalties that Defendant collected from Named Plaintiffs and Class members and for vehicles that were impounded pursuant to Defendant's enforcement of the nighttime RV parking and vehicle habitation ordinances and for violation of signs for vehicle habitation;

F.    Order Defendant to pay compensatory damages to Named Plaintiffs only pursuant to 42 U.S.C. § 1983 for the deprivation of Plaintiffs' constitutionally guaranteed rights, and for violation of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 19 U.S.C. § 794,  including damages for emotional distress, and pain and suffering in an amount to be proven at trial;

G.    Award to Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a(a)(2)(b), Cal. Civ. Code § 52, and Cal. Civ. Proc. Code § 1021.5;

H.    Award to Plaintiffs costs of suit; and

I.    Order such other and further relief that the Court deems just and proper.

Dated: February 14, 2018           FISH & RICHARDSON P.C.


                                   By: */s/ Geoff D. Biegler*
                                   Geoff D. Biegler, SB #290040
                                   Biegler@fr.com
                                   Robert M. Yeh, SB #286018
                                   RYeh@fr.com
                                   Nancy L. Ly, SB #284991
                                   Ly@fr.com
                                   Ryan L. Frei, SB #310722
                                   RFrei@fr.com
                                   FISH & RICHARDSON P.C.
                                   12390 El Camino Real
                                   San Diego, CA 92130
                                   Telephone: (858) 678-5070
                                   Fax: (858) 678-5099

                                   Maria Foscarinis (*Pro Hac Vice* to be
                                   filed)
                                   mfoscarinis@nlchp.org
                                   National Law Center on Homelessness
                                   and Poverty
                                   2000 M Street, NW, Suite 210
                                   Washington, DC 20036
                                   Telephone: (202) 638-2835 x. 102
                                   Fax: (202) 628-2737

                                   Ann E. Menasche, SB # 74774
                                   Ann.menasche@disabilityrightsca.org
                                   Stuart Seaborn, SB# 198590
                                   Stuart.seaborn@disabilityrightsca.org
                                   DISABILITY RIGHTS CALIFORNIA
                                   1111 Sixth Avenue, Suite 200
                                   San Diego, CA 92101
                                   Telephone: (619) 239-7861
                                   Fax: (619) 239-7906

Robert Scott Dreher, SB #120527
scott@dreherlawfirm.com
Dreher Law Firm
350 Ash Street, Ste. 101
San Diego, CA 92101
Telephone: (619) 230-8828
Fax: (619) 687-0142

Manfred P. Muecke, SB # 222893
mmuecke@bffb.com
Patricia Syverson, SB # 203111
psyverson@bffb.com
Bonnett Fairbourn Friedman & Balint PC
600 West Broadway, #900
San Diego, CA 92101
Telephone: (619) 798-4292
Fax:  (602) 274-1199

**ATTORNEYS FOR PLAINTIFFS**

1

## CERTIFICATE OF SERVICE

2    The undersigned hereby certifies that a true and correct copy of the above and

3  foregoing document has been served on February 14, 2018 to all counsel of record who

4  are deemed to have consented to electronic service via the Court's CM/ECF system

5  per Civ LR 5.4(d).  Any other counsel of record will be served by U.S. mail or hand

6  delivery.

7

8    *By: /s/ Geoff D. Biegler*
Geoff D. Biegler, SB #290040

9    Biegler@fr.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:17-cv-02324-AJB-NLS