

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Michael Bloom, et al.,<br><br>                                    Plaintiffs,<br><br>v.<br><br>City of San Diego, et al.,<br><br>                                    Defendants. | Case No.:  17-cv-2324-AJB-NLS<br><br>**ORDER DENYING DEFENDANTS'**<br>**MOTION TO DISMISS (Doc. No. 15)** |

    Living with yearly record-breaking rent increases seems to be par for the course in San Diego—part of the so-called "Sunshine Tax." Plaintiffs in this case, disabled and homeless individuals, are amongst those hit the hardest by the Sunshine Tax. Unable to work and living off of government assistance, plaintiffs took refuge from the streets in their RVs; a risky endeavor as two San Diego Municipal Codes make it unlawful to: (1) use a vehicle as a living quarters, and (2) park RVs on city streets during the early morning. Plaintiffs' complaint alleges, among other things, that these ordinances violate the ADA and the Rehabilitation Act because they place a disproportionate burden on the disabled homeless.

    Arguing the law is facially neutral and non-discriminatory, the City of San Diego moves to dismiss these causes of action. (Doc. No. 15.) However, taking plaintiffs' allegations as true, which the Court is required to do at this stage, the Court finds plaintiffs

adequately state claims under both statutes, and thus **DENIES** the City's dismissal motion. (Doc. No. 15.)

## I.  BACKGROUND

Plaintiffs' complaint paints a grim picture of San Diego's housing crisis, which has left many disabled, homeless persons without shelter, but instead, living in their recreational vehicles. (Doc. No. 14 ¶ 1.) The City has two ordinances which target RV residents: San Diego Muni. Code § 86.0139(a) and § 86.0137(f). (*Id.*) The former prohibits an RV from being parked on a public street or in a parking lot from 2:00 a.m. to 6:00 a.m. and the latter outlaws living in a vehicle. (*Id.*) There is an exception, however, to the nighttime RV ordinance "via a permit process that allows for temporary overnight parking of RVs on public streets for a cumulative total of up to 72 days," but this exception is "only available for people with physical addresses, thereby excluding persons whose only stable form of shelter is their RVs. . . ." (*Id.* ¶ 54.)

Plaintiffs have been ticketed under these ordinances and live with continued fear of further citation. (*Id.* ¶¶ 9–17.) Plaintiffs allege that the housing crisis, coupled with the ordinances, "[s]everely and [d]isproportionately" harm disabled plaintiffs. (*Id.* at 22.) Plaintiffs allege they cannot afford to pay rent at an RV park, which costs nearly as much as an apartment, and homeless "safe lots" do not allow RVs. (*Id.* ¶ 3.) This leave plaintiffs with no choice but to live in their RVs, as homeless shelters cannot accommodate plaintiffs' disabilities. (*Id.*) Plaintiffs allege there is "a strong link between homelessness and disability," and state that a "Regional Task Force found that 31% of the City's homeless population was 'chronically homeless.'" (*Id.* ¶ 40.) "The U.S. Department of Housing and Urban Development (HUD) defines 'chronically homeless' as an individual with a disability who has been homeless continuously for at least 12 months or on at least four separate occasions in the last three years." (*Id.*) The complaint alleges there is a high percentage of homeless who suffer from disabilities, and a high degree of danger for the disabled homeless who are forced to live on the streets. (*Id.* ¶¶ 41–44.)

Due to these combined circumstances, plaintiffs argue disabled homeless are

disproportionately burdened under the ordinances—which seem to target them specifically. Plaintiffs merely seek a place to park their RVs overnight without fear of ticketing, impound, or arrest. (*Id.* ¶¶ 45–49.) In furtherance of this goal, plaintiffs "delivered to the office of the City Attorney a written request for a reasonable modification," proposing the City allow homeless RV owners to use empty parking lots at night in non-residential neighborhoods. (*Id.* ¶¶ 59–60.) A meeting occurred, however the City took no action and continued to ticket homeless RV owners, even those who displayed disabled placards. (*Id.* ¶ 61.) Plaintiffs once again requested the City halt the ordinance's enforcement, however, the City refused, and plaintiffs filed this complaint. (*Id.* ¶ 62.)

## II.   LEGAL STANDARDS

### A. Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "[A] court may dismiss a complaint as a matter of law for (1) lack of cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). However, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this determination, a court reviews the contents of the complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the nonmoving party. *See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Notwithstanding this deference, the reviewing court need not accept legal conclusions as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is also improper for a court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 664.

**B. Americans with Disabilities Act and Rehabilitation Act § 504**

Under the ADA, an individual must show: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Weinreich v. L.A. County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1994) (emphasis omitted); 42 U.S.C. § 12132. Under the Rehabilitation Act § 504 ("RA"), a plaintiff must show: "(1) he is an 'individual with a disability';[] (2) he is 'otherwise qualified' to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Id.* (emphasis omitted); 29 U.S.C. § 794.

### III.   DISCUSSION

The City takes issue with the ADA's and the Rehabilitation Act's third requirement: whether plaintiffs were discriminated against because of their disabilities. (Doc. No. 15-1 at 2 ("Plaintiffs fail to establish that enforcement of these ordinances against them is based on their disabilities, as opposed to some other factor, such as their homelessness.").) In support of its argument, the City looks to a Ninth Circuit case in which the Court held that Los Angeles had discriminated against the plaintiff because of his financial circumstances rather than his disability. *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 979 (9th Cir. 1997). In that case, the L.A. Metro Transportation Authority (MTA) offered "a Reduced Fare Program [ ] for elderly and eligible disabled patrons." *Id.* at 978. Weinreich, who was disabled, qualified for the program. *Id.* However, a new rule required program participants to recertify their disability every three years. *Id.* Because Weinreich was indignant, he could not "afford to pay a private doctor to recertify his disability," and requested an exemption from the recertification requirement. *Id.* The MTA refused and did not renew his eligibility in the low fare program. *Id.* The District Court held that "the MTA had no obligation under the ADA or the Rehabilitation Act to 'reasonably accommodate' Weinreich's financial inability to provide updated recertification of his disability" because

"[t]he duty to provide 'reasonable accommodations' under the ADA and the Rehabilitation Act arises only when a policy discriminates on the basis of disability." *Id.* The Ninth Circuit affirmed, concluding "Weinreich's lack of 'meaningful access' to the Reduced Fare Program was not due to his medical disability, but rather to his inability to satisfy a condition of eligibility because of his financial circumstances." *Id.* at 979. Similarly, the City argues plaintiffs are not being denied benefits from the City's services because of their disabilities, but "[r]ather, Plaintiffs are claiming that it is their homelessness that causes them to violate the nighttime RV parking ordinance and the vehicle habitation ordinance." (Doc. No. 15-1 at 7.) Moreover, the City states, "both the nighttime RV parking ordinance and the vehicle habitation ordinance are facially neutral regulations. They are generally applicable and apply to all people regardless of disability status." (*Id.*)

However, as plaintiffs note, the City's latter argument misses plaintiffs' disproportionate burden claims. (Doc. No. 19 at 13.) A facially neutral program can violate the ADA and RA if it disparately impacts or places a disproportionate burden on the disabled. *Alexander v. Choate*, 469 U.S. 287, 299, 309 (1985) (clarifying what sorts of disparate impacts upon the handicapped were covered by the Rehabilitation Act § 504, which the Court assumed included some such impacts); *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (explaining that the Ninth Circuit has "repeatedly recognized that facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced."); *Communities Actively Living Independent and Free v. City of L.A.*, No. CV 09–0287 CBM (RZx), 2011 WL 4595993, at *2 (C.D. Cal. Feb. 10, 2011) (holding "[b]ecause individuals with disabilities require special needs, the City disproportionately burden[ed] them through its facially neutral practice of administering its program in a manner that fails to address such needs."). For support, plaintiffs rely on another Ninth Circuit case where the Court held a facially neutral Hawaiian law requiring a "120-day quarantine on carnivorous animals entering the state" disproportionately burdened—and thus discriminated against— "visually-impaired individuals." *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).

Here, plaintiffs allege three ways in which they are disproportionately burdened by the ordinances: (1) plaintiffs cannot simply stay at the City's homeless shelters as the shelters cannot accommodate plaintiffs' disabilities; (2) plaintiffs' pre-existing conditions makes them more vulnerable to unsheltered homelessness if their RVs are impounded; and (3) plaintiffs cannot access permanent housing since their disabilities preclude them from working and result in fixed incomes. (Doc. No. 14 ¶¶ 40–44, 46, 48, 110–24, 125–29.)

First, because of plaintiffs' disabilities, they cannot seek housing in a homeless shelter because the shelters cannot accommodate their disabilities; or as the complaint states, the shelters are "functionally unavailable" to them. (*See* Doc. No. 14 ¶ 3.) For example, plaintiff Stephen Chatzy "has asthma and sleep apnea and is prone to lung infections. Shelters typically reek of tobacco smoke, which make it difficult for him to breathe and put him at risk for lung infections." (*Id.* ¶ 10.) Plaintiff Tony Diaz cannot take refuge at an emergency shelter because "the tobacco smoke, cleaning fluid odors, and lack of fresh air would aggravate his respiratory condition. Moreover, the crowded, noisy, and regimented environment of shelters would worsen his symptoms of anxiety." (*Id.* ¶ 12.) Plaintiff Valerie Grischy suffers from "severe back pain, depression, anxiety, and panic attacks stemming from a traumatic brain injury and PTSD." (*Id.* ¶ 13.) As such, "her medical history and medical needs require that she live alone. Communal shelter life is simply untenable." (*Id.*) Additionally, most of the plaintiffs have mental health issues— including depression, anxiety, trauma, panic attacks, and post-traumatic stress disorder— which would worsen if forced to find shelter and separate from family. (*Id.* ¶¶ 9–19.) Second, as plaintiffs' counsel argued at the motion hearing, plaintiffs would be even worse off if forced to live on the streets should their RVs be impounded, as disabled individuals face heightened risks on the streets (such as an elevated risk surrounding the hepatitis A outbreak in San Diego) than non-disabled individuals do because of their disabilities. Finally, disabled homeless plaintiffs cannot "escape their plight by obtaining employment, or a better paying position." (Doc. No. 19 at 22, n.7.) Because those with disabilities live on "small fixed incomes," plaintiffs argue they "have been permanently squeezed out of

San Diego's housing market" and have no choice but to live in their RVs. (*Id.* at 21–22.)

It is worth noting, though, that both cases the parties rely on were decided after a bench trial (*Weinreich*) and on a summary judgment motion (*Crowder*). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). Whether the City's two ordinances actually discriminate based on disability is the topic for another type of motion or perhaps trial. The Court's only role here is to assess the complaint's sufficiency.

To that end, the Court finds the complaint plausibly alleges that disabled, homeless plaintiffs are disproportionately burdened by the ordinances. While the City does raise credible issues as to the complaint's focus on homelessness as the discerning factor here rather than plaintiffs' disabilities, the complaint addresses these deficiencies. Paralleling the holding in *Crowder*, although the City's nighttime RV parking ordinance "applies equally to all persons" with RVs in the City, taking plaintiffs' allegations as true, "its enforcement burdens" disabled "persons in a manner different and greater than it burdens others. Because of the unique dependence upon" plaintiffs' need for their RVs to live, the City's ordinances "effectively denies these persons . . . meaningful access" to the City's services, programs, and activities, which are easily accessible by others. *Crowder*, 81 F.3d at 1484.

///
///
///
///
///
///
///
///

## IV.   CONCLUSION

Thus, the Court finds plaintiffs have stated claims under both the ADA and the Rehabilitation Act § 504. Accordingly, the Court **DENIES** the City's motion to dismiss those claims. (Doc. No. 15.)

**IT IS SO ORDERED.**

Dated:  June 7, 2018

Hon. Anthony J. Battaglia
United States District Judge