Michael A. Amon, SB # 226221
Amon@fr.com
Madelyn S. McCormick, SB # 320063
MMcCormick@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Fax: (858) 678-5099

*[Additional Counsel Listed on following page]*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BLOOM, STEPHEN CHATZKY, TONY DIAZ, VALERIE GRISCHY, PENNY HELMS, BENJAMIN HERNANDEZ, DOUG HIGGINS, SUZONNE KEITH, GERALD STARK, ANNA STARK, and DAVID WILSON, individually and on behalf of themselves and all others similarly situated,, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN DIEGO, <br><br> Defendant. | Case No. 3:17-cv-02324-AJB-MSB <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, RESTITUTION AND DAMAGES UNDER THE UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983), AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132), SECTION 504 OF THE REHABILITATION ACT (29 U.S.C.§ 794), THE U.S. AND CALIFORNIA CONSTITUTIONS, AND CALIFORNIA CIVIL CODE § 52.1** <br><br> **JURY TRIAL DEMANDED** |

Maria Foscarinis, DC SB # 397792 (Admitted *Pro Hac Vice*)
mfoscarinis@nlchp.org
NATIONAL LAW CENTER ON HOMELESSNESS AND POVERTY
2000 M Street, NW, Suite 210
Washington, DC 20036
Telephone: (202) 638-2835 x 102/Fax: (202) 628-2737

Ann E. Menasche, SB # 74774
Ann.Menasche@disabilityrightsca.org
Nichole Marie Mendoza, SB # 276632
Nichole.Mendoza@disabiltyrightsca.org
Lili Graham, SB # 284264
Lili.Graham@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
530 B Street, Suite 400
San Diego, CA  92101
Telephone:  (619) 814-8524/Fax: (619) 239-7906

Benjamin Conway, SB # 246410
ben.conway@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel St., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000/Fax: (213) 213-8001

Stuart Seaborn, SB # 198590
sseaborn@dralegal.org
Shira J. Tevah, SB # 307106
stevah@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor,
Berkeley, CA 94704
Telephone: (510) 665-8644/Fax: (510) 665-8511

Robert Scott Dreher, SB #120527
scott@dreherlawfirm.com
DREHER LAW FIRM
350 West Ash St., Ste. 101
San Diego, CA 92101
Telephone: (619) 230-8828

Case No. 3:17-cv-02324-AJB-MSB

Manfred P. Muecke, SB # 222893
mmuecke@bffb.com
Patricia Syverson, SB # 203111
psyverson@bffb.com
BONNETT FAIRBOURN FRIEDMAN & BALINT PC
600 West Broadway, #900
San Diego, CA 92101
Telephone: (619) 798-4292/Fax:  (602) 274-1199

Case No. 3:17-cv-02324-AJB-MSB

# INTRODUCTION

1.      In the midst of a severe housing crisis characterized by dramatically rising rents, a shrinking affordable housing supply, long waits for housing subsidies, scarcity of shelter beds, and a homeless population that has grown 23% in five years, the City of San Diego ("the City") is targeting its most vulnerable residents. There are over 800 unsheltered homeless residents in San Diego, many with disabilities, who seek shelter in their recreational vehicles ("RVs"), campers, or other vehicles (collectively, "Vehicles"). For these people, their Vehicles are their only reliable, safe shelter from the elements and only place to store their belongings. Yet, even though there are no adequate alternatives, the City has repeatedly ticketed and harassed these individuals for seeking shelter in their Vehicles or simply for owning Vehicles and having nowhere else to park. Specifically, the City has used its ordinance prohibiting vehicle habitation, San Diego Muni. Code § 86.0137(f) ("the Original VHO"), and its ordinance prohibiting RV parking from 2:00 a.m. to 6:00 a.m., San Diego Muni. Code § 86.0139(a) ("the nighttime RV parking ordinance") to target homeless vehicle owners, ticketing them and impounding their Vehicles for unpaid tickets. In addition, the City has threatened homeless Vehicle owners with punishment under other laws for the same conduct, including arrest and misdemeanor charges for illegal lodging under California Penal Code § 647(e).

2.      Despite being alerted to these issues, the City refuses to modify its policies to provide a reasonable opportunity for homeless individuals to seek shelter in and/or park their Vehicles legally on City streets or other public property, at least until affordable, accessible, and medically appropriate housing is available to them. While failing to provide any appropriate accommodation for homeless individuals, including those with disabilities, the City has created an exemption to the nighttime RV parking ordinance, via a permit system, for persons who have a physical address. In other words, the City permits people who are not homeless to park their RVs overnight on public streets but penalizes homeless people for the same behavior.

3.     What's more, a new plan, commissioned by the City and intended to guide San Diego's renewed efforts to eliminate homelessness, recommends taking steps to reduce its criminalization of homelessness because it undermines housing solutions.[1] Indeed, the report advises that criminalizing homelessness often has "negative long- term impacts on people experiencing homelessness that make obtaining employment and housing even more difficult[,]"[2] among other harms. The plan, by the Corporation for Supportive Housing, urges the City to immediately prioritize a review of those policies practices, which would include the new version of the vehicle habitation ordinance (the "New VHO"). The plan also encourages the City to look at ways to dial- back the police department's prominent role in homeless outreach.

4.     On August 21, 2018, this Court granted Plaintiffs' motion for a preliminary injunction, enjoining enforcement of the Original VHO. (ECF 44 at 1.) The Court found Plaintiffs likely to prevail on their claim that the Original VHO "violates Plaintiffs' constitutional rights since the [Original VHO] is both vague on its face and is being arbitrarily enforced." (Id.) The Court stated that "Plaintiffs will suffer irreparable harm if their RVs are impounded, that the balance of hardships tilts in their favor, and that an injunction is in the public's interest." (*Id.* at 3.)

5.     In response to the preliminary injunction, on February 5, 2019, San Diego City Council voted to repeal the Original VHO. Then on May 14, 2019, San Diego City Council enacted a New VHO to replace the Original. The New VHO, titled "Prohibition of Use of Streets for Storage, Service, or Sale of Vehicles or for Habitation," makes it "unlawful for any person to use a vehicle for human habitation on any street or public property" between 9:00 p.m. and 6:00 a.m., and at any time within 500 feet of a residence or school. San Diego Muni. Code § 86.0137(f). The

---

[1] The Plan was approved by the San Diego City Council on October 14, 2019. https://www.voiceofsandiego.org/wp-content/uploads/2019/10/San_Diego_Homelessness_Strategic_Plan.pdf.
[2] *Id.* At 48.

New VHO excludes otherwise law-abiding people from most areas of the City anytime—day or night—even when those areas are open to the rest of the public. The New VHO imposes criminal penalties upon people for seeking shelter, resting, or performing other life-sustaining activities in most areas of the City. The New VHO also prohibits people living in vehicles from using their vehicles to visit family, friends, doctors, lawyers, to attend church, to drop their children off at school, or to visit places open to the rest of the public such as retail stores or public parks due to their proximity to a residence. It also severely restricts where people who live in Vehicles may assemble to engage in expressive conduct in pursuit of political, social, economic, educational, religious, and cultural ends. The new VHO further imposes a 9:00 p.m. curfew at which time homeless individuals in Vehicles are to be segregated into a small number of designated parking lots, whether or not those lots are accessible and reasonable options for them.  Violators of the New VHO may be charged with either an infraction or a misdemeanor which may be subject them to arrest and incarceration.

6.     Through its enforcement of the nighttime RV parking ordinance, the Original VHO, its enforcement and threatened enforcement of the New VHO, and its policy and practice of towing and impounding vehicle shelters, the City has carried out a discriminatory, cruel, punitive, and unconstitutional policy against Plaintiffs and Class members, many of whom have disabilities with nowhere else to go. People who seek shelter in their Vehicles do so because they do not have access to affordable, adequate, accessible, stable, permanent, and medically appropriate housing. Sky-high rents and extremely low incomes, among other factors, have excluded these City residents from the housing market.

7.     People who lack housing due to their poverty, often a result of their disabilities, also have inadequate emergency shelter options and far outnumber the number of available temporary shelter beds in San Diego. Even if there were a total number of shelter beds to accommodate the thousands of people experiencing

1  homelessness in San Diego, which there are not, shelters provide only temporary

2  accommodations, sometimes open only overnight. People entering shelters are often

3  required to separate from their partners, pets, and personal possessions, and a large

4  majority of people who exit emergency shelters are recycled immediately back onto

5  the streets. Moreover, temporary shelter options are medically intolerable and thus

6  unavailable to people with disabilities because their medical condition or disability

7  cannot be adequately accommodated in those settings.

8       8.    Shelters also lack parking options for homeless people who own

9  Vehicles. Commercial RV parks exclude older RVs and are often as costly as renting

10  an apartment, and so are not viable options. There is only one "safe lot" that provides

11  overnight parking spaces for homeless individuals in RVs to park that recently

12  opened in May of 2019 ("RV Safe Lot"). However, the RV Safe Lot is in a location

13  that is difficult to access and lacks amenities necessary for people in RVs to maintain

14  life and health. There is inadequate sanitation and no potable water. There is no shade

15  and no electricity at the site, so there is no way to get out of the heat or to safely store

16  medications. The RV Safe Lot is open only overnight and far from places where RVs

17  may lawfully park when the RV Safe Lot is closed. Therefore, homeless people living

18  in RVs are required to drive a distance from the RV Safe Lot on a daily basis, which

19  is prohibitively expensive given that RVs are not fuel efficient.

20       9.    "Safe lots" for cars are also generally unavailable as they have far fewer

21  spaces than the hundreds of homeless persons in San Diego who seek shelter in their

22  cars for lack of adequate alternatives. Yet, homeless vehicle owners are treated as

23  criminals if they "habitate in their vehicles" in most areas of the City, day or night,

24  despite having no other reasonable options for shelter or lawful parking options. This

25  vague prohibition will allow San Diego to exclude poor, disabled, and homeless

26  people from entering into or remaining in most areas of the City. In addition,

27  homeless vehicle owners cannot afford to pay the excessive fines associated with

28

enforcement of the nighttime RV parking and vehicle habitation ordinances, and they risk their ability to buy food, medicine, or other necessities if they attempt to do so.

10.     They also risk the loss of their only shelter, method of transportation, and personal property as a result of the City's policy and practice of towing and impounding Vehicles—without any public safety or urgent traffic control purpose—without a warrant, notice and/or a meaningful opportunity to be heard, and without any public safety or urgent traffic control purpose. There are no standard operating procedures or policy to guide officer discretion regarding vehicle tow and impoundment, even when it is apparent that the vehicle is used as shelter. Plaintiffs first learned of the City's lack of policy or guidance *after* having filed the First Amended Complaint. On January 16, 2019, a San Diego police investigative service officer testified during deposition that the City has no policy, procedures, or training to guide officer discretion regarding towing. The officer also testified that his main interest in enforcing the nighttime RV parking ordinance is to ensure adequate parking availability. Once a Vehicle has been towed and impounded, homeless vehicle owners are charged excessive fines to reclaim their property, often resulting in the permanent loss of their property and only available shelter. Under the New VHO, arrests, incarceration, and larger fines associated with possible misdemeanor charges are likely to cause additional severe hardship.

11.     The nighttime RV parking ordinance, Original VHO, New VHO, and the City's policy and practice of impounding homeless persons' Vehicles without a warrant or any exception to the warrant requirement and without notice and/or a meaningful opportunity to be heard, violate numerous U.S. Constitutional rights, including the Fourteenth Amendment Due Process protections, the Right to Procedural Due Process, the prohibition on State Created Danger, the Right to Equal Protection, and the Right to Travel; Eighth Amendment prohibitions on Cruel and Unusual Punishment and Excessive Fines; Fourth Amendment prohibition against Unreasonable Seizure of Property; and the Right to Association protected by the First

and Fourteenth Amendments. The City's unconstitutional policies and practices also violate California Constitutional rights, including the rights to Due Process, Equal Protection, the right to be free from unreasonable property seizures, and the right to be free from excessive fines. The City's enforcement and threatened enforcement of the ordinances, along with its unconstitutional Vehicle towing policy and practice, also disproportionately burden and discriminate against homeless people with disabilities who live in vehicles based on their disabilities in violation of the antidiscrimination protections of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

12.    Rather than adequately accommodating this homeless, largely disabled, group of individuals and complying with statutory and Constitutional requirements, the City has chosen to place the health, safety, liberty, property, and lives of homeless Vehicle owners in further jeopardy, in the hope that the continuing and escalating harassment will force these residents to leave town.

13.    The Original VHO was so vague and ambiguously worded that neither homeless individuals nor anyone else could ascertain what was or was not prohibited or how to comply with the ordinance to avoid receiving a ticket or having their Vehicle impounded. The New VHO provides no added clarity or meaningful guidance, while now adding broad daytime prohibitions and subjecting violators to arrest and incarceration.

14.    Plaintiffs seek a Court order requiring that the City put an end to these harmful, discriminatory, and unconstitutional practices against this marginalized and vulnerable group of individuals.

## <u>JURISDICTION AND VENUE</u>

15.    The Court has jurisdiction over this action pursuant 28 U.S.C. § 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional

claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

16.    Venue is proper in the Southern District of California because Defendant resides in the District and all events given rise to Plaintiffs' claims occurred in this District. The relief Plaintiffs seek is within this Court's power to grant.

## PARTIES

### A.   Plaintiffs

17.    Plaintiff MICHAEL BLOOM is 70 years-old and a life-long resident of the City of San Diego. Mr. Bloom previously worked as an electrician and carpenter but suffered several accidents that left him with a severely damaged arm and foot, and led to his suffering from hypoglycemia and severe depression. Because of these debilitating physical and mental health issues, Mr. Bloom has not been able to engage in gainful employment since his last accident in 1982. His sole source of income is Social Security benefits, and he cannot afford market rents in San Diego. Even if Mr. Bloom were able to locate an open bed at an emergency or temporary shelter, which are generally full and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to him because his physical disabilities require him to lie down frequently during the day, which is not an option at many shelters, and the overcrowding and lack of privacy would worsen his mental health condition. As a result, for the last twelve years, his only available shelter has been his Vehicle. Before his RV became inoperable in 2019, Mr. Bloom was not able to park his RV in the existing City "safe lots" because the "safe lots" generally did not allow RVs at that time and a small pilot parking program for RVs had only a handful of spaces. Despite this, and even though he has a disability placard on his vehicle, Mr. Bloom has received at least a dozen tickets for parking his RV at night on city streets, about five tickets for vehicle habitation under the Original VHO, and has been threatened with arrest for vehicle habitation. As one example, he received a ticket on

or about December 12, 2017 for violation of the nighttime RV parking ordinance. When he paid these tickets, Mr. Bloom did not have enough money to pay for adequate food or gasoline. If Mr. Bloom did not pay the tickets, however, the City could have towed and impounded his RV, the only form of shelter available to him, which would have been devastating for his mental and physical health and put him at far greater risk of serious harm. It would also have left Mr. Bloom without his most valuable personal property. Mr. Bloom's only shelter currently is a van, which he intends to continue using for that purpose. He's threatened with citation and/or arrest under the New VHO because he has no other shelter or legal place to park that is reasonably accessible to him, and because he must travel into areas forbidden to him under the New VHO, including to retail stores and farmer's markets he frequents for groceries, medical doctors, and churches where he obtains meals. Mr. Bloom meets the definition of "chronically homeless" as defined by the regulations issued by the U.S. Department of Housing and Urban Development ("HUD"). 24 C.F.R. § 91.5(1). Mr. Bloom is also a qualified individual with disabilities within the meaning of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12102, and the Rehabilitation Act of 1973, 29 U.S.C. § 706(8).

18.     Plaintiff STEPHEN CHATZKY is 72 years old and resides in the City of San Diego with his domestic partner, Suzonne Keith, and her disabled adult daughter. Mr. Chatzky is a lawyer, but his Attention Deficit Disorder and memory problems have made it impossible for him practice law. As a result, since 2002, his sole source of income has been Social Security benefits, and he cannot afford market rents in San Diego. Even if Mr. Chatzky were able to locate an open bed at a temporary or emergency shelter, which are generally filled and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to him because shelter conditions would force the family to separate. A psychologist who evaluated Mr. Chatzky opined that if Mr. Chatzky were separated from his family, it would worsen his mental health condition. Additionally, Mr. Chatzky has asthma and sleep

apnea and is prone to lung infections. Shelter conditions expose people to tobacco smoke, which would make it difficult for Mr. Chatzky to breathe and put him at risk for lung infections. Because of these circumstances, the family has lived in an RV since 2008. In approximately June of 2015, the City of San Diego impounded Mr. Chatzky's first RV for unpaid tickets, including tickets for nighttime RV parking and vehicle habitation, even though the family had a disability placard on the vehicle at that time. Mr. Chatzky's vehicle was towed and impounded by the City without a warrant, notice, and/or a meaningful opportunity to be heard, and without any public safety or urgent traffic control purpose. The discretionary tow occurred even though it was known or obvious that Mr. Chatzky and his family resided in the vehicle and would be involuntarily exposed to the outdoor elements as a result of the City's action, and that such action created known or obvious risks of harm that Mr. Chatzky did not otherwise face. Moreover, the City failed to take any obvious steps to address that elevated risk of serious harm, such as by offering Mr. Chatzky and his family adequate alternative shelter. Unable to afford the high cost of retrieving his vehicle from impound, the City's discretionary tow and impound of Mr. Chatzky's first RV resulted in the permanent loss of his property and his family's only available shelter. After the impoundment, Mr. Chatzky and his family had to seek shelter in their car, where all three adults rested, ate, and performed other life-sustaining activities in cramped conditions for five months until they were able to obtain another RV through a family member's assistance. Until May of 2019, there was no "Safe Lot" that accepted more than a handful of RVs. Currently, the sole Safe Lot serving RVs and other oversized vehicles in the City is located at a site that is difficult to physically access as the only entrance, which is a narrow passage through a metal gate, is located on a sloped and busy street. The RV Safe Lot itself is on an incline making it difficult to operate an RV, has inadequate sanitation and no potable water, and there is no place to discard grey water waste at or near the site. There is also no shade or electricity hookups at the site, so there is no way to regulate temperature in a

way necessary for life and health. Moreover, the sole RV Safe Lot is open only overnight and is far from places where Mr. Chatzky may legally park when the RV Safe Lot is closed. Use of the RV Safe Lot would require Mr. Chatzky, Ms. Keith, and her disabled daughter to drive back and forth daily, which is prohibitively expensive on their limited income. As a result, despite making every effort to avoid ticketing by parking in a non-obstructive manner along non-residential streets, Mr. Chatzky and Ms. Keith continue to receive tickets for parking their RV in violation of the nighttime RV parking ordinance. Mr. Chatzky and his family are also threatened with citation and/or arrest under the New VHO as they have no other shelter or legal place to park that is reasonably accessible to them, and they must travel into areas forbidden to them under the New VHO to care for Mr. Chatzky's elderly mother. Mr. Chatzky meets the definition of "chronically homeless" as defined by HUD regulations and is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act.

19.    Plaintiff SUZONNE KEITH is 70 years old and a resident of the City of San Diego. Ms. Keith has held a range of government jobs, including as an equal rights investigator, but her disabilities have made her unable to engage in gainful employment for the last 21 years. She has severe arthritis and edema that interfere with her ability to stand or walk, depression, and Post Traumatic Stress Disorder ("PTSD") from having survived domestic violence prior to meeting Mr. Chatzky, and debilitating migraines. Ms. Keith's sole source of income is a pension of $400 per month, and she cannot afford market rents in San Diego. As a result, Ms. Keith's only option for shelter is to live in an RV with Mr. Chatzky and her disabled adult daughter. After the couple's first RV was impounded for unpaid parking tickets, the family slept cramped in a car for five months because Mr. Chatzky and Ms. Keith could not afford to pay the fines and fees needed to retrieve their RV from impound. Because the police continue to ticket the couple, Ms. Keith is terrified that the City will also impound their second RV, which is the only form of shelter available to her.

Even if Ms. Keith were able to locate an open bed at a temporary or emergency shelter, which are generally filled and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to her because it would require that Ms. Keith be separated from Mr. Chatzky and her disabled daughter, triggering her trauma symptoms and worsening her depression. Additionally, the conditions of the City's crowded emergency shelters, including the high noise level, triggers migraines for Ms. Keith. When Ms. Keith is suffering from a debilitating migraine, she needs to rest in a private and dark space, which is generally not available at shelters. Ms. Keith is threatened with ticketing under the nighttime RV parking ordinance, and also with citation and/or arrest under the New VHO as she has no other shelter or legal place to park that is reasonably accessible to her, and she must travel into areas forbidden to her under the New VHO. Ms. Keith is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act and meets the definition of "chronically homeless" as defined by the HUD regulations.

20.     Plaintiff TONY DIAZ is 60 years old and a resident of the City of San Diego. Mr. Diaz worked as a welder until 2011, when worsening pain and other symptoms of his anxiety disorder, diabetes, hypertension, severe respiratory problems, and bad knee and shoulder prevented him from working. He also recently had major heart surgery. Mr. Diaz has been homeless for approximately seven years and owns a pick-up truck with a shell that serves as his only shelter and place to keep his belongings. He has no regular income, and he cannot afford market rents in San Diego. Mr. Diaz has received four tickets under the Original VHO, even though he spends nights parked at a local 7-Eleven store with the permission of the manager and does not sleep in his vehicle when it is parked on City property. On August 25, 2016, at approximately 6:30 a.m., Mr. Diaz came out of a bathroom in a public park when a member of the San Diego Police Department issued him a vehicle habitation ticket. Mr. Diaz explained to the officer that he had just arrived to go fishing and told the

officer that he was disabled and just had heart surgery. The officer nonetheless issued the ticket and threatened to ticket him anytime he saw Mr. Diaz's vehicle. The officer also threatened to have Mr. Diaz arrested for vehicle habitation. Since that incident, police officers continued to harass and ticket Mr. Diaz under the Original VHO until its repeal. As one example, Mr. Diaz received a ticket for violation of the vehicle habitation ordinance on or about December 23, 2017. Mr. Diaz did his best to comply with the Original VHO by parking overnight on private property with the owner's permission but does not understand what he needs to do in order to stop the ticketing. Even if Mr. Diaz were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to him because the tobacco smoke, cleaning fluid odors, and lack of fresh air would aggravate his respiratory condition.  Moreover, the crowded, noisy, and regimented environment of shelters would worsen his symptoms of anxiety. Mr. Diaz's vehicle was recently towed without a warrant, proper notice, or an opportunity to be heard, leaving him on the streets without shelter. Should he be able to retrieve the vehicle or obtain another one, he will likely be threatened with citation and/or arrest under the New VHO as he has no other shelter or legal place to park that is reasonably accessible to him, and he must travel into areas forbidden to him under the New VHO. Mr. Diaz is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. He also meets the definition of "chronically homeless" as defined by HUD regulations.

21.     Plaintiff VALERIE GRISCHY is 60 years old and a resident of the City of San Diego. Ms. Grischy was a licensed chiropractor and had a successful career, until she became disabled by a serious car accident in 2009. Shortly after the accident, she was unable to work due to severe back pain, depression, anxiety, and panic attacks stemming from a traumatic brain injury and PTSD. Ms. Grischy's sole source of income is Supplementary Security Income (SSI), and she cannot afford

market rents in San Diego. Because she has not been able to afford housing, Ms. Grischy has been living primarily in her RV since 2012. She has received tickets from the City of San Diego for vehicle habitation under the Original VHO and nighttime RV parking even though she has a disability placard on the Vehicle. Ms. Grischy has tried to find places to park to avoid being ticketed. Despite her efforts, Ms. Grischy continued to receive written warnings and tickets from police. As one example, she received two tickets on or about December 30, 2017, one for violation of the Original VHO and one for violation of the nighttime RV parking ordinance. Paying these parking tickets is a severe financial hardship for her. The threat of ticketing has also forced her to temporarily leave San Diego, which she considers her home, to avoid further ticketing. Even if Ms. Grischy were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to her because her medical history and medical needs cannot be accommodated in a crowded communal shelter. Until May of 2019, there was no "Safe Lot" that accepted more than a handful of RVs. The sole RV Safe Lot currently operating in the City is located at a site that is difficult to physically access, as the only entrance, which is a narrow passage through a metal gate, is on a sloped and busy street. The parking lot itself is on an incline that interferes with operation of an RV, there is inadequate sanitation and no potable water at the site, and no place to discard grey water waste at or near the site. There is also no shade or electricity at the site, so there is no way regulate temperature in a way necessary for life and health. Moreover, the sole RV Safe Lot is open only overnight and is distant from places where Ms. Grischy may lawfully park during the hours when the RV Safe Lot is closed. Use of the RV Safe Lot would require Ms. Grischy to drive back and forth daily, which is prohibitively expensive on her limited income. Ms. Grischy currently has a friend who lets her park her RV on his property to avoid the ticketing. Should this arrangement end, Ms. Grischy would likely be threatened with unaffordable

tickets under the nighttime RV parking ordinance and also threatened with citation or arrest under the New VHO as she would have no other shelter or legal place to park that is reasonably accessible to her, and she must travel into areas forbidden to her under the New VHO. Ms. Grischy is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. She also meets the definition of "chronically homeless" as defined by HUD regulations.

22.     Plaintiff PENNY "GRACE" HELMS is 60 years old and a resident of the City of San Diego. Ms. Helms supported herself throughout her 20s working as a waiter and dancer. At the age of 29, the long-term effects of chronic illnesses, and the physical and emotional trauma that she experienced as a child, became so debilitating that she had to stop working. Ms. Helms suffers from fibromyalgia; chronic fatigue syndrome; arthritis; six bulging disks; hypersensitivity and allergy to environmental pollutants such as cigarette smoke and perfume; and various neurological disorders including PTSD, hypervigilance, emotional hypersensitivity, and dissociative identity disorder.  She recently had back surgery. Over the past two decades, she has tried to earn a living by working as a house cleaner, dog groomer, among other jobs, whenever her disabilities permit. But none of that income has been steady or sufficient for her to support herself, and that income has only fallen over the years. Ms. Helms' main, and often the only, source of income for the past few years has been Social Security disability benefits. She cannot afford market rents in San Diego. Because of this, Ms. Helms had been forced to seek shelter in her RV. She has been threatened multiple times by police with ticketing for vehicle habitation and vehicle impoundment for living in her RV. She has also been threatened with arrest for encroachment near her RV. The threat of receiving citations she cannot afford to pay, impoundment, and arrest terrifies her and exacerbates her disabilities, including her hypervigilance. She has left San Diego for weeks or months at a time for fear of being ticketed, arrested, and having her RV impounded, even though she considers San Diego her home. Even if Ms. Helms were able to locate an open bed at a

temporary or emergency shelter, which are generally full and cannot accommodate the hundreds of homeless people forced to seek shelter in their vehicles, it would be functionally unavailable to her because she cannot tolerate communal living given her myriad disabilities. Until May of 2019, there was no "Safe Lot" that accepted more than a handful of RVs. The sole RV Safe Lot currently in the City is located at a site that is difficult to physically access, as the only entrance, which is a narrow passage through a metal gate, is on a sloped and busy street. The parking lot itself is on an incline interfering with the ability to operate an RV. There is inadequate sanitation and no potable water at the site, and no place to discard grey water waste at or near the site. There is also no shade or electricity at the site, so there is no way to regulate temperature in a way necessary for life and health. Moreover, the sole RV Safe Lot is open only overnight and is distant from places where RVs may lawfully park during the hours when the RV Safe Lot is closed. Use of the RV Safe Lot would require Ms. Helms to drive back and forth daily, which is prohibitively expensive on her limited income. Having no adequate place to park, Ms. Helms is threatened with unaffordable tickets for violation of the nighttime RV parking ordinance. Ms. Helms is also threatened with citation or arrest under the New VHO as she has no other shelter or legal place to park that is reasonably accessible to her, and she must travel to areas forbidden to her under the New VHO, including to her medical provider, the local laundromat, and to visit a close friend. Ms. Helms is a qualified individual with disabilities within the meaning of the ADA, and the Rehabilitation Act. She also meets the definition of "chronically homeless" as defined by HUD regulations.

23.     Plaintiff BENJAMIN HERNANDEZ is a 56-year-old man and a resident of the City of San Diego. Mr. Hernandez was a stonemason and primary breadwinner for his family until he was involved in a pedestrian accident in 2015. After the accident, the orthopedic impairments from his injuries, along with depression, left him unable to work. Mr. Hernandez was only given a small, one-time disability award and does not receive ongoing disability benefits. Though his wife works, her

wages are extremely modest and insufficient to afford the high cost of housing in San Diego. Their lack of funds has caused Mr. Hernandez and his wife to utilize their RV as their shelter for the past year. In addition to offering shelter from the elements, their RV provided them with a shower, toilet, refrigerator, stove and microwave and a queen-sized bed. On or about July 26, 2017, however, the City impounded their RV for unpaid nighttime RV parking citations. The City impounded the RV without a warrant, without notice and/or a meaningful opportunity to be heard, and without any public safety or urgent traffic control purpose. The discretionary tow occurred even though it was known or obvious that Mr. Hernandez and his wife resided in the vehicle and would be involuntarily exposed to the outdoor elements as a result of the City's action, and that such action created known or obvious risks of harm that Mr. Hernandez did not otherwise face. Moreover, the City failed to take any obvious steps to address that risk, such as offering Mr. Hernandez and his wife adequate alternative shelter. The tow and impound of Mr. Hernandez's vehicle resulted in the permanent loss of his property. Since Mr. Hernandez and his wife could not afford to pay the excessive citations and towing fees to retrieve their RV from impoundment, the couple spent several weeks sleeping, eating, and performing other life-sustaining activities cramped in their Toyota Camry, which aggravated Mr. Hernandez's back injury. The loss of his RV was also extremely traumatic, causing Mr. Hernandez's depression to worsen. Even if Mr. Hernandez were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to him because it would force him to separate from his wife, aggravating the symptoms of his depression. Currently, Mr. Hernandez uses an SUV as his only available shelter. The current "Safe Lots" for cars are inaccessible to Mr. Hernandez and his wife because they are distant from his wife's job. Also, his wife frequently works late night shifts and Safe Lots do not allow entry after 9:00 p.m. or 10:00 p.m. Mr. Hernandez is threatened with citation and/or arrest under the New VHO as he has no

1    other shelter or legal place to park that is reasonably accessible to him, and he must

2    travel to areas forbidden to him under the New VHO, including to medical providers

3    whose offices are within 500 feet of schools and/or residences. Mr. Hernandez is a

4    qualified individual with disabilities within the meaning of the Rehabilitation Act, the

5    ADA, and California law. He also meets the definition of "chronically homeless" as

6    defined by the regulations issued by HUD.

7        24.    Plaintiff DOUG HIGGINS is 70 years old, a resident of the City of San

8    Diego, and a veteran who was honorably discharged from the U.S. Army. He had a

9    successful career as a car dealer until his symptoms of anxiety and depression, along

10   with a painful back condition, worsened in 2009. His bad back, which is aggravated

11   by stress, keeps him from standing, sitting, or walking for any length of time. His sole

12   source of income is Social Security benefits, and he cannot afford to pay market rent

13   in San Diego. Even if Mr. Higgins were able to locate an open bed at a temporary or

14   emergency shelter, which are generally full and cannot accommodate the thousands

15   of homeless people in the City, it would be functionally unavailable to him because it

16   would exacerbate his mental health symptoms. For the past five years, his RV has

17   been the only shelter available to him. Mr. Higgins has received tickets both for

18   vehicle habitation and for nighttime RV parking. He received a nighttime RV parking

19   ticket on or about November 11, 2017 and a habitation ticket on or about November

20   10, 2016. He cannot afford to pay the tickets, as paying them jeopardizes his ability to

21   pay for food and other necessities. Until May of 2019, there was no "Safe Lot" that

22   accepted more than a handful of RVs. The sole current RV Safe Lot in the City is

23   located at a site that is difficult to physically access as the only entrance, which is a

24   narrow passage through a metal gate, is on a sloped and busy street. The parking lot

25   itself is on an incline interfering with the operation of an RV. There is inadequate

26   sanitation and no potable water at the site, and no place to discard grey water waste at

27   or near the site. There is also no shade or electricity at the site, so there is no way to

28   regulate temperature in a way necessary for life and health. Moreover, the sole RV

Safe Lot is open only overnight and is distant from places where Mr. Higgins may legally park during the hours when the RV Safe Lot is closed. Use of the RV Safe Lot would require Mr. Higgins to drive back and forth daily, which is prohibitively expensive on his limited income. Having no accessible alternative, Mr. Higgins is threatened with unaffordable tickets under the nighttime RV parking ordinance. The threat of ticketing and fear of losing his RV to impoundment increases his stress and exacerbates the symptoms of his disabilities. Police have told him to leave the City if he does not like the ticketing, but he considers San Diego to be his home. Mr. Higgins is also threatened with citation and/or arrest under the New VHO as he has no other shelter or legal place to park that is reasonably accessible to him, and he must travel to areas forbidden to him under the ordinance, including to the local library and stores that he frequents. Mr. Higgins is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. Mr. Higgins also meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

25.    Plaintiff DAVID WILSON is 49 years old and a resident of the City of San Diego. Mr. Wilson previously worked as an actor, taxi driver, and security guard. Mr. Wilson has a range of conditions arising from a car accident, including compression of the spine, peripheral neuropathy, edema in both feet and ankles (requiring him to elevate his feet), depression, PTSD, Social Anxiety Disorder, an eating disorder, and porphyria (a skin condition that makes him highly susceptible to infection). Mr. Wilson also suffers from asthma and hypersomnia (a condition in which a person has trouble staying awake during the day). Because of these conditions, Mr. Wilson had to stop working in 1999. His sole source of income is SSI, and he cannot afford to pay market rent in San Diego. In 2013, Mr. Wilson purchased an RV, giving him a place to lie down and take shelter from the elements. In addition, the RV provided him with running water, a stove, a refrigerator and the ability to control the temperature in his environment. Mr. Wilson has received

numerous tickets from the City of San Diego, including for vehicle habitation under the Original VHO and nighttime RV parking, and has been threatened with arrest for vehicle habitation. This happened despite his having a disabled placard on the Vehicle. In an attempt to save the little money he had to pay the tickets, Mr. Wilson resorted to eating out of the trash. Ultimately unable to pay all the tickets, Mr. Wilson sold his RV around October of 2015 to avoid imminent impoundment of his Vehicle and purchased a truck with the proceeds. Deprived of his RV, he began sleeping outside or cramped in the cab of his truck. Without a proper place to lie down and elevate his feet, which his peripheral neuropathy requires that he do and having no alternative but to sleep outside or in his truck, Mr. Wilson ended up hospitalized. The loss of his RV has continued to have negative effects on Mr. Wilson's health; however, he has been and continues to be deterred from exchanging his truck for another RV because of the ongoing enforcement of the nighttime RV parking ordinance. Even if Mr. Wilson were able to locate an open bed at a temporary or emergency shelter, which are generally full and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to him because the crowded and noisy shelter environment would aggravate Mr. Wilson's mental health conditions and, due to his vulnerability to infection and asthma, put his physical condition at further risk. The "Safe Lots" for vehicles are also inaccessible to him because of his inability to regulate his own body temperature requiring he stay in a temperate micro-climate, which current "Safe Lot" locations do not offer. His disabilities also place him at elevated risk of infection if he uses portable toilets, and they require him to have regular access to running water, which is not available at safe lots. Mr. Wilson has been warned and threatened by police with citation or arrest under the New VHO as he has no other shelter or legal place to park that is reasonably accessible to him, and he must travel to areas forbidden to him under the New VHO. Mr. Wilson is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. Mr. Wilson also meets the definition of

"chronically homeless" as defined by HUD regulations.

26.     Plaintiff GERALD STARK is 78 years-old, and has lived his entire life in the City of San Diego. He was recently diagnosed with and is being treated for cancer. Mr. Stark worked installing pipes as a member of the Steamfitters Union until he retired in 2007. Since retirement, his income consists only of Social Security and a small pension totaling $2,000 per month to support himself and his wife of fourteen years, Anna Stark. This income is not enough to afford market rents in San Diego for himself and his wife. As a result, Mr. Stark and his wife, Anna, moved into an RV in 2008 – one year after his retirement. Emergency shelter is not an option for Mr. Stark. Even if he were able to locate an open bed at an emergency or temporary shelter, which are generally full and cannot accommodate the thousands of homeless people in the City, it would be functionally unavailable to him because it would require him to separate from his wife. Since 2008, Mr. Stark's home and only available shelter has been inside an RV shared with Ms. Stark. Despite this, Mr. Stark has received tickets for parking his RV at night on City streets and for vehicle habitation under the Original VHO. Because he was unable to afford to pay those excessive fines, his RV was impounded by the City on or about March 28, 2017. Mr. Stark's RV was towed by the City without a warrant, notice, and/or a meaningful opportunity to be heard, and without any public safety or urgent traffic control purpose. The tow occurred even though it was known or obvious that Mr. Stark and his wife resided in the vehicle and would be involuntarily exposed to the outdoor elements as a result of the City's action, and that such action created known or obvious risks of harm that Mr. Stark did not otherwise face. Moreover, the City failed to take any obvious steps to address that risk of harm, such as offering Mr. Stark and his wife adequate alternative shelter. Because Mr. Stark was unable to pay the excessive fines imposed upon him by the City, the tow and impoundment of Mr. Stark's RV resulted in the permanent loss of his property. Because the City impounded his home and only form of shelter, Mr. Stark lived for several months unsheltered on the streets of the City where he

suffered serious physical, mental, and emotional harm. With assistance from family members, Mr. Stark purchased another RV to use for shelter. Until May of 2019, there was no "Safe Lot" that accepted more than a handful of RVs. The sole RV Safe Lot in the City is located at a site that is difficult to physically access, as the only entrance, which is a narrow passage through a metal gate, is on a sloped and busy street. The parking lot itself is also on an incline, making it difficult to operate an RV. There is inadequate sanitation and no potable water at the site, and no place to discard grey water waste at or near the site. There is also no shade or electricity at the site, so there is no way regulate temperature in a way necessary for life and health. Moreover, the sole RV Safe Lot is open only overnight and is distant from places where Mr. Stark may legally park during the hours when the RV Safe Lot is closed. Use of the RV Safe Lot would require Mr. Stark to drive back and forth daily, which is prohibitively expensive on his limited income. He continues to be at risk for tickets for parking his RV on City streets at night and having his RV again impounded. Mr. Stark is also threatened with citation or arrest under the New VHO as he has no other shelter or legal place to park that is reasonably accessible to him, and he must travel to areas that are forbidden to him under the ordinance including to medical appointments and to visit Ms. Stark's daughter. Mr. Stark is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. Mr. Stark meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

27.   Plaintiff ANNA STARK is 50 years-old, and she has lived in the City of San Diego for her entire life. She has been married to Gerald Stark for fourteen years. Ms. Stark has severe anxiety stemming from multiple past traumas. She previously worked as a home health care worker, but has been unemployed for many years due to her mental health condition. She has no income, and she is entirely dependent on her husband's small pension and Social Security, which is too low to afford market rents in San Diego. Even if Ms. Stark were able to locate an open bed at an

emergency or temporary shelter, which are generally full and cannot accommodate the thousands of homeless people who live in the City, it would be functionally unavailable to her because it would require her to separate from her husband and her support animal, and the crowded congregate living environment would aggravate her anxiety. Since 2008, her only available home and shelter has been inside an RV shared with Mr. Stark. Until May of 2019, there was no "Safe Lot" that accepted RVs. The sole RV Safe Lot in the City is located at a site that is difficult to physically access, as the only entrance, which is a narrow passage through a metal gate, is on a sloped and busy street. The parking lot itself is on an incline interfering with the proper functioning of an RV. There is inadequate sanitation and no potable water at the site, and no place to discard grey water waste at or near the site. There is also no shade or electricity at the site, so there is no way regulate temperature in a way necessary for life and health. Moreover, the sole RV Safe Lot is open only overnight and is distant from places where Ms. Stark may lawfully park during the hours when the RV Safe Lot is closed. Use of the RV Safe Lot would require Ms. Stark to drive back and forth daily, which is prohibitively expensive on her limited income. Despite the lack of availability of adequate options for RV parking, the RV Ms. Stark used as a home was ticketed multiple times, including for violation of the nighttime RV parking ordinance. On or about March 28, 2017, the Starks' RV was impounded for unpaid tickets. Ms. Stark's vehicle was towed by the City without a warrant, notice, and/or a meaningful opportunity to be heard, and without any public safety or urgent traffic control purpose. The discretionary tow occurred even though it was known or obvious that Ms. Stark and her husband resided in the vehicle and would be involuntarily exposed to the outdoor elements as a result of the City's action, and that such action created known or obvious risks of harm that Ms. Stark did not otherwise face. Moreover, the City failed to take any obvious steps to address that risk, such as offering Ms. Stark and her husband adequate alternative shelter. Because the City impounded their home and only form of shelter, Ms. Stark lived for several months

unsheltered on the streets of the City where she suffered serious physical, mental, and emotional harm. Ms. Stark is now living in another RV with her husband and is at continuing risk for ticketing and impoundment. Ms. Stark is also threatened with citation or arrest under the New VHO as she has no other shelter or legal place to park that is reasonably accessible to her, and she must travel to areas forbidden to her under the ordinance including to medical appointments and to visit her daughter. Ms. Stark is a qualified individual with disabilities within the meaning of the ADA and the Rehabilitation Act. Ms. Stark also meets the definition of "chronically homeless" as defined by the regulations issued by HUD.

28.     "Named Plaintiffs" or "Plaintiffs" refers to the individual Plaintiffs named in this section.

## B.     Defendant

29.     Defendant CITY OF SAN DIEGO is now and, at all times mentioned in this Complaint, a local government agency and subdivision of the State of California. Defendant CITY OF SAN DIEGO, through its agents the Mayor, City Council, City Attorney, Parking Enforcement, Police Department, and the Police Chief undertakes to cite Plaintiffs and Class members for nighttime RV parking and for vehicle habitation.

30.     Defendant CITY OF SAN DIEGO also demands exorbitant penalties that Plaintiffs and Class members cannot afford to pay, impounds and/or threatens to impound their RVs or other vehicles, and threatens them with arrest, all the while refusing to provide reasonable modifications of these policies based on Plaintiffs' and Class members' disabilities.

31.     Defendant CITY OF SAN DIEGO implements the ticketing and impoundment of Plaintiffs' and Class members' Vehicles even though Plaintiffs' and Class members' vehicles are the only shelter from the elements available to them and the only secure place they have to keep their belongings. In addition, the Defendant CITY OF SAN DIEGO has threatened Plaintiffs and Class members with arrest and

misdemeanor charges for illegal lodging pursuant to state law, and under the New VHO.

## **CLASS ALLEGATIONS**

32.     Plaintiffs bring this action against Defendant on their own behalf and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

33.     The main class, referred to as the "Main Class" is defined as: All homeless persons who have been cited and/or subject to citation and/or arrest or are at risk of citation and/or arrest by the City of San Diego pursuant to Original and/or New VHO, San Diego Muni. Code §§ 86.0137(f); and the nighttime RV parking ordinance San Diego Muni. Code § 86.0139(a) and/or who have had or are at risk of having a vehicle used as shelter towed and impounded by the City.

34.     Plaintiffs also bring this action on behalf of a subclass, referred to as the "Disability Subclass" or "Subclass," which is defined as: All Class members who have a "disability" as defined under the ADA, 42 U.S.C. § 12102.

35.     All members of the Subclass are also members of the Main Class. The terms "Class" and "Classes" refers to both the Main Class and the Subclass collectively.

36.     Plaintiffs reserve the right to amend or modify the Class definitions in connection with a motion for class certification and/or with the result of discovery.

### **Numerosity**
### **Main Class**

37.     Plaintiffs do not know the exact size or identities of the Class. However, Plaintiffs believe that the Class encompasses a minimum of several hundred homeless individuals who are dispersed geographically throughout the City of San Diego as

well as California and neighboring states.[3] Therefore, the members of the Class are so numerous that individual joinder of all members is impracticable.

38.     All members of the Class are subject to Defendant's policies and practice in enforcing the nighttime RV parking ordinance, the Original VHO and/or New VHO, and in towing and impounding Class members' Vehicles without a warrant or any exception to the warrant requirement, and without notice and/or a meaningful opportunity to be heard. The Class is united in its interests with respect to proof of Defendant's conduct, and the effects caused by Defendant's actions.

### Subclass

39.     Plaintiffs do not know the exact size or identities of the Disability Subclass. Plaintiffs believe that the Subclass consists of hundreds of homeless individuals based on the high number of persons with disabilities found in surveys of the homeless population in San Diego. *See* ¶ 51, *infra*.

40.     All members of the Subclass are subject to or have been subjected to Defendant's discriminatory policies and practice in enforcing the nighttime RV parking ordinance, Original VHO and/or New VHO, and in towing and impounding Class members' Vehicles without a warrant and/or any exception to the warrant requirement, and without notice and/or a meaningful opportunity to be heard. The Class is united in its interests with respect to proof of Defendant's discriminatory conduct, and the effects caused by Defendant's actions.

---

[3] *See* REGIONAL TASK FORCE ON THE HOMELESS, 2017 WE ALL COUNT RESULTS (2017), http://www.rtfhsd.org/wp-content/uploads/2017/07/2017-PITC-Results- Powerpoint.pdf.  The methodology for counting individuals experiencing homelessness in San Diego changed in 2019, which artificially reduced the number of individuals counted. Moreover, individuals living in certain vehicles were not counted at all in 2018. For these reasons, we believe that the 2017 data, which is still generally considered an undercount of the actual homeless population, is the most accurate data set available.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Predominance of Common Issues**

**Main Class**

41.    The questions of law and fact common to members of the Class predominate over questions that may affect individual Class members. Such common questions of law and fact include but are not limited to the following:

(i)    whether Defendant's enforcement of San Diego Muni. Code §§ 86.0137(f), the Original VHO and New VHO, and 86.0139(a) including ticketing for "violation of signs" prohibiting vehicle habitation under § 86.0112(E) has and continues to violate 42 U.S.C. § 1983 by infringing upon Named Plaintiffs' and Class members' constitutional rights, including by endangering Plaintiffs and Class members, and by violating their Right to Equal Protection; the Right to Travel; the Right to be free from Cruel and Unusual Punishment; the Right to Due process; and/or the Right to Association.

(ii)    whether Named Plaintiffs and other Class members are at risk of arrest for illegal lodging or under the New VHO pursuant to Defendant's existing policies because they are homeless and seek shelter in their vehicles;

(iii)    whether Named Plaintiffs and other Class members are at risk that their RV, camper or other vehicle will be towed and impounded by the City without a warrant or any exception to the warrant requirement, and without notice and/or a meaningful opportunity to be heard for unpaid tickets or impounded as a result of an arrest for vehicle habitation under the New VHO along with their personal belongings seized because they are homeless and need to use their vehicles as shelter; and

(iv)    whether Named Plaintiffs and the other Class members are entitled to equitable relief, including system-wide policy changes to address the constitutional and statutory violations detailed in this Complaint.

**Subclass**

(v)    whether Defendant's policies, including its policies regarding enforcement of San Diego Muni. Code §§ 86.0137(f), the Original VHO and the New

VHO, and 86.0139(a) including ticketing for "violation of signs" prohibiting habitation under § 86.0112(E), and towing and impounding vehicles discriminate on the basis of disability; and

(vi)    whether Defendant has failed or refused to provide reasonable modifications of their policies as required under the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 749.

## Typicality
## Main Class

42.    Named Plaintiffs are asserting claims typical of the claims of the entire class of affected persons described above and do not conflict with the interests of any other members of the Classes. Named Plaintiffs and Class members have been injured by the same wrongful policies, practices, and conduct of Defendant. Named Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class members and are based on the same legal theories.

## Subclass

43.    Named Plaintiffs are all qualified individuals with disabilities and assert claims typical of the claims of the entire Disability Subclass. The interests of the Named Plaintiffs do not conflict with those of the Disability Subclass. All have been injured by the same wrongful policies, practices, and conduct of Defendant, which discriminate on the basis of disability. Named Plaintiffs' claims arise from the same practices and conduct that give rise of all Subclass members and are based on the same legal theories.

## Adequate Representation

44.    Named Plaintiffs will fairly and adequately represent the interests of the Main Class and the Subclass, and they have no interests antagonistic to those of the Classes. Indeed, Named Plaintiffs' interests are aligned with those of the Class members. Named Plaintiffs have retained lawyers who are competent and experienced in class action litigation.

**Superiority**

45.    A class action is preferable and superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of claims by many Class members who could not afford to individually litigate their claims or vindicate their rights against the government. There are no difficulties likely to be encountered in the management of this case that might preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this matter.

## COMMON FACTUAL ALLEGATIONS

Plaintiffs allege the following common facts on information and belief.

### San Diego's Lack of Affordable Housing Has Created a Homelessness Crisis

46.    San Diego now has the fourth largest homeless population in the country. Based on a January 2017 survey, the Regional Task Force on the Homeless found that there are 5,619 homeless people in the City of San Diego, an increase of 10% since 2016. 2017 WE ALL COUNT RESULTS, supra note 3, at 37. The Regional Task Force further found that 3,231 of these 5,619 homeless individuals are unsheltered and living in places not meant for human habitation, an 18% increase from the previous year. According to the same survey, San Diego County now has a homeless population of 9,116, more than double the approximately 4,000 shelter beds available in the County. The results of this crisis have been seen in the rapidly expanding encampments in downtown San Diego and other parts of the City and in the number of people who seek shelter in their Vehicles for lack of adequate alternatives.

47.    The homelessness crisis in San Diego is directly linked to the lack of affordable housing. As of 2014, the median cost of an efficiency studio apartment in San Diego was 110% of the amount of an SSI check, which at that time was less than

$900/month.[4] Since then, rents have continued to rise while SSI rates for a single individual in California is only approximately $931 per month. The San Diego Housing Federation reports a shortfall of 135,749 homes affordable to low income San Diegans, with rents up 32% in the last decade. Average rent and utilities for a two-bedroom apartment has climbed to $1618 a month.[5] In addition, the demand for housing subsidies far exceeds supply. There is a 10- to 12-year waiting list for a Section 8 housing voucher, with over 60,000 persons on that list alone. The small amount of existing affordable or subsidized housing also has long waiting lists.

48.    The Regional Task Force on Homelessness found that the homeless population in the City of San Diego included 817 people living in Vehicles. *See* 2017 WE ALL COUNT RESULTS, supra note 3, at 37. These individuals have no accessible shelter available to them other than in their Vehicles. They also lack lawful places to park their Vehicles. RV owners without physical addresses have no legal place to park their RVs at night that is reasonably available and accessible to them. The few "Safe Lots" established in San Diego only serve a small portion of people with Vehicles who are homeless, and they prioritize families with small children – a subset of the putative class. The only RV Safe Lot in the City is in an inaccessible location, lacks necessary amenities needed to maintain health and life, and requires that people living in RVs drive a distance back and forth daily, which is prohibitively expensive.

49.    RV parks in San Diego charge high rents. Monthly rentals in RV parks in the City of San Diego range from a low of $699 per month to a high of $1950 per month depending on the park and the time of year, which is unaffordable to Plaintiffs

---

[4] *See* EMILY COOPER ET AL., PRICED OUT IN 2014: THE HOUSING CRISIS FOR PEOPLE WITH DISABILITIES 24 (Technical Assistance Collaborative, Inc. 2015),  ttp://www.tacinc.org/media/52012/Priced%20Out%20in%202014.pdf.
[5] *See* STEPHEN RUSSELL, THE AFFORDABLE HOUSING CRISIS IN SAN DIEGO: HOW DO WE MEET THE NEED? (San Diego Housing Federation 2017), http://docs.sandiego.gov/councilcomm_agendas_attach/2017/sglu_170125_4c.pdf.

1   and Class members. Moreover, many RV parks have maximum stay limits and limit

2   or exclude older RVs.

### People with Disabilities Have Been Severely and Disproportionately Harmed by the Crisis

5   50.     There is also a strong link between homelessness and disability.  The

6   U.S. Department of Housing and Urban Development ("HUD") defines "chronically

7   homeless" as an individual with a disability who has been homeless continuously for

8   at least 12 months or on at least four separate occasions in the last three years. 24

9   C.F.R. § 91.5(1).  A person is deemed homeless if he or she lacks a fixed, regular,

10  and adequate nighttime residence. This includes persons who use RVs or other

11  vehicles for other than temporary living quarters for recreational use. 42 U.S.C. §

12  11302(a)(1); 24 C.F.R. § 3282.8(g).  The Regional Task Force found that 31% of the

13  City's homeless population was "chronically homeless." *See* 2017 WE ALL COUNT

14  RESULTS, supra note 3, at 37.

15  51.     In San Diego, a high number of homeless individuals have disabilities.

16  The Regional Task Force found that 39% of homeless people in San Diego reported

17  mental health disabilities and 40% reported a physical disability. Some surveys have

18  found even higher rates of disability. For example, of the 1,145 persons attending a

19  one-day resource fair for the homeless in the City, 60.2% reported a long lasting

20  medical condition and 49.5% reported having a mental illness.[6]

21  52.     The primary reason for the strong link between disability and

22  homelessness is an economic one. Homeless individuals with disabilities are not

23  homeless as a matter of choice. Rather, many people with disabilities, including

24  Named Plaintiffs and Class members, are unable to work due to their disabilities and

---

[6] *See* SAN DIEGO HOUSING COMMISSION, PROJECT HOMELESS CONNECT REPORT (2015),
http://www.sdhc.org/uploadedFiles/Housing_Innovations/Project_Homeless_Connect/2015Project%20Homeless%20Connect%20Report_04.15.15.pdf.

therefore must rely on a rapidly shrinking social safety net that has not kept up with rising San Diego rents.

53.     Living on the streets is dangerous, especially for women, seniors, and people with disabilities. In the fiscal year ending September 30, 2017, 117 homeless people died on the streets of San Diego, double the figure from two years earlier.[7] Adults who are homeless and age 50 and older have rates of chronic illness and geriatric conditions similar to or more than adults who are age 65-70 and housed.[8]

54.     The City's recent Hepatitis A epidemic highlights the health dangers, both to homeless individuals and to others, associated with living on the streets without access to shelter and sanitation. The Hepatitis A outbreak has resulted in at least twenty deaths.

### Plaintiffs and Class Members Have No Reasonable Option for Shelter Other Than Their RVs or Other Vehicles

55.     Sheltering oneself is not voluntary conduct. It is a universal and basic human need that is necessary for health and life. It is harmless. Sheltering oneself in public space is an act integral to the status of homelessness. For Named Plaintiffs and Class members fortunate enough to have RVs or other vehicles, their only reasonable option is to utilize the rudimentary shelter provided by their Vehicles until permanent, accessible, and medically appropriate housing that they can afford is available.

56.     Named Plaintiffs and Class members do not have reasonably accessible places in the City to seek shelter in their vehicles or to park their RVs or other

---

[7] See Daniel Wheaton, Homeless Deaths Have Doubles Over Two Years, San Diego Union Tribune, November 28, 2016, http://www.sandiegouniontribune.com/news/data-watch/sd-me-homeless-deaths-20161128-story.html.

[8] See JENNIFER GOLDBERG, ET AL., HOW TO PREVENT AND END HOMELESSNESS AMONG OLDER ADULTS (Justice in Aging 2016), http://www.justiceinaging.org/wp-content/uploads/2016/04/Homelessness-Older-Adults.pdf.

oversized vehicles legally at night. As explained above, RV parks in San Diego are generally unaffordable to Plaintiffs and Class members. Dreams for Change operates a "Safe Parking Program," which provides some places to park vehicles at night as does Jewish Family Services. However, there are far fewer spaces than the number of people living in vehicles in San Diego. Until May of 2019, there were virtually no "Safe Lots" that allowed RVs. Now, the only RV Safe Lot in the City is in an inaccessible location, lacks necessary amenities needed to maintain health and life, and requires that RV owners drive distances back and forth daily, which is prohibitively expensive. Moreover, despite the absence of available permanent affordable housing options, all participants are required to participate in "programming" or case management and are often expected to sign up for programs that provide only temporary or short-term shelter, and are frequently inaccessible and/or medically unacceptable to Plaintiffs and to Disability Subclass members.

57.     There is also an insufficient number of temporary shelter beds available in the City as compared to the homeless population, including those who seek shelter in their Vehicles, even when accounting for seasonal and overflow spaces.

58.     Even if a homeless person is able to identify an available bed in a temporary or emergency shelter, the shelter bed may be inaccessible to that person. Emergency and temporary shelter beds and transitional housing programs are functionally unavailable to many people with disabilities including Named Plaintiffs and members of the Subclass, because emergency and temporary shelter conditions are likely to aggravate their mental health and/or physical conditions. Many shelters and transitional housing programs in San Diego have an overcrowded congregate living environment, are noisy, lack privacy, often lack opportunity to lie down during the day, present an increased risk of infection, expose shelter residents to strong odors from smoke and chemical cleaning products that can aggravate respiratory disabilities, along with other risks. In addition, many shelters only take adults and separate them by gender, thereby separating family members and causing additional

trauma.

59.     Emergency and temporary shelters, including most transitional housing programs, do not provide a real solution for Named Plaintiffs or Class members. Even if they were to enter a temporary or emergency shelter or be admitted into a transitional housing program, Named Plaintiffs and Class members with RVs would not have anywhere to park their RVs legally at night and would continue to be at risk of ticketing under the nighttime RV parking ordinance. Moreover, these programs provide only temporary accommodations with strict time limits. The Regional Taskforce on Homelessness has found that a majority of persons exited from shelter programs have not been placed in permanent housing. In the continued absence of permanent affordable housing alternatives, individuals who are able to use the shelter system are released back onto the streets, with all of the associated health and safety risks attendant to unsheltered homelessness. Thus, under current conditions, there are no reasonable alternatives for Named Plaintiffs and Class members other than utilizing their RVs or other vehicles for shelter.

**The City Uses Multiple Laws to Punish Homeless Individuals with Vehicles**

60.     The City's original "Prohibition of Use of Streets for Storage, Service or Sale of Vehicles or For Habitation" ordinance, San Diego Muni. Code § 86.0137(f), provides: "It is unlawful for any person to use a vehicle while it is parked or standing on any streets as either temporary or permanent living quarters, abode, or place of habitation." The terms "temporary or permanent living quarters, abode, or place of habitation" are not defined. A ticket for vehicle habitation is punishable as an infraction by a fine of $40 plus a $12.50 surcharge and doubles if not paid in 21 days.

61.     The City's newly enacted "Prohibition of Use of Streets for Storage, Service or Sale of Vehicles or For Habitation" ordinance, San Diego Muni. Code § 86.0137(f), provides: "It is unlawful for any person to use a vehicle for human habitation on any street or public property, unless the street or public property is specifically authorized for such use by the City Manager, as follows: (1) between the

hours of 9:00 p.m. and 6:00 a.m.; and (2) at any time within 500 feet of a residence, meaning a building used for living, including a house, condominium, apartment unity, or other similar dwelling unit affixed to real property; and (3) at any time, within 500 feet of a school that offers instruction on those courses of study required by the California Education Code or that is maintained pursuant to standards set by the State Board of Education. School for purposes of this section 86.0137(f) does not include a vocational or professional institution of higher education, including a community or junior college, college, or university. (4) For purposes of this section 86.0137(f), evidence of human habitation may include observations, considering all the circumstances, that a person is using a vehicle for: sleeping; bathing; preparing or cooking meals; possessing or storing items that are not associated with ordinary vehicle use, such as a sleeping bag, bedroll, blanket, sheet, pillow, used bedding, kitchen utensils, cookware, cooking equipment, camping gear, food, water, personal grooming items, or containers of feces or urine. Evidence of human habitation also may include observations, considering all the circumstances, that: a person has obscured some or all of the vehicle's windows; there is litter, rubbish, or waste in or around the vehicle; there is furniture set up in or around the vehicle, such as chairs, tables, umbrellas, or portable cooking equipment; or there is evidence of human urination or defecation around the vehicle." The term "human habitation" is not defined; instead, the New VHO provides a list of "evidence" purportedly related to "human habitation." Violations of the New VHO may be charged as an infraction which normally carries a fine of $40 plus a $12.50 surcharges, doubling if not paid in 21 days. Unlike under the Original VHO, violators of the New VHO may also be arrested and charged with a misdemeanor which may carry up to a $1,000 fine and six months in jail.

      62.    The City has posted signs in various locations stating "No Habitation." Named Plaintiffs and Class members have been ticketed and continue to be at risk of ticketing for "Violation of Signs" under S.D. Mun. Cod § 86.0112(E) for allegedly

"habitating" in their vehicles. A ticket for "Violation of Signs" is punishable as an infraction by a fine of $40 plus a $12.50 surcharge and doubles if not paid in 21 days.

63.     The City's "Prohibition of Parking of Oversized, Non-Motorized and Recreational Vehicles" ordinance, S.D. Mun. Code § 86.0139(a), provides in relevant part: "Except as provided in section 86.0140 or otherwise expressly provided to the contrary herein, or unless such parking or standing is authorized by the City Manager and appropriate sign permitting such parking or standing are posted: (a) it is unlawful for any person to park or leave standing upon any public street, park road or park parking lot, any oversized, non-motorized or recreational vehicle between the hours of 2:00 a.m. and 6:00 a.m." A ticket for nighttime RV parking is punishable as an infraction by a fine of $100 plus a $12.50 surcharge and doubles if not paid in 21 days.

64.     In addition to fines, there is potential for other serious consequences for violating these ordinances. A vehicle can be removed or impounded by the City when it has five or more unpaid parking violations. *See* Cal. Veh. Code § 22651. In addition, the City may notify the Department of Motor Vehicles ("DMV") and the DMV will not renew a Vehicle's registration until the penalties are paid. Cal. Veh. Code §§ 4760 and 40229(a).

65.     Ironically, and intentionally, though it has made no exceptions to any of these ordinances for people without housing, the City has created a specific exception to its nighttime RV parking ban for people with housing. The City has established a permit process that allows for temporary overnight parking of RVs on public streets for a cumulative total of up to 72 days in a given year. S.D. Mun. Code § 86.0143. Such permits are only available for people with physical addresses, thereby excluding persons whose only stable form of shelter is their RV or other oversized vehicle, including Named Plaintiffs and Class members. Named Plaintiffs and Class members are therefore left with no reasonably accessible places anywhere in the City to park their RVs at night, whether or not they are able to access a temporary shelter bed.

66.     On information and belief, the City enacted the nighttime RV parking ordinance in 2013 for the primary purpose of removing homeless RV owners from the community, reflecting the City's animus toward homeless people. The City enacted the ordinance in significant part due to the difficulty the City was having proving that such homeless persons were in violation of the Original VHO and ordinance prohibiting parking a vehicle in excess of 72 consecutive hours. San Diego Muni. Code § 86.0118.

67.     A report from the City Council's Land Use & Housing Committee in support of the nighttime RV parking ordinance declared that "in many cases an occupant is living illegally in vehicle" and "current enforcement tools are time consuming and unproductive (*e.g.* marking tires, knocking on vehicle doors)."[9]

68.     At a subsequent Mission Beach Town Council meeting, Julio DeGuzman of the San Diego City Attorney's office responded to complaints regarding an increasing number of "transients" with RVs, by reassuring attendees that his office "works on removing the homeless from our community."[10]

69.     On information and belief, the City enacted the New VHO in response to private animus against Class members, who are disproportionately people with disabilities. Private bias and unsubstantiated, prejudiced assumptions about Class members, as reflected in statements made about Class members at the City Council hearing on May 14, 2019 and at other times prior to the enactment of the New VHO, unduly influenced the City to enact the New VHO which excludes Named Plaintiffs

---

[9] *See* THE COMMITTEE ON LAND USE AND HOUSING OF THE CITY COUNCIL OF THE CITY OF SAN DIEGO, REPORT FROM COUNCILMEMBER KEVIN FAULCONER'S OFFICE REGARDING THE ADOPTION OF THE NEIGHBORHOOD PARKING AND SAFETY ORDINANCE, Agenda item-4, doc. 8 at 3 (March 27, 2013), http://docs.sandiego.gov/councilcomm_agendas_attach/2013/LUH_130327_4ppt.pdf.

[10] *See* MISSION BEACH TOWN COUNCIL, MINUTES OF GENERAL MEMBERSHIP MEETING (Nov. 13, 2013), http://www.missionbeachtc.com/uploads/5/0/0/3/50033147/mbtc_minutes_general_mtg_nov.13.2013.pdf.

and Class members from the majority of public space and segregates them from other citizens based on their status as homeless people sheltering in their vehicles.

70.    Defendant has had and continues to have a policy and practice of utilizing these ordinances to issue and/or threaten to issue parking tickets to homeless people who live in vehicles, including to individuals with disability placards or special disabled license plates issued by the State of California prominently displayed on their vehicles, to impose exorbitant penalties, and to tow and impound their vehicles for failure to pay the penalties. Defendant has carried out this policy even though it knew or reasonably should have known that the majority of the "transients" being targeted for ticketing have a disability and/or have no other reasonable option for shelter besides their vehicles. San Diego police officers and other agents and employees of the City knew or reasonably should have known that many of the individuals receiving these tickets have disabilities due to the fact that disability placards are commonly displayed on the vehicles; and even in the absence of a disability placard, the officers may have had an opportunity to observe or interact with the persons being ticketed, who either had an obvious disability or voluntarily disclosed the disability to the officer.

71.    State law considers a person guilty of disorderly conduct, a misdemeanor, if the person "lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it." Cal. Penal Code § 647(e). The City has enforced and/or threatened enforcement of this state statute against Class members for sheltering in their vehicles. Violation of the statute carries a maximum penalty of six months in jail and a $500 fine. The language of the statute makes clear that the City has the authority to grant permission to persons lodging in vehicles to stay on public property and therefore such arrests or threats of arrest are purely discretionary. The City has similarly indicated a willingness to enforce other discretionary statutes disproportionately against the homeless population, including the "encroachment"

statute, S.D. Mun. Code §54.0110.[11]

## The City Has Refused to Modify Its Discriminatory Policies

72.     On March 30, 2017, seven of the Plaintiffs—Michael Bloom, Stephen Chatzky, Valerie Grischy, Penny Helms, Doug Higgins, Suzonne Keith, and David Wilson—acting through their attorneys, delivered to the office of the City Attorney a written request for a reasonable modification of the City's ticketing policies pursuant to the provisions of Title II of the ADA. The reasonable modification would allow them and other homeless RV owners with disabilities to continue to live in San Diego and fully utilize their RVs as shelter, including at night without ticketing and harassment. The request included supporting evidence documenting each of their disability-related need to utilize their Vehicles for shelter.

73.     Plaintiffs are aware of multiple parking lots under City control that are empty at night, and could be used by Named Plaintiffs and Class members for nighttime parking of their RVs and other vehicles used as shelter. Plaintiffs are also aware of streets in industrial areas that are empty at night and have ample places to park RVs and other vehicles used as shelter. The use of these lots and industrial areas by Plaintiffs and Class members would not infringe on residential parking or otherwise inconvenience other City residents.

74.     In response to Plaintiffs' reasonable modification request, the City Attorney's office held one meeting with Plaintiffs' counsel on May 9, 2017. Over the next two months, and despite the urgency of this matter to Plaintiffs' health and safety, the City did not take or propose any actions to address Plaintiffs' concerns. The City continued to ticket, tow, and impound homeless persons' Vehicles, including those of persons with disabilities. The City's actions showed an

---

[11] "It is unlawful for any person to erect, place, allow to remain, construct, establish, plant, or maintain any vegetation or object on any public street, alley, sidewalk, highway, or other public property or public right-of-way, except as otherwise provide by this Code." San Diego Municipal Code §54.0110 ("Unauthorized Encroachments Prohibited").

unwillingness to make reasonable modifications to its nighttime RV parking ordinance, the Original VHO, and its policy and practice of towing and impounding homeless persons' vehicles for unpaid tickets.

75.     On July 8, 2017, Plaintiffs requested that the City temporarily halt enforcement of the nighttime RV parking ordinance and the Original VHO to stop ticketing homeless people living in RVs and other vehicles and to stop impounding their RVs and other vehicles pending a final resolution of the matter. The City again stalled, waiting until August 23, 2017, before telling Plaintiffs that it would not agree to temporarily halt enforcement of these ordinances, nor to temporarily halt its policy of towing and impounding homeless persons' Vehicles for unpaid tickets. Because of the continued harm caused to Named Plaintiffs and Class members by the City's actions, Plaintiffs had no choice but to file their Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Substantive Due Process—Void for Vagueness**
**(Fourteenth Amendment; 42 U.S.C. § 1983)**

76.     Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     The Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

78.     To satisfy the Due Process Clause, an ordinance must be sufficiently definite to provide adequate notice of the conduct proscribed and provide sufficient guidelines for the police so that arbitrary and discriminatory enforcement does not occur. *See Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1106-1107 (1995).

79.     The Original VHO did not satisfy the requirements of the Due Process Clause. As written, the Original VHO made unlawful the use of a vehicle parked or standing on the street as "either temporary or permanent living quarters, abode, or

place of habitation." None of the terms used—"temporary living quarters," "permanent living quarters," "abode" or "place of habitation"—were defined anywhere in the ordinance.

80.    The Original VHO (whether enforced directly or indirectly through citations issued under "Violation of Signs" prohibiting habitation) failed to provide adequate notice and sufficient guidance, which would allow an individual to ascertain beyond mere speculation as to how one uses a parked or standing vehicle as "either temporary or permanent living quarters, abode, or place of habitation." he ordinance therefore failed "to draw a clear line between innocent and criminal conduct," *Desertrain v. City of Los Angeles*, 754 F. 3d 1147, 1156 (9th Cir. 2014), and invited selective enforcement against people who are homeless, many of whom have disabilities. As detailed above, Named Plaintiffs and Class members attempted to comply with the vehicle habitation ordinance but were nonetheless ticketed under its vague and overbroad reach.

81.    The New VHO also does not satisfy the requirements of the Due Process Clause. As written, the New VHO makes unlawful the use of a vehicle for "human habitation." The New VHO does not define the term. Although the New VHO includes a list of "evidence of human habitation," the ordinance provides no standard to gauge when this evidence amounts to unlawful human habitation of a vehicle, other than "considering all of the circumstances."

82.    Like the Original VHO, the New VHO fails to provide adequate notice and sufficient guidance, which would allow an individual to ascertain beyond mere speculation as to how one uses a vehicle for "human habitation." The evidence of human habitation listed in the ordinance consists largely of ordinary activities that occur in or around the vehicle including: "sleeping," storing "sleeping bags, bedrolls, [and] blankets," and leaving "litter, rubbish, or waste." Even with these potential observations, it is still not clear when such evidence or activities demonstrate that a vehicle is being used for unlawful human habitation, and it does not change or

1    meaningfully limit how police enforcement operated under the Original VHO—

2    which this Court found violated Plaintiffs' constitutional rights because it was both

3    vague on its face and was being arbitrarily enforced. Bloom v. City of San Diego,

4    2018 WL 9539239 (S.D. Cal. Aug. 21, 2018). Therefore, the New VHO fails "to

5    draw a clear line between innocent and criminal conduct," *Desertrain v. City of Los*

6    *Angeles*, 754 F. 3d 1147, 1156 (9th Cir. 2014), and continues to invite selective

7    enforcement against people who are homeless, many of whom have disabilities.

8        83.    The City's attempt to add time, place, and manner provisions to the New

9    VHO fail to bolster the ordinance's constitutionality. The New VHO excludes those

10   who are purporting to use a vehicle for "human habitation" from the vast majority of

11   the City anytime of the day or night, and excludes them from all public streets and

12   parking lots (except for designated "Safe Lots") from 9:00 p.m. until 6:00 a.m. The

13   New VHO's provisions do not clarify or meaningfully limit how police are expected

14   to enforce the ordinance. The New VHO's time and place provisions function in the

15   same way as under the Original VHO—effectively constituting a blanket ban on the

16   use of a vehicle for "human habitation." Thus, despite the time and place provisions,

17   the New VHO fails "to draw a clear line between innocent and criminal conduct,"

18   *Desertrain*, 754 F. 3d at 1156, and continues to invite selective enforcement against

19   people who are homeless, many of whom have disabilities. In addition, while the

20   Original VHO arguably allowed for daytime enforcement, the New VHO makes this

21   explicit, opening the door for even more police harassment and selective enforcement

22   against people deemed to be homeless.

23       84.    Named Plaintiffs and Class members have no choice but to continue to

24   live in their RVs or other Vehicles. Despite repealing the Original VHO, the City

25   enacted the New VHO and, through its actions and officers, has communicated

26   specific warnings and threats of enforcement against Named Plaintiffs and enforced

27   the New VHO against Class members. Based on the City's enforcement of the

28   Original VHO, Named Plaintiffs and Class members face the realistic dangers

1    associated with the City's enforcement of the New VHO.

2         85.    The Original VHO and New VHO should therefore be declared

3    unconstitutionally vague both facially and as applied or likely to be enforced against

4    Named Plaintiffs and Class members in violation of Substantive Due Process

5    protections under the Fourteenth Amendment to the U.S. Constitution.

6         86.    As a result of the Defendant's actions with respect to the Original VHO

7    under color of law in violation of the Due Process Clause of the Fourteenth

8    Amendment, Named Plaintiffs and Class members were forced to pay fines and

9    assessments they could not afford and were deprived of or threatened with the

10   deprivation of their only available shelter—their RVs or other vehicles. In addition to

11   that cost, Named Plaintiffs suffered emotional and mental distress as well as

12   humiliation because of this violation of their rights. Defendant's unlawful actions and

13   the resulting injuries entitle Named Plaintiffs to compensatory damages, including

14   damages for emotional distress. Named Plaintiffs and Class members are also entitled

15   to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

16        87.    As a result of the Defendant's actual and threatened actions with respect

17   to the New VHO under color of law in violation of the Due Process Clause of the

18   Fourteenth Amendment, Named Plaintiffs and Class members have been and will

19   continue to be forced to pay fines and assessments they cannot afford. Moreover, the

20   New VHO threatens even greater penalties with the issuance of misdemeanor

21   citations, arrests, incarceration, and continued threat that they will be deprived of

22   their only available shelter—their RVs or other vehicles. In addition to those costs,

23   Named Plaintiffs will suffer emotional and mental distress as well as humiliation

24   because of this violation of their rights. Defendant's unlawful actions and the

25   resulting injuries entitle Named Plaintiffs to compensatory damages, including

26   damages for emotional distress. Named Plaintiffs and Class members are also entitled

27   to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

28

## SECOND CAUSE OF ACTION

### Right to Be Secure from Unreasonable Seizures
### (Fourth Amendment; 42 U.S.C. § 1983)

88.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

89.     Defendant has violated Plaintiffs' right to be secure from unreasonable seizure of their property without a warrant.

90.     Removing a Vehicle constitutes a seizure under the Fourth Amendment of the United States Constitution.

91.     Under the guise of the New VHO and the nighttime RV parking ordinance,[12] Defendant has a policy and practice of ordering Vehicles, including Vehicles Plaintiffs use as shelter, to be towed and impounded without a warrant and without any public safety or urgent traffic control purpose.

92.     As a direct and proximate consequence of Defendant's intentional acts and unconstitutional policies and practices with respect to the New VHO and the nighttime RV parking ordinance, Named Plaintiffs and Class members have suffered and continue to suffer from the seizure and impoundment of their Vehicles, which they use as shelter. Plaintiffs request injunctive relief to stop the towing and impoundment of Plaintiffs' vehicles under the New VHO and the nighttime RV parking ordinance and to require Defendant to adopt constitutionally sound policies.

## THIRD CAUSE OF ACTION

### Right To Procedural Due Process Of Law
### (Fourteenth Amendment; 42 U.S.C. § 1983)

93.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

94.     A state cannot deprive a person of life, liberty, or property, without due process of law. U.S. CONST. amend. XIV, § 1. The Due Process Clause of the

---

[12] *See* ¶ 10, above.

United States Constitution requires the government to provide adequate notice and a meaningful opportunity to be heard prior to depriving individuals of their property.

95.     Towing and impounding a Vehicle constitutes a seizure under the Fourth Amendment of the United States Constitution.

96.     Under the guise of the New VHO and the nighttime RV parking ordinance, Defendant has a policy and practice of towing and impounding Plaintiffs' vehicles without a warrant and without any public safety or urgent traffic control purpose.

97.     As a matter of policy and practice, Defendant does not provide notice or an opportunity to be heard prior to towing and impounding Plaintiffs' vehicles with respect to the New VHO and the nighttime RV parking ordinance. This is Defendant's policy and practice even when it is evident that the subject vehicles are used as shelter. This is Defendant's policy and practice even though tow and impound of Plaintiffs' vehicles often result in the permanent deprivation of Plaintiffs' property.

98.     Plaintiffs' interest in their vehicles, which they use for transportation, property storage, and as their only form of available shelter, significantly outweighs Defendant's interest in enforcement of the challenged ordinances.

99.     As a direct and proximate consequence of the acts of the Defendant, and its unconstitutional policies and practices, Named Plaintiffs and Class members have suffered and continue to suffer from the seizure and impoundment of their vehicles. Plaintiffs request injunctive relief to stop the towing and impoundment of Plaintiffs' vehicles under the New VHO and the nighttime RV parking ordinance and to require Defendant to adopt constitutionally sound policies. Named Plaintiffs and Class members are also entitled to restitution, attorneys' fees and costs.

# FOURTH CAUSE OF ACTION

## Violation of Cruel and Unusual Punishment
## (Eighth and Fourteenth Amendments; 42 U.S.C. § 1983)

100.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.   The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

102.   Defendant's policy and practice of issuing citations and/or making arrests or threats of same for violations of the vehicle habitation ordinances violates the Eighth Amendment's prohibition on cruel and unusual punishment because it constitutes a punishment that is disproportionate to the severity of the "crime" of violating the nighttime RV parking and vehicle habitation ordinances or of lodging in one's vehicle on City streets. *See Solem v. Helm*, 463 U.S. 277 (1983).

103.   The punishments inflicted by Defendant for violation of the ordinances in question force Named Plaintiffs and Class members to attempt to pay exorbitant fines that they cannot afford. Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication, or other necessities. And when they no longer pay the fines, they lose the only form of shelter available to them—their RV or vehicle—through impoundment. With their RVs or vehicles taken from them, Plaintiffs and Class members face the dangers described herein of living on the streets without shelter and the other necessities of life provided by their RVs.

104.   These punishments grossly outweigh any interest on the part of Defendant in preventing Plaintiffs and Class members from parking on city streets at certain times of the day and/or seeking shelter in their vehicles.

105.   For Named Plaintiffs and Disability Subclass members, Defendant's practice and policy also violates the Eighth Amendment's prohibition on cruel and unusual punishment because it punishes Named Plaintiffs and Disability Subclass

members for being disabled and homeless. By punishing the act of sheltering oneself in a vehicle when there are no adequate alternatives, the City effectively punishes a person for her homeless status. *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). Defendant infringes Plaintiffs' and Subclass members' rights by threatening and/or imposing criminal punishment for sitting, lying, sleeping, and/or sheltering oneself in a vehicle in most areas of the City at any time of the day or night, and in all places between the hours of 9:00 p.m. and 6:00 a.m.

106.   Named Plaintiffs and Class members are involuntarily homeless because the City lacks affordable permanent housing. The City also lacks accessible, adequate, and available temporary shelters for the hundreds of people who seek shelter in their Vehicles, much less the thousands of people who are homeless in the City. Many Named Plaintiffs and Disability Subclass members are homeless because their disabilities led to their unemployment and poverty. Plaintiffs and Class members cannot reasonably forego sheltering themselves, as sheltering oneself is a basic human need. Until permanent, affordable, and accessible housing is available to them, their RVs or other vehicles are their only option for meeting their basic human need for shelter and for other necessities of life that housing normally provides.

107.   Defendant's actions that penalize Plaintiffs for their homeless status constitute cruel and unusual punishment in violation of Plaintiffs' rights under the Eighth Amendment to the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

108.   Because the New VHO violates the freedom from cruel and unusual punishment guaranteed by the Eighth Amendment, Named Plaintiffs and Class members are entitled to a declaratory judgment that the New VHO is unconstitutional as applied to them as well as to injunctive relief, restitution and attorney's fees.

**FIFTH CAUSE OF ACTION**

**Violation of Right to Be Free From Excessive Fines**
**(Eighth and Fourteenth Amendments; 42 U.S.C. § 1983)**

109.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

110.   The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609–10 (1993). A fine is excessive if it is grossly disproportionate to the gravity of the offense, will deprive the offender of their livelihood or is more than their circumstances and estate will bear. *See Timbs v. Indiana*, 139 S. Ct. 682 (2019).

111.   In addition, imposing unpayable fines on indigent defendants violates due process and equal protections of the laws under the due process and equal protections provisions of Fourteenth Amendment, and the California Constitution. *Bearden v. Georgia*, 461 US 660, 667-668 (1983). People vs. Duenas, 30 Cal. App. 5th 1157 (2019). Defendant's policy and practice of issuing tickets and threats of tickets for nighttime RV parking and vehicle habitation to Plaintiffs and Class members is an excessive fine in violation of the Eighth Amendment to the U.S. Constitution.

112.   The punishments inflicted by Defendant for violation of the ordinances in question force Named Plaintiffs and Class members to attempt to pay more than they can afford on excessive fines. Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication or other necessities. And when they can no longer afford the fines, they lose the only form of shelter available to them—their RV or vehicle—through towing and impoundment. With their RVs or vehicles taken from them, Plaintiffs and Class members face the dangers described herein of living on the streets without shelter and/or without the other necessities of life provided by their vehicles.

113.   These punishments grossly outweigh any interest on the part of Defendant in enforcing the nighttime RV parking restriction, the Original VHO, the New VHO, and the City's policy and practice of towing and impounding homeless persons' vehicles.

114.   As a result of enforcement, Named Plaintiffs suffered emotional and mental distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress. Plaintiffs and Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

### Violation of Substantive Due Process—State Created Danger
### (Fourteenth Amendment; 42 U.S.C. § 1983)

115.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.   Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. Wood v. Ostrander, 879 F. 2d 583 (9th Cir. 1989).

117.   Defendant City of San Diego has a policy, pattern, custom, and practice of issuing tickets and/or citations to Named Plaintiffs and Class members under the above described ordinances, even though they have insufficient options for alternative shelter and lawful parking.

118.   When said Class members are unable to pay tickets and/or citations for sheltering in or parking their vehicles, the City's policy and practice is to tow and impound the RVs or other vehicles that Plaintiffs and Class members rely on for shelter from the elements and for other necessities without a warrant or any exception

to the warrant requirement, and without notice and/or a meaningful opportunity to be heard. In addition, vehicles may be towed incidental to an arrest under the New VHO.

119.  As a direct result of that policy and practice, Defendant, through its agents, employees, officials and departments, has acted and continues to act affirmatively as described herein to place Plaintiffs and Class members in a highly dangerous situation that they would not otherwise face, thereby threatening Plaintiffs' and Class members' health and safety, risking serious exacerbations of their disabilities, and putting their lives at risk.

120.  As a direct result of its policy and practice, Defendant has acted affirmatively by citing Plaintiffs and Class members for parking and vehicle habitation violations that they cannot reasonably avoid, thereby forcing Plaintiffs and Class members to attempt to pay exorbitant fines that they cannot afford. Plaintiffs and Class members who attempt to pay these fines must sacrifice paying for life-sustaining food, medication, or other necessities. And when they can no longer pay the fines, they lose the only form of shelter available to them—their RV or vehicle—through tow and impoundment without notice and/or meaningful opportunity to be heard.

121.  As a direct result of its policy and practice, Defendant has acted affirmatively to require Plaintiffs and Class members to move in and out of "Safe Lots" on a daily basis that are devoid of basic services, protection from the elements, and/or disability access, and where they face an elevated risk of harm.

122.  The City has acted affirmatively to tow and impound Named Plaintiffs and Class members' vehicles without notice and/or a meaningful opportunity to be heard, often resulting in the permanent loss of that property.

123.  Without the Vehicles that they rely upon for shelter, Plaintiffs and Class members are involuntarily exposed to the outdoor elements and face the dangers described herein of living unsheltered on the streets. In addition, Class members who have their RVs taken are deprived of other necessities of life previously provided by

their RVs including access to running water, toilet, shower, cooking and food storage facilities; and temperature control. Both RVs and other vehicles provide a place to store critical personal property, and they provide secure, private sleeping accommodations. Thus, loss of Plaintiffs and Class members' Vehicles through impoundment, has a significant negative impact on their physical and/or mental health.

124.   It is known or obvious to Defendant that its affirmative conduct as described above places homeless people who live in Vehicles at elevated risk of serious harm to their health and safety. In the absence of Defendant's affirmative actions, Plaintiffs and Class members would not face that elevated risk.

125.   Defendant acted with reckless disregard or deliberate indifference to the known or obvious risks of harm —including malnourishment, illness, exposure to the outdoor elements, and/or aggravation of disabilities—that they created for Plaintiffs and Class members by enforcing and/or threatening to enforce Defendant's nighttime RV parking ordinance, Original VHO, New VHO, and/or by towing and impounding their RVs and other vehicles. Defendant and its agents and employees also knew or reasonably should have known that the Named Plaintiffs and many Class members have disabilities, are chronically homeless, and have no other viable options for shelter. Despite Defendant's actual knowledge or willful blindness to the elevated risk of serious harm to Plaintiffs and Class members flowing from its above described affirmative actions, Defendant failed to take obvious steps to address the elevated risk. *See, e.g.*, *L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996). Defendant's actions show a reckless disregard or deliberate indifference to the health, safety and well-being of Plaintiffs and Class members, in violation of Plaintiffs' and Class members' Substantive Due Process rights under the Fourteenth Amendment to the U.S. Constitution.

126.   As a result of Defendant's policies and practices described herein, Named Plaintiffs' health and safety were and are placed in grave danger in violation

of the Fourteenth Amendment. Named Plaintiffs were injured and damaged in that they suffered serious harm and were forced to bear the medical costs of those harms. In addition to that cost, the Named Plaintiffs suffered emotional and mental distress as well as humiliation because of the danger created by Defendant's unlawful actions. Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress.

127.   Plaintiffs and Class members have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief, including restitution for fines and assessments collected and vehicles impounded by Defendant. Plaintiffs are also entitled to attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION

### Infringement on the Fundamental Right to Travel – Equal Protection (Fourteenth Amendment; 42 U.S.C. § 1983)

128.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

129.   The Fourteenth Amendment to the U.S. Constitution protects as a hallmark of personal liberty the right to travel to whatever place one's own inclination may direct and stay as long as one wishes. Enforcement practices that deprive individuals of a basic necessity of life may be found to burden the right to travel unconstitutionally. *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974); *Pottinger v. Miami*, 810 F. Supp. 1551 (S.D. Fla. 1992). "The right to travel has found its strongest expression in the context of attempts by states to discourage the immigration of indigents." *Joyce v. City & Cty. of S.F.*, 846 F. Supp. 843, 860 (N.D. Cal. 1994).

130.   The Equal Protection Clause of the Fourteenth Amendment dictates that no State shall deny to any person within its jurisdiction the equal protection of the laws. Conduct violates the Equal Protection Clause when it disproportionately affects

a suspect class or impinges on the exercise of a fundamental right. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

131.   Defendant's pattern and practice of ticketing Named Plaintiffs and Class members under its nighttime RV parking ordinance directly infringes Named Plaintiffs' and Class members' Right to Travel. Defendant has created an RV parking permit process available to City residents with physical addresses to allow nighttime RV parking, but have denied access to that permitting process to Named Plaintiffs and Class members. Defendant has conducted these activities by collecting exorbitant fines that Named Plaintiffs cannot afford to pay, impounding their vehicles, and threatening criminal prosecution for a misdemeanor, even though Named Plaintiffs and Class members have no reasonable alternative but to utilize the rudimentary shelter provided by their Vehicles. This conduct has the purpose and effect of depriving or threatening to deprive Named Plaintiffs and Class members of the necessities of life, including food, shelter, and medicine, thereby preventing Named Plaintiffs and Class members from traveling to and residing in San Diego. Defendant's enforcement of the nighttime RV parking ordinance specifically leaves Named Plaintiffs and Class members with no reasonable options for parking their RVs between 2:00 a.m. and 6:00 a.m. Since Named Plaintiffs and Class members lack the means to pay for housing or private parking and temporary shelters are not available to them, and the RV Safe Lot is in an inaccessible location and lacking necessary amenities, Named Plaintiffs and Class members cannot reasonably be in the City within those times, effectively depriving them of all shelter while traveling within the City.

132.   Defendant's actions have violated Named Plaintiffs' and Class members' Right to Travel under the Fourteenth Amendment by refusing to provide an exemption to the nighttime RV parking ordinance based on homelessness or disability. The City has provided an exemption to its nighttime RV parking ordinance via a permit process that allows people with physical addresses to park RVs and

oversized vehicles from 2:00 a.m. to 6:00 a.m., but has denied the same rights to those without physical addresses, including Named Plaintiffs and Class members. Defendant's enforcement of the nighttime RV parking ordinance against Named Plaintiffs and Class members denies them the basic necessity of shelter and violates their fundamental Right to Travel.

133.   Defendant's implementation and enforcement of the New VHO also impinges on the Named Plaintiffs and Class members' fundamental Right to Travel. In particular, the ordinance makes areas within 500 feet of residences and schools off limits to persons suspected of living in their Vehicles any time of the day or night and providing such residents with very few places in the City they can be during day – without facing criminal penalties and the prospect of arrest. This conduct thus requires Named Plaintiffs and Class members, who have no other option in the City for housing other than living in their Vehicles, to keep moving or otherwise leave the City altogether, severely inhibiting their freedom of movement. It also prevents them from engaging in life sustaining activities in the City, such as sleeping, going to medical appointments, picking up groceries, dropping their kids off at school, among a wide range of other necessary activities that would require them to be present in banned or restricted areas under the ordinance, further impinging their freedom of movement.

134.   Defendant's actions therefore unconstitutionally infringe on the Right to Travel protected under the Fourteenth Amendment to the U.S. Constitution.

135.   As a result of Defendant's actions under color of law in violation of the Right to Travel under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs and Class members face the prospect of arrest unless they keep moving or avoid engaging in necessary and life sustaining activities. They have also been forced to pay citations that they could not afford, and/or lost their Vehicles through impoundment, thereby depriving them of the use of their only available shelter—their RVs or other vehicles. In addition to that cost, Named Plaintiffs suffered emotional

1   and mental distress as well as humiliation because of this violation of their rights.

2   Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to

3   compensatory damages including damages for emotional distress. Named Plaintiffs

4   and Class members are also entitled to injunctive and declaratory relief, restitution,

5   and attorneys' fees and costs.

### EIGHTH CAUSE OF ACTION

**Violation of Right to Association**
**(First Amendment; Fourteenth Amendment; 42 U.S.C. § 1983)**

9   136.  Plaintiffs hereby incorporate each and every allegation contained in the

10  foregoing paragraphs as if fully set forth herein.

11  137.  The New VHO violates Plaintiffs' and putative Class members'

12  constitutional right to association in two related yet distinct contexts: the right to

13  familial association; and the right to expressive association.

14  138.  The Ninth Circuit has routinely found that the right to familial

15  association is protected under both the First and Fourteenth Amendments. *See Keates*

16  *v. Koile*, 883 F.3d 1228, 1235–36 (9th Cir. 2018) ("Accordingly, we have held that

17  claims under both the First and Fourteenth Amendment for unwarranted interference

18  with the right to familial association could survive a motion to dismiss.") (citing *Lee*

19  *v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)).

20  139.  Under the language of the New VHO, which prohibits Plaintiffs and

21  Class members from being present with their vehicles in most areas of the City day or

22  night and imposes a 9:00 p.m. curfew, Plaintiffs are restricted from exercising their

23  constitutional right under the Fourteenth Amendment to associate with family

24  members. This includes the exercise of child visitation rights and the ability to care

25  for siblings or parents who are elderly, ill, or disabled. Plaintiffs are unable to park

26  within any reasonable walking distance of a residence where close relatives and

27  family members may live. The time and place distance requirements set forth in the

28  New VHO pose exacerbated difficulties for Plaintiffs and Class members who have

disabilities and who may be unable to comply with these restrictions due to their own disabilities.

140.   Even more, the "anytime within 500 feet" New VHO language unconstitutionally violates the right to associate under the Fourteenth Amendment by restricting Plaintiffs and Class members from engaging in routine activities at or around school properties, such as picking up and/or dropping off children at school. Thus, the New VHO creates unnecessary obstacles for homeless children who reside in vehicles to attend school and related school functions.

141.   Defendant's onerous New VHO also violates Plaintiffs' and Class members' right to expressive association protected under the First Amendment. This right enables citizens to assemble or otherwise gather for church, monthly social meetings, educational workshops, community gatherings, and virtually anything that could reasonably be construed as protected permissible expressive associational activities presumably protected under the First Amendment. *See Santropietro v. Howell*, 857 F.3d 980, 989 (9th Cir. 2017) ("Association for the purpose of engaging in protected activity is itself protected by the First Amendment. '[I]mplicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'") (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244, 3252(1984)).

142.   As a result of Defendant's unconstitutional policies and practices in enforcing and threatening to enforce the New VHO, Plaintiffs and putative Class members are substantially prohibited from exercising their right to expressive association protected by the First Amendment, or to associate with others in the pursuit of political, social, economic, educational, religious, and cultural ends.

143.   As a result of Defendant's actions under color of law in violation of the Right to Association under the First Amendment and Fourteenth Amendment, Plaintiffs and Class members are unduly restricted from exercising their right to

familial and expressive association solely as a result of residing in their RVs or other vehicles. Plaintiffs have suffered and continue to endure emotional and mental distress as well as humiliation because of this violation of their rights. Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages including damages for emotional distress. Named Plaintiffs and putative Class members are also entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## NINTH CAUSE OF ACTION

**Violation of California Constitution - Rights to Due Process, Equal Protection, Freedom from Unreasonable Seizure of Property, and Freedom from Excessive Fines**
**(California Constitution Article I, § 7; Article I, § 13; Article I, § 17)**

144.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.   Defendant's policies and practices as herein stated violate the due process liberty interests and equal protection provisions of Article I, § 7 of the California Constitution.

146.   Defendant's policies and practices with respect to the New VHO and the nighttime RV parking ordinance as herein stated violate due process guarantees and protection against unreasonable seizures of property under Article I, § 13 of the California Constitution.

147.   Defendant's policies and practices with respect to the New VHO and the nighttime RV parking ordinance as herein stated violate the prohibition against imposition of excessive fines under Article I, § 17 of the California Constitution.

148.   Defendant's unlawful actions and the resulting injuries entitle Named Plaintiffs to compensatory damages, including damages for emotional distress. Named Plaintiffs and Class members are also entitled to injunctive and declaratory relief, destitution, and attorneys' fees and costs.

# **TENTH CAUSE OF ACTION**

## **Violation of Bane Act**
## **(California Civil Code § 52.1)**

149.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

150.   California Civil Code § 52.1, also known as the "Bane Act," provides a cause of action to individuals whose exercise or enjoyment of rights secured by the United States and/or California Constitutions and other laws has been interfered with, or attempted to be interfered with, by another's threat, intimidation, or coercion.

151.   By their conduct and actions as set forth herein, Defendant, through its agents and employees, has interfered with, has attempted to interfere with, and continues to attempt to interfere with, by threat, intimidation, and/or coercion, Plaintiffs' and Class members' exercise of their rights to be present on the public streets and parking locations in the areas of San Diego, as those rights are secured by the Eighth and Fourteenth Amendments to the United States Constitution and by the Constitution and laws of the State of California, including California Constitution Art. I, § 7, and the federal and state statutory protections guaranteed to individuals with disabilities. Defendant's actions, including citations, arrests, and punishments and the threat thereof, have criminalized conduct that is the involuntary result of Named Plaintiffs' and Class members' status, in violation of Plaintiffs' Constitutional rights.

152.   There was and is no lawful justification for Defendant to threaten, intimidate, or coerce any of the Named Plaintiffs and Class members, or to attempt to use threats, intimidation, or coercion as described herein to interfere with Plaintiffs' exercise of their rights. Defendant's actions were and are taken willfully and with malice and oppression in order to deter and/or prevent Named Plaintiffs and Class members from exercising their protected constitutional and statutory rights.

153.   Plaintiffs and Class members are entitled to injunctive relief and other

appropriate equitable relief to protect the peaceful exercise and enjoyment of Plaintiffs' and Class members' rights.

## ELEVENTH CAUSE OF ACTION

**Violation of Americans with Disabilities Act**
**(42 U.S.C. § 12132)**
**(On Behalf of Disability Subclass Members)**

154.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155.   Title II of the ADA, 42 U.S.C. § 12132, provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

156.   The Named Plaintiffs and Disability Subclass members are "qualified persons with disabilities" as defined under the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

157.   Under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does." *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F. 3d 168, 171 & n. 5 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations).

158.   The City's parking program including the enforcement by the Police Department of its parking ordinances and its restrictions on vehicle habitation is a service, program, or activity of the City.

159.   In addition, the various amenities of City life offered to its residents, including San Diego's parks, beaches and public events are "services, programs, or activities" of the City.

160.   Title II protects people with disabilities against facially neutral policies that burden people with disabilities more than others, by requiring that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental

1  alteration of the program. 28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagaw*, 81 F. 3d
2  1480 (9th Cir. 1996).

3      161.   Reasonable modifications can adjust for the financial limitations that
4  arise from a disability, not just the immediate manifestations of the impairment
5  giving rise to the disability. *Giebeler v. M & B Associates*, 343 F. 3d 1143, 1152 (9th
6  Cir. 2003).

7      162.   By refusing to reasonably modify its policies and practices as described
8  herein to allow Named Plaintiffs and Disability Subclass members to legally park
9  their vehicles on City streets or other public property and to utilize their vehicles for
10  shelter, at least until affordable, accessible and medically appropriate housing is
11  available for them, Defendant has violated and continues to violate the
12  antidiscrimination requirements of Title II of the ADA.

13      163.   Title II regulations interpreting the ADA prohibit a public entity from
14  utilizing criteria or methods of administration that have the effect of subjecting
15  qualified individuals with disabilities to discrimination based on disability. 29 C.F.R.
16  § 35.130(b)(3).

17      164.   A public entity is also prohibited from imposing eligibility criteria that
18  screen out or tend to screen out individuals with disabilities from fully and equally
19  enjoying any service, program, or activity. 28 C.F.R. § 35.130(b)(8).

20      165.   Defendant's policies and practices in administrating their parking
21  program through ticketing Disability Subclass members, impounding their RVs and
22  other vehicles and excluding homeless RV owners from the ability to obtain parking
23  permits available to people with physical addresses, and threatening them with arrest
24  and criminal prosecution for vehicle habitation, imposing a 9:00 p.m. curfew on
25  them, and excluding them from most areas of the City day or night, has the effect of
26  discriminating against and imposing disproportionate burdens on people with
27  disabilities based on disability, screening out such persons from the benefits of the

28

1   City's parking program, and denying them meaningful access to such benefits and to

2   the City's amenities enjoyed by and available to people without disabilities.

3       166.   In carrying out Defendant's policies and practices as described herein,

4   Defendant has utilized criteria or methods of administration that have the effect of

5   subjecting qualified individuals with disabilities to discrimination based on disability.

6   29 C.F.R. § 35.130(b)(3).

7       167.   In carrying out Defendant's policies and practices as herein described

8   and denying Plaintiffs' request for reasonable modification in violation of Plaintiffs'

9   rights under the ADA, Defendant has acted knowingly and with deliberate

10  indifference to the harm substantially likely to occur.

11      168.   As a result of Defendant's unlawful acts, Named Plaintiffs have suffered

12  and continue to suffer injuries, including emotional injuries, and are entitled to

13  compensatory damages, including damages for emotional distress. In addition,

14  Named Plaintiffs and Disability Subclass members are entitled to injunctive and

15  declaratory relief, restitution, and attorneys' fees and costs.

16                    **TWELFTH CAUSE OF ACTION**

17
18              **Violation of § 504 of the Rehabilitation Act of 1973**
                            **(29 U.S.C. § 794)**
19                **(On Behalf of Disability Subclass Members)**

20      169.   Plaintiffs hereby incorporate each and every allegation contained in the

21  foregoing paragraphs as if fully set forth herein.

22      170.   Defendant City of San Diego and the City's Police Department, are

23  recipients of financial assistance from the federal government.

24      171.   Section 504 of the Rehabilitation Act of 1973 requires that qualified

25  persons with disabilities be provided with meaningful access to federally funded

26  programs. In order to assure meaningful access, reasonable modifications may be

27  required unless the recipient of federal funding can demonstrate that such

28  modifications would result in a fundamental alteration in the nature of the program.

29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; Alexander v. Choate, 469 U.S. 287, 301 (1985).

172. Defendant's actions and omissions as herein stated have denied Plaintiffs' and Disability Subclass members' right to reasonable modifications thereby denying them meaningful access to Defendant's parking program and to the amenities that the City offers its residents without disabilities, and subjecting them to discrimination on the basis of disability, in violation of section 504 of the Rehabilitation Act.

173. As a result of Defendant's unlawful acts in violation of the Rehabilitation Act, Named Plaintiffs have suffered and continue to suffer injuries, including emotional injuries, and are entitled to compensatory damages, including damages for emotional distress. In addition, Named Plaintiffs and Disability Subclass members are entitled to injunctive and declaratory relief, restitution, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A. Declare that Defendant's past, present, and threatened future enforcement of the Original and New vehicle habitation ordinances and the nighttime RV parking ordinances, San Diego Muni. Code §§ 86.0137(f) and 86.0139(a), including its enforcement of San Diego Muni. Code § 86.0112(E) "Violation of Signs" for vehicle habitation and enforcement of California Penal Code § 647(e) against Named Plaintiffs and Class members, and Defendants' policy and practice of towing and impounding Plaintiffs' vehicles violates the right to be free from cruel and unusual punishment, the right to be free from excessive fines, the right to travel, the right of familial and expressive association, the right to freedom from unreasonable seizures of property, the right to procedural and substantive due process and equal protection of the laws;

B.     Declare that Defendant's past, present and threatened future enforcement of San Diego ordinances, San Diego Muni. Code §§ 86.0137(f), 86.0139(a), 86.0112(E), and California Penal Code § 647(e) against Named Plaintiffs and Disability Subclass members discriminates on the basis of disability in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794;

C.     Declare that San Diego's vehicle habitation ordinance, San Diego Muni. Code § 86.0137(a), is void for vagueness and unenforceable facially and/or as applied to Named Plaintiffs and Class members pursuant to the due process protections of the U.S. and California Constitutions and enforcement of § 86.0112(E) for vehicle habitation is similarly void;

D.     Issue a preliminary and permanent injunction, enjoining Defendant, their departments, officers, employees, assignees, successors, and agents from enforcing the above San Diego ordinances, San Diego Muni. Code §§ 86.0137(f), 86.0139(a), 86.0112(E), and California Penal Code § 647(e) against Named Plaintiffs and Class members through issuing of tickets, collecting unpaid fines associated with previous tickets issued under these ordinances, arresting Class members, or through impoundment of RVs or other vehicles for unpaid tickets, incident to an arrest for vehicle habitation or for other reasons without a warrant or providing proper notice and a meaningful opportunity to be heard, and further enjoining Defendant against ticketing, arrests, prosecutions or any threats of arrest or prosecution against Named Plaintiffs and Class members for vehicle habitation or for lodging in vehicles on public property, until such time that permanent, accessible, affordable housing is available to these individuals;

E.     Award restitution for fines and penalties that Defendant collected from Named Plaintiffs and Class members and for vehicles that were impounded pursuant to Defendant's policy and practice of towing and impounding vehicles without a warrant or an exception to the warrant requirement and without notice and/or a meaningful opportunity to be heard;

F.      Order Defendant to pay compensatory damages to Named Plaintiffs only pursuant to 42 U.S.C. § 1983 for the deprivation of Plaintiffs' constitutionally guaranteed rights, and for violation of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 19 U.S.C. § 794, including damages for emotional distress, and pain and suffering in an amount to be proven at trial;

G.      Award to Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a(a)(2)(b), Cal. Civ. Code § 52, and Cal. Civ. Proc. Code § 1021.5;

H.      Award to Plaintiffs costs of suit; and

I.      Order such other and further relief that the Court deems just and proper.

Dated:  May 1, 2020              **DISABILITY RIGHTS CALIFORNIA**

By:  */s/ Ann E. Menasche*
Ann E. Menasche, SB # 74774
Ann.menasche@disabilityrightsca.org
Nichole Marie Mendoza, SB # 276632
Nichole.Mendoza@disabilityrightsca.org
Lili Graham, SB# 284264
Lili.Graham@disabilityrightsca.org
530 B Street, Suite 400
San Diego, CA  92101
Telephone:  (619) 814-8524
Fax: (619) 239-7906

Michael A. Amon, SB # 226221
Amon@fr.com
Madelyn S. McCormick, SB # 320063
MMcCormick@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Fax: (858) 678-5099

Maria Foscarinis, DC SB # 397792
(Admitted Pro Hac Vice)
mfoscarinis@nlchp.org
NATIONAL LAW CENTER ON
HOMELESSNESS AND POVERTY
2000 M Street, NW, Suite 210
Washington, DC 20036
Telephone: (202) 638-2835 x 102
Fax: (202) 628-2737

Benjamin Conway, SB # 246410
ben.conway@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel St., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Fax: (213) 213-8001

Stuart Seaborn, SB # 198590
sseaborn@dralegal.org
Shira J. Tevah, SB # 307106
stevah@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor,
Berkeley, CA 94704
Telephone: (510) 665-8644/
Fax: (510) 665-8511

1    Robert Scott Dreher, SB #120527
2    scott@dreherlawfirm.com
     DREHER LAW FIRM
3    350 W. Ash, Ste. 101
     San Diego, CA 92101
4    Telephone: (619) 230-8828
5
6    Manfred P. Muecke, SB # 222893
     mmuecke@bffb.com
7    Patricia Syverson, SB # 203111
     psyverson@bffb.com
8    BONNETT FAIRBOURN FRIEDMAN &
     BALINT PC
9    600 West Broadway, #900
10   San Diego, CA 92101
     Telephone: (619) 798-4292
11   Fax:  (602) 274-1199
12
13   **ATTORNEYS FOR PLAINTIFFS**
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 1, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

Executed on May 1, 2020 at San Diego, California.


*/s/ Ann E. Menasche*
Ann E. Menasche