MARA W. ELLIOTT, City Attorney
GEORGE F. SCHAEFER, Assistant City Attorney
LILYS D. MCCOY, Deputy City Attorney
California State Bar No. 156918
     Office of the City Attorney
     1200 Third Avenue, Suite 1100
     San Diego, California 92101-4100
     Telephone: (619) 533-5800
     Facsimile: (619) 533-5856

Attorneys for Defendant CITY OF SAN DIEGO

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BLOOM, STEPHEN CHATZKY, TONY DIAZ, VALERIE GRISCHY, PENNY HELMS, BENJAMIN HERNANDEZ, DOUG HIGGINS, SUZONNE KEITH, DAVID WILSON, ANNA STARK, GERALD STARK, individually and on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>CITY OF SAN DIEGO,<br><br>          Defendants. | Case No.  17cv2324 AJB MSB<br><br>**DEFENDANT CITY OF SAN DIEGO'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br><br>Judge:  Hon. Anthony J. Battaglia<br>Courtroom: 4A (4th floor) |

17cv2324 AJB-MSB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………1

II.     RELEVANT PROCEDURAL AND FACTUAL BACKGROUND………..1

III.    PLAINTIFFS HAVE NOT MET THEIR BURDEN UNDER EITHER

THE TRADITIONAL OR SLIDING-SCALE TESTS……………………...4

     A. The new VHO and the Nighttime RV Ordinance are Constitutional…….4

     B. The new VHO Was Enacted to Curb the Problematic Aspects of
Vehicle Habitation, Not Punish Homelessness, and an Order Restraining
the Enforcement of the new VHO Would Not Be in the Public Interest…….8

     C. The Safe Lots Provide a Reasonable Alternative to the Plaintiffs and
        Plaintiffs Have Not Established that The Lots Cannot Accommodate
        Them………………………………………………………………10

     D. The Request to Compel the City to Open Public Parking Lots
        Will  Force the City to Violate County Health Orders…………………12

IV.    CONCLUSION…………………………………………………………..14

# TABLE OF AUTHORITIES

**Cases**

Alliance for Wild Rockies v. Cottrell,
    632 F3d 1127, 1131 (9th Cir. 2011).................................................................10

American Passage Media Corp. v. Cass Communications, Inc.,
    750 F.2d 1470, 1473 (9th Cir. 1985)...............................................................11

Amoco Production Co. v. Gambell,
    480 U.S. 531 542 (1987)....................................................................................8

Caribbean Marine Services Co., Inc. v. Baldrige,
    844 F.2d at 677...................................................................................................8

City of Los Angeles v. Lyons,
    461 U.S. 95, 102 (1983)...................................................................................10

Dahl v. HEM Pharmaceuticals Corp.,
    7 F. 3d 1399, 1403 (9th Cir. 1993).................................................................14

Garcia v. Google, Inc.,
    786 F.3d 733, 740 (9th Cir. 2015).....................................................................4

Henschen v. City of Houston,
    959 F.2d 584, 588 (5th Cir.1992).......................................................................9

Id. at 24 ..................................................................................................................8

In re Estate of Ferdinand Marcos Human Rights Litig.,
    94 F. 3d 539, 545 (9th Cir. 1996)...................................................................13

Joyce v. City and County of San Francisco,
    846 F. Supp. 843, 850 (N.D. Cal. 1994) .......................................................12

League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton,
    752 F3d 755, 766 (9th Cir. 2014)......................................................................8

Machete Productions, L.L.C. v. Page,
    809 F.3d 281, 288 (5th Cir. 2015).....................................................................9

Maryland v. King,
    567 U.S. 1301, 133 S. Ct. 1, 3 (2012) .........................................................1, 8

Mazurek v. Armstrong,
    520 U.S. 968, 972 (1997) ..................................................................................1

Munns v. Kerry,
    782 F3d 402, 411 (9th Cir. 2015).....................................................................10

Network Corp. v. Federal Communications Commission,
    653 F. 3d 771, 776 (9th Cir. 2011).....................................................................4

Rizzo v. Goode,
    423 U.S. 362, 379 (1976)....................................................................................8

Robinswood Community Club v. Volpe,
    506 F. 2d 1366, 1368 (9th Cir. 1974)................................................................5

Rodriguez v. Dzurenda,
    2018 WL 7822062 (D. Nevada Dec. 17, 2018) ............................................10

Schmidt v. Lessard,
  414 U.S. 473, 476 (1974) ................................................................................ 12

Sid Berk, Inc. v. Uniroyal, Inc.,
  425 F. Supp. at 29 .......................................................................................... 5

Towery v. Brewer,
  672 F. 3d 650, 657 (9th Cir. 2012)................................................................. 4

United States v. First Nat'l City Bank,
  379 U.S. 378, 383 (1965) ............................................................................... 8

VIP of Berlin, LLC v. Town of Berlin,
  593 F.3d 179, 185-186 (2nd Cir. 2010) ........................................................ 9

Weinberger v. Barcelo,
  456 U.S. 305, 312-313 (1982)........................................................................ 8

Winter v. Natural Resources Defense Council, Inc.,
  555 U.S. at 20 ................................................................................................. 8

Winter v. Natural Resources Defense Council, Inc.,
  555 U.S. 7, 22, (2008) ............................................................................... 1, 4

Winter v. Natural Resources Defense Council, Inc.,
  supra, 555 U.S. at 22 ................................................................................... 10

**Statutes**

SDMC § 86.0137 ................................................................................................ 6

**Other Authorities**

Nighttime RV Ordinance ................................................................................... 4

Old Vehicle Habitation Ordinance ................................................................... 6

Oversized Vehicle Ordinance ("OVO") ................................................... 1, 5, 6, 7

Vehicle Habitation Ordinance ("VHO") .................................................. 2, 5, 9

**Rules**

Fed. R. Civ. P. 65(d)(B)-(C) .......................................................................... 12

Federal Rule of Civil Procedure 65, subdivision (d) ...................................... 13

## I.    <u>INTRODUCTION</u>

Plaintiffs' Emergency Motion for a Temporary Restraining Order fails to meet the extremely high burden required for this extraordinary remedy, one that would impact the health and safety of all San Diego residents. Plaintiffs' requests, which include a mandatory injunction to open beach parking lots in contravention of County Health Department mandates, would work a form of irreparable injury by enjoining an ordinance enacted by representatives of the people. See, *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012). This ordinance, whose purpose is to ensure the health and safety of all citizens, would be enjoined at a time when City resources are consumed with responding to a public health emergency. Moreover, Plaintiffs' motion is moot in light of the extensive efforts already in place by the City of San Diego to create an unprecedented level of services and protection during the SARS-CoV-2 pandemic. See, *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (the "clear showing" requirement is particularly strong when a party seeks a TRO, referring the rule in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, (2008) that a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") For these reasons, Plaintiffs' motion should be denied.

## II.    <u>RELEVANT PROCEDURAL AND FACTUAL BACKGROUND</u>

The City of San Diego (the "City") continues to respond to the needs of homeless individuals by providing social services, expanding alternative shelter and safe lot options, and promoting the development of affordable housing. The City is simultaneously working to meet its obligation to maintain public health and respond to safety concerns created by the unregulated, widespread, long-term habitation in vehicles, along with the dangers posed by the extended parking of oversized vehicles in certain areas. The City enacted the Oversized Vehicle Ordinance ("OVO") to mitigate the dangers large vehicles pose to pedestrians and drivers who cannot see around them, among other issues. The City enacted the

1

Vehicle Habitation Ordinance ("VHO") to maintain safe and sanitary neighborhoods for all individuals, including the homeless population.

The City has expanded services for homeless individuals, generally, and in particular, for homeless individuals residing in vehicles, including in the two years since this lawsuit was filed. As more fully detailed in Defendant's Opposition to the Plaintiffs' Motion to File a Second Amended Complaint, which is already on file with this Court, the City funds three centrally located safe parking lots with supportive services such as food assistance, employment development, emergency support, benefits access, and asset building. (See ECF #103-3, Marni von Wilpert's Decl. in Support of City's Opp'n. to Plaintiffs' Mot. for Leave to File a Second Am. Compl., Ex. B ("von-Wilpert Decl.")). The safe parking program is run by social services experts at JFS who possess the education, training, and experience to help the unhoused.

Since the new vehicle habitation ordinance was enacted as an emergency ordinance on May 14, 2019, the San Diego Police Department (SDPD) has maintained a posture of education and referral to services, rather than aggressive enforcement. SDPD has adopted a progressive enforcement model to provide warnings and education to various groups of individuals who may be contacted for vehicle habitation on city streets, including tourists, campers, and people experiencing homelessness. In addition, on August 22, 2019, the City's Treasurer's Office and City Attorney's Office partnered with the San Diego County Public Defender to expand the City's Clean License Plates Program (Clean Plates) and low-income payment program for parking tickets to provide additional options and relief to a greater number of homeless individuals. (See ECF #103-5, von-Wilpert Decl., Ex. D; see also, ECF #103-16, DeeDee Alari's Decl. in Support of City's Opp'n. to Plaintiffs' Mot. for Leave to File a Second Am. Compl., Ex. A (Alari's Decl.)).

///

1    In the wake of the SARS-CoV-2 pandemic, City employees have worked
2  long hours to provide medical care, social services, hygiene, sanitation, and
3  physical distancing to those experiencing homelessness. In addition to the Safe
4  Lots, the City has joined forces with the County of San Diego, the Regional Task
5  Force on the Homeless and San Diego Housing Commission came together to
6  establish a Homeless Operations Branch under the City's Emergency Operations
7  Center (EOC) to coordinate the needs, resources and logistics of homeless service
8  operations. See, https://www.sandiego.gov/coronavirus/homelessness. Recognizing
9  that traditional shelters would not allow for sufficient social distancing, the City of
10  San Diego opened Golden Hall and then the Convention Center to allow for
11  physical distancing according to CDC guidelines. In this Homeless to Home
12  Program, clients are provided food, sanitation, access to healthcare, and testing for
13  Coronavirus infection, and immediate isolation and medical attention if an
14  individual tests positive. See, Declaration of Lilys McCoy, and Exhibits thereto.

15    But, contrary to the implications in the Plaintiffs' Motion, the City is not
16  forcing those who live in their cars into congregate shelters. Instead, the City has
17  empowered its safe lot service provider to move its Mission Valley Safe Lot to the
18  SDCCC Stadium parking lot to increase capacity and distancing. See, Declaration
19  of Sarah Jarman and Exhibit 1 attached thereto. Since the state of emergency was
20  declared, JFS has also increased the amount and type of services provided. Cars are
21  to park a minimum of one space apart; clients have 24/7 access to two of the three
22  safe lots and can come and go as needed. In addition, people who avail themselves
23  of the safe lots are provided three meals each day, bathrooms, showers,
24  handwashing stations, free face coverings, bags of canned food and non-perishable
25  items, hand-sanitizer, bottled water for each family member, bottled water for pets,
26  daily check-ins to screen for symptoms, support in connecting with healthcare
27  providers, and isolation areas for anyone experiencing Covid-19 symptoms. See,
28  Declaration of Sarah Jarman and Exhibit 1 attached thereto. Staff are following

social distancing requirements at all times use face coverings. And, as of May 1, cloth face coverings were given to all clients with the requirement that they be worn when outside their vehicles[1]. And the services are regularly calibrated and augmented to keep pace with this fast-moving and oft-changing public emergency. As an example of this, JFS is currently evaluating how to provide clients with internet service at all three of its City funded locations before the end of May. See, Declaration of Sarah Jarman and Exhibit 1 attached thereto.

### III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN UNDER EITHER THE TRADITIONAL OR SLIDING-SCALE TESTS

Plaintiffs must show four elements: that that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008). Plaintiffs have argued that they are entitled to a sliding-scale approach to the factors elucidated in *Winter.* But, even with the sliding scale approach, plaintiffs must carry their burden of persuasion via a ***clear showing*** on ***each element***. *Towery v. Brewer,* 672 F. 3d 650, 657 (9th Cir. 2012)*; See, also, Network Corp. v. Federal Communications Commission,* 653 F. 3d 771, 776 (9th Cir. 2011). Under both the traditional rubric, and the sliding-scale approach, Plaintiffs' Motion fails to meet the exacting standard of an emergency TRO.

### A.   The new VHO and the Nighttime RV Ordinance are Constitutional

The Ninth Circuit has held that "[th]e first factor under Winter is the most important – likely success on the merits."  *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015). A party seeking a preliminary injunction must "demonstrate a

---

[1] Plaintiffs refer to the safe lots using quotation marks to imply that the lots are not safe, but the safe lots have hundreds of clients, some in family groups, each week who are safely taking advantage of these services. Such characterization borders on being disrespectful to the thoughtful and dedicated social services professionals who work daily to help those looking for services at those lots.

strong likelihood or reasonable certainty that it will prevail on the merits."
*Robinswood Community Club v. Volpe*, 506 F. 2d 1366, 1368 (9th Cir. 1974). "The
existence of any debate or doubts on the record as to the merits of the claim or the
power of the court to act will ordinarily bar the granting of a preliminary
injunction." *Sid Berk, Inc. v. Uniroyal, Inc.*, 425 F. Supp. at 29 (emphasis added).
With a strong health and safety legislative purpose behind the new VHO and the
OVO, and with the safe lots program as a reasonable accommodation, Plaintiffs
cannot meet their burden of showing they have a strong likelihood or reasonable
certainty that they will prevail on the merits.

The City immediately ceased enforcement of its original vehicle habitation
ordinance after this Court issued its preliminary injunction on August 21, 2018.
(See, ECF #44.) The San Diego City Council repealed its original vehicle habitation
ordinance on February 25, 2019. In the ensuing months after the repeal, the City
was flooded with phone calls, emails, pictures and videos from San Diego residents
concerned about the public health and safety effects of the repeal. (See ECF #103-
12, Robert A. Vacchi's Decl. in Support of City's Opp'n. to Plaintiffs' Mot. for
Leave to File a Second Am. Compl., Ex. B, p. 3 (Vacchi Decl.). In some cases, the
City received reports of new "Van-BnB" listings that emerged, advertising to
tourists who want to visit San Diego and avoid renting hotel rooms by instead
renting out vans or RVs to sleep on city streets overnight – often in residential
neighborhoods. In other cases, the City received reports of an influx in individuals
pursuing the "van-life movement," which appears to appeal to young adults living
in converted vehicles such as ambulances and school buses outfitted for habitation,
travel, and recreation.  Indeed, the Instagram Account for the "#Vanlife Movement"
had over 4.8 million posts at that time, including some titled "Van Life Guide to
San Diego" that advertised San Diego as a prime location for van-life visitors
wishing to park and live in converted vehicles on city streets. (See ECF #103-12,
Vacchi Decl., Ex. B.)  Unfortunately, as this was occurring the City received

1  increasing reports that some people living in vehicles were urinating and defecating

2  on sidewalks and accumulating trash (since most vehicles do not have bathrooms

3  and trash receptacles). (See ECF #10312, Vacchi Decl., Ex. B). Some individuals

4  living in vehicles were causing excessive and persistent noise, leaving trash and

5  human waste around the vehicles, blocking portions of streets and sidewalks with

6  temporary furnishings and personal items, and crowding out parking for residents

7  and businesses. (See ECF #103-11, Vacchi Decl., Ex. A). Calls to the City for

8  service to address incidents related to vehicle habitation rose significantly after the

9  repeal. (See ECF #103-12, Vacchi Decl., Ex. B).

10        To address these parking, health, and safety issues that arose in the months

11  after the repeal, the City Council enacted a new and significantly different vehicle

12  habitation ordinance as an emergency ordinance on May 14, 2019. To comply with

13  the Court's order (ECF #44), the City amended the Old Vehicle Habitation

14  Ordinance to provide clear direction in its enforcement and sufficient notice to San

15  Diego citizens. San Diego Municipal Code Section 86.0137 now defines evidence

16  of human habitation, the time of enforcement, and areas where vehicles cannot be

17  inhabited during all hours of the day. These definitions provide sufficient notice and

18  ensure adequate due process to San Diego citizens.  The legislative purpose behind

19  the new VHO is to "balanc[e] the needs of those individuals who inhabit their

20  vehicles and the needs of all City residents, businesses, and visitors for clean,

21  healthy, and safe public areas." See, page 4, Recitals, Ordinance 21071 dated May

22  14, 2019. In addition, the City specifically stated that its intent was not to prosecute

23  or regulate homelessness. See, *Id.*, page 3. Declaration of Lilys McCoy, page 2,

24  paragraph 6 and exhibit referenced therein.

25        In enacting amendments to the OVO in 2016, the legislative history stated

26  that the City's goals or objectives in passing the ordinance is to protect lives,

27  property and the environment and reduce and prevent crime.  (Council Action

28

Executive Summary Sheet, dated March 24, 2016; Exhibit 3, at p. 2.) It was noted that:

> The regulations set forth in this ordinance significantly enhance the safety and livability of San Diego's neighborhoods. The unregulated parking of oversized vehicles, non-motorized vehicles, and recreational vehicles on public streets and in public parking lots detracts from a healthy and safe environment by causing the deterioration of air quality, safety, tranquility, aesthetics and other similar values.
>
> Certain neighborhoods and areas of the City do not have sufficient on or off-street space to accommodate the convenient parking of oversized vehicles, non-motorized vehicles, and recreational vehicles. Residents are adversely affected by transient populations who park these types of vehicles overnight in residential neighborhoods. The parking of such vehicles, especially by non-residents, creates serious adverse effects in many areas and neighborhoods of the City of San Diego.

(Council Action Executive Summary Sheet, dated March 24, 2016; Exhibit 3 to ECF 31, at p. 3, previously filed with this Court.)  Further, in October 2012, when bringing this issue to the attention of the City Council's Land Use and Housing Committee, then Council President Pro Tem, and current Mayor, Kevin Faulconer, stated that community groups and citizens had contacted his office to complain of illegally parked oversized vehicles. (Memorandum Council President Pro Tem Kevin L. Faulconer, dated October 2, 2012, Exhibit 4, at p. 1 of ECF 31.)

Moreover, when the City Council passed the 2016 amendments to the OVO, citizens supported it. Many sent emails to their elected officials urging support and expressed concern about crime, safety, littering, and the discharge of gray and black water (wastewater) from these vehicles into storm drains or along the curb line of City streets. (See, *e.g.*, SB343 Emails, Exhibit 2 to ECF 31.)

///

///

///

7

**B. <u>The new VHO Was Enacted to Curb the Problematic Aspects of Vehicle Habitation, Not Punish Homelessness, and an Order Restraining the Enforcement of the new VHO Would Not Be in the Public Interest</u>**

A party seeking a preliminary injunction must also demonstrate that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. at 20. "'In exercising their sound discretion, courts of equity should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."'" Id. at 24 (quoting *Amoco Production Co. v. Gambell*, 480 U.S. 531 542 (1987)). If the injunction goes beyond the parties, carrying with it a potential for public consequences, the "public interest" becomes relevant to whether an injunction should issue. *United States v. First Nat'l City Bank*, 379 U.S. 378, 383 (1965). The "district court must always consider whether the public interest would be advanced or impaired by issuance of an injunction in any action in which the public interest is affected." *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d at 677. Where the public interest is involved, the district court must decide whether the public interest favors the plaintiff, and where the public interest will be adversely affected, the court may deny relief, even where there may be a burden placed on the plaintiff. *Weinberger v. Barcelo*, 456 U.S. 305, 312-313 (1982). The Supreme Court, in evaluating a case where the plaintiffs sought an injunction against a city, its mayor and other city and police officials, stated that "principles of equity . . . militate heavily against the grant of an injunction except in the most extraordinary circumstances." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976)).

The City contends that such a heightened standard is appropriate here where the moving parties seek to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme. See, *Maryland v. King*, 567 U.S. 1301, 1302-1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." [Internal quotes omitted].); see, also, *League of Wilderness Defenders/Blue*

1  *Mountains Biodiversity Project v. Connaughton,* 752 F3d 755, 766 (9th Cir. 2014)

2  (public interest element "deserves separate attention in cases where the public

3  interest may be affected"); see, also, *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d

4  179, 185-186 (2nd Cir. 2010) ("Where a party seeks a preliminary injunction that

5  challenges 'government action taken in the public interest pursuant to a statutory or

6  regulatory scheme' and that would 'alter, rather than maintain, the status quo,' the

7  moving party must demonstrate irreparable harm and a 'clear' or 'substantial'

8  likelihood of success on the merits"); *Machete Productions, L.L.C. v. Page*, 809

9  F.3d 281, 288 (5th Cir. 2015) ("[E]specially where governmental action is

10 involved, courts should not intervene unless the need for equitable relief is clear,

11 not remote or speculative" (quoting *Henschen v. City of Houston*, 959 F.2d 584,

12 588 (5th Cir.1992)).

13      As evidenced in the Declaration of Captain Scott Wahl, the unintended

14 consequences that accompany vehicle habitation remain a legitimate concern during

15 the pandemic. See, Declaration of Captain Scott Wahl, paragraph 2. And while the

16 City is not suggesting that any of the named plaintiffs would comport themselves in

17 this manner, the problematic aspects of vehicle habitation cannot be ignored. The

18 newly tailored Vehicle Habitation Ordinance, with its reasonable time, place, and

19 manner limitations, and its progressive, services-based enforcement, provides front-

20 line officers a mechanism to curb the problematic aspects of vehicle habitation

21 while also helping those living out of their cars find useful services.

22      Moreover, from the inception of the new VHO, the City has used a progressive

23 enforcement model to encourage individuals to access the safe lots where they can

24 access services. On April 10, the San Diego Police Department issued a directive to

25 its officers not to impound vehicles that are being used for habitation during the

26 crisis. The directive emphasized that officers should refer the occupants of the

27 vehicle to the City's Safe Parking Lot Program. See, Declaration of Lilys McCoy,

28 paragraph 5, and Exhibit 2 referenced therein. Plaintiffs cannot qualify for a

temporary restraining order based on past alleged wrongs; they must show a real and immediate threat that they will be wronged again. See, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief …"); See, also, *Munns v. Kerry*, 782 F3d 402, 411 (9th Cir. 2015).

**C.** **The Safe Lots Provide a Reasonable Alternative to the Plaintiffs and Plaintiffs Have Not Established that The Lots Cannot Accommodate Them**

The Declaration of Plaintiffs' own expert Lara Elizabeth Frye, M.D. (ECF 135-4) states in at page 20, paragraph 37 "Congregate parking lots could be a reasonable option for some people living in vehicles to weather the pandemic under certain conditions . . ." The May 2020 report from the City's contractor, attached to the Declaration of Sarah Jarman as Exhibit 1, affirms that the safe lots are the "reasonable option" that Dr. Frye writes about. As described above and in Exhibit 1 attached to the Declaration of Sarah Jarman, the City has worked with its Safe Lots contractor, Jewish Family Services, to provide more space and more services to those living in their vehicles.

The declarations from the Plaintiffs do not state that they have tried to avail themselves of the safe lots or their services. Their averments focus on why the safe lots *could* be hazardous, without providing proof that they *are* hazardous. A preliminary injunction may not be granted based on a "possibility" of irreparable harm, even if plaintiff demonstrates a strong likelihood of prevailing on the merits. Again, this is because injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc., supra,* 555 U.S. at 22; *Alliance for Wild Rockies v. Cottrell*, 632 F3d 1127, 1131 (9th Cir. 2011); *Rodriguez v. Dzurenda,* 2018 WL 7822062 (D. Nevada Dec. 17, 2018*)* (the four *Winter* elements must be met). In his Declaration at page 6, paragraphs 10-11, Doc. 135-9, Mr.

1   Walsh only says that he "looked into" the lots, without providing specifics of
2   whether he spoke to the social services professionals who have dedicated their
3   careers to helping individuals such as him. In addition, Mr. Walsh speaks of his
4   "fears" surrounding the safe lots without pointing to specific facts. *Id.* Mr.
5   Chatzky's Declaration (EFC 135-7) is similarly speculative. In paragraph 6, page 5,
6   Mr. Chatzky reports being "fearful" and having to "worry" about catching Covid-
7   19 at the safe lots without pointing to a factual basis for his concerns. His fears,
8   while sympathetic, are not sufficient to support a motion for a temporary restraining
9   order. In a similar vein, the declarations do not identify the locations or events
10  leading up to the interactions with the police, thereby leaving to conjecture whether
11  there were extenuating circumstances. See, *e.g.,* Hayward Dec., page 4, para. 5,
12  Doc. 135-8. While these anecdotes might support a lower standard in support of a
13  different motion, they do not have the weight necessary to support the extraordinary
14  relief sought in this Motion. See, *e.g., American Passage Media Corp. v. Cass*
15  *Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (conclusory allegations
16  and affidavits are insufficient to show irreparable harm).

17        As with the percipient declarations, the declarations by Dr. Frye and
18  Physician's Assistant Brett Feldman are based on insufficient facts or data to
19  support the conclusions they reach. Dr. Frye lives in Atlanta. There is nothing in
20  her declaration to indicate that she has personally observed the San Diego safe lots
21  or that she has observed safe lots similar to those run by the City of San Diego. The
22  same holds true for Mr. Feldman, who is from Los Angeles. Both base their
23  opinions about Plaintiffs' need to shelter in vehicles parked on San Diego streets
24  and public thoroughfares on the Plaintiffs' declarations without having been made
25  aware of the countervailing health and safety issues created by some who live in
26  their vehicles. Only Mr. Feldman spoke to one of the Plaintiffs and neither Mr.
27  Feldman nor Dr. Frye aver that they examined any of the plaintiffs or read their
28

medical records. And, indeed, Dr. Frye agreed that safe lots could be a reasonable alternative. See, Frye Declaration, paragraph 37.

**D. <u>The Request to Compel the City to Open Public Parking Lots Will Force the City to Violate County Health Orders</u>**

"[A]n additional consideration affecting the Court's determination to grant injunctive relief is whether or not the terms of the injunction can be stated with sufficient clarity to permit the injunction to be fairly enforced." *Joyce v. City and County of San Francisco*, 846 F. Supp. 843, 850 (N.D. Cal. 1994). Federal Rule of Civil Procedure 65(d) states that "[e]very order granting an injunction and every restraining order must . . . (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(B)-(C).  This mandate is designed "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.... [B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The Plaintiffs seek a mandatory injunction to reopen public parking lots, bathrooms and RV waste disposal stations to people sheltering in vehicles, to take "sufficient steps" to inform the public that bathrooms and waste disposal stations are open, and to properly maintain those facilities. This request, while it does not mention the beach areas, is referencing the public parks and restroom facilities near the beach. See, e.g., Declaration of David Wilson, page 5, para. 7; see, also, Declaration of Doug Higgins, page 4, para. 3. The City, however, is bound by the edicts of the County Department of Health, which has issued a series of health mandates during the COVID-19 health emergency containing a directive that "all parking lots at public beaches shall be closed." See, paragraph 13 of the Order of the Health Officer and Emergency Regulations dated May 1, which is the latest

version of this order (an earlier version also prohibited use of beach parking lots). The Governor of California has also closed certain beaches and threatened a statewide beach closure as a response to COVID-19. Thus, any injunction by this Court to force the City to open its Beach parking lots would be unenforceable. But, courts refrain from issuing unenforceable injunctions. See, *In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F. 3d 539, 545 (9th Cir. 1996). Moreover, Plaintiffs do not cure this defect by including the language "to the fullest extent of Defendant's authority and in cooperation with San Diego County." In addition, the Plaintiffs have asked to open "all public parking lots" without limitation or distinction. Furthermore, the phrase "sufficient steps" also lacks the specificity and reasonable detail required by Federal Rule of Civil Procedure 65, subdivision (d).

Furthermore, the City has been responsive—not indifferent—to Plaintiffs' concerns about access to grey-water disposal and beach bathrooms for those living in Recreational Vehicles (RVs). First, the City arranged to have the Mission Bay Park grey-water disposal closest to the freeway opened. Then, the bathroom at De Anza Cove, near the grey-water station, and one on Mission Blvd. were identified as particularly useful because they had showers. These bathrooms were open, but Plaintiffs expressed concern that they were not easily accessible from the right-of-way. Accordingly, provisions were made to allow for access from the right-of-way to these bathrooms. See, Declaration of Andrew Field, page 2, paragraph 4; see, also, Declaration of Lilys McCoy, paragraph 3. Plaintiffs have protested those efforts citing k-rail, police tape and guards as off-putting. But those precautions were not to discourage people, especially those in dire need, from accessing the bathrooms. Rather, those barriers were erected around parks and beach areas to ensure compliance with State and County Health Orders prohibiting ***congregating*** in recreational areas—again, ***not*** to discourage people from using the unlocked and maintained bathrooms. See, Declaration of Andrew Field, page 2, paragraph 5;

Declaration of Lilys McCoy, paragraph 4. Furthermore, the City of San Diego has not closed public restrooms during the pandemic, with the exception of those situations where the bathrooms had been vandalized or required repair. See, Declaration of Andrew Field, page 2, paragraph 6; see also Declaration of Lilys McCoy, paragraph 2. In addition, the City has never stopped maintaining or cleaning its public restrooms. See, Declaration of Andrew Field, page 2, paragraph 6; see, also, Declaration of Lilys McCoy, paragraph 4.

As of May 6, 2020, people were using the greywater dump at Mission Bay, as well as at least one bathroom with shower facilities near the right-of-way. See, Declaration of Jessica LaScola, and photographs attached thereto.

Mandatory injunctive relief is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party. *Dahl v. HEM Pharmaceuticals Corp.*, 7 F. 3d 1399, 1403 (9th Cir. 1993); *Garcia v. Google, Inc.*, 786 F3d 733, 740 (9th Cir. 2015). The request for mandatory injunctive relief to force the City to open the beach parking lots in violation of County Health Orders does not meet the level of heightened scrutiny, nor is it necessary.

### IV.   CONCLUSION

The City of San Diego has an interest in protecting the entire community of San Diego from the spread of SARS-CoV-2, not just those experiencing homelessness. To effectuate that interest, the Mayor declared that San Diego City Employees are Disaster Service Workers (see Mayor's Executive Order 2020-2, paragraph 3[2]), and the employees of the City of San Diego have taken that declaration seriously, doing remarkable and unprecedented work. A substantial amount of that work has included creating safe and viable options for those who are unhoused, including expanding opportunities for those forced to shelter in their cars and RVs. See, Declarations of Scott Wahl and Sarah Jarman. The Plaintiffs' accusation of

---

[2] See, https://www.sandiego.gov/sites/default/files/mkf_executive_order_2020-2-3-30-2020_1.pdf

deliberate indifference is simply untrue. For all the reasons state above, Plaintiffs have failed to prove that the requested temporary restraining order is necessary, and the City respectfully requests that the Court deny Plaintiffs' Motion.

Dated: May 7, 2020                    MARA W. ELLIOTT, City Attorney


                                      By  *s/Lilys D. McCoy*
                                          Lilys D. McCoy
                                          Deputy City Attorney

                                      Attorneys for Defendant
                                      CITY OF SAN DIEGO
                                      Email: lmccoy@sandiego.gov